# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Petitioner,** | |
| **v.** | **Case No. 1:22-mc-54 (RJL/GMH)** |
| **MATCH GROUP, INC.,** | |
| **Respondent.** | |

## MEMORANDUM OPINION AND ORDER

In March 2020, the Federal Trade Commission ("FTC" or "Petitioner") issued a civil investigative demand (the "March 2020 CID") to Match Group, Inc. ("Respondent" or "Match"). That CID was part of a non-public investigation spurred by a 2019 New York Times article suggesting a relationship between a start-up developing facial recognition technology and OkCupid, a dating site owned by Respondent, that involved the start-up accessing and using images from the dating site to help build its product.[1]  The parties wrangled over the March 2020 CID for more than two years until, in May 2022, Petitioner filed this action to enforce the administrative subpoena, seeking production of 136 documents that Match has withheld on the basis of attorney-client privilege or work product protection.  This litigation has proved as contentious as the administrative proceedings, with Match not only resisting production of those documents, but also decrying as bad faith conduct the FTC's litigation tactics, including its refusal to agree to seal this case.  This decision does not discuss whether the withheld documents are protected from disclosure—that is a dispute for another day.  Instead, it addresses Match's motion to keep the bulk of

---

[1] Respondent explains that it—that is, Match Group, Inc.—is a holding company with no independent employees. ECF No. 17-2, ¶ 2.  Match Group LLC, a subsidiary of the holding company, provides services to other subsidiaries, including Humor Rainbow, Inc., which owns and operates the OkCupid brand.  *Id.*

the record of these proceedings under seal until the Court rules on the FTC's petition (the "Primary Motion to Seal") and Match's motion for leave to take discovery to unearth evidence that the FTC filed this enforcement action for an improper purpose (the "Motion for Discovery").[2]  For the reasons that follow, both motions are denied.

---

[2] Documents marked with an asterisk in the following list of the documents most relevant to the resolution of these motions are currently sealed:  (1) Respondent's Motion to Seal, which seeks to maintain certain sealed documents under seal and to seal all future filings (a.k.a. the Primary Motion to Seal) (ECF No. 15 and its attachments)*; (2) the FTC's Opposition to the Primary Motion to Seal (ECF No. 16 and its attachments); (3) Respondent's Reply in further support of the Primary Motion to Seal ("Primary Motion to Seal Reply") (ECF No. 18-1)*; (4) Respondent's Motion for Limited Discovery Regarding FTC's Abuse of Process and to Supplement the Record (a.k.a., the Motion for Discovery) (ECF Nos. 20-1, 20-2)*; (5) the FTC's Opposition to Match's Motion for Discovery (ECF No. 26 and its attachments); and (6) Respondent's Reply in further support of its Motion for Discovery ("Motion for Discovery Reply") (ECF Nos. 28-1 through 28-13)*.

In addition, Match has filed subsidiary motions to seal its filings and the FTC has opposed those motions. Again, documents marked with an asterisk in the following lists are currently sealed.  The papers related to the subsidiary motions to seal the Motion to Seal are ECF Nos. 18 (Respondent's Motion to Seal the Primary Motion to Seal Reply (the "Motion to Seal ECF No. 18-1"))*, 21 (the FTC's Opposition to the Motion to Seal ECF No. 18-1), 22-1 (Respondent's Reply in support of the Motion to Seal ECF No. 18-1)*, 22 (Respondent's Motion to Seal the Reply in support of the Motion to Seal ECF No. 18-1 (the "Motion to Seal ECF No. 22-1"))*, 25 (the FTC's Opposition to the Motion to Seal ECF No. 22-1), 27-1 (Respondent's Reply to the Motion to Seal ECF No. 22-1)*, and 27 (Respondent's Motion to Seal the Reply to the Motion to Seal ECF No. 22-1 ("the Motion to Seal ECF No. 27-1"))*, 29 (the FTC's Opposition to the Motion to Seal ECF No. 27-1), 30-1 (Respondent's Reply in support of the Motion to Seal ECF No. 27-1)*, ECF No. 30 (Respondent's Motion to Seal the Reply in support of the Motion to Seal ECF No. 27-1 (the "Motion to Seal ECF No. 30-1"))*, 31 (the FTC's Opposition to the Motion to Seal ECF No. 30-1).

The papers related to the subsidiary motions to seal the Motion for Discovery are ECF Nos. 20 (Respondent's Motion to Seal the Motion for Discovery)*, 25 (the FTC's Opposition to the Motion to Seal the Motion for Discovery), 28-1 (Respondent's Reply to the Motion to Seal the Motion for Discovery)*, 28 (Respondent's Motion to Seal the Reply to the Motion to Seal the Motion for Discovery (the "Motion to Seal ECF No. 28-1"))*, 29 (the FTC's Opposition to the Motion to Seal ECF No. 28-1), 30-1 (Respondent's Reply to the Motion to Seal ECF No. 28-1)*, 30 (Respondent's Motion to Seal the Reply in support of the Motion to Seal ECF No. 28-1 ("Motion to Seal ECF No. 30-1"))*, and 31 (the FTC's Opposition to the Motion to Seal ECF No. 30-1).

There are also subsidiary motions to seal briefing associated with the Petition.  Those are ECF Nos. 17 (Respondent's Motion to Seal the Opposition to the Petition)*, 21 (the FTC's Opposition to the Motion to Seal the Petition), 23 (Respondent's Motion to Seal its Motion for Leave to File a Surreply)*.  None of Respondent's subsidiary motions to seal includes a substantive argument; each relies on the arguments in Respondent's Primary Motion to Seal and asks that the documents remain sealed only until the Primary Motion to Seal is resolved.  *See* ECF Nos. 17, 18, 20, 22, 23, 27, 28, 30; *see also generally* ECF No. 22-1 (stating that Respondent's arguments in favor of its subsidiary motions to seal are articulated in the Primary Motion to Seal).  At this point, the vast majority of Match's filings are temporarily under seal pending resolution of the Primary Motion to Seal.  Because the Primary Motion to Seal is denied, all subsidiary motions to seal are also denied.

## I.    BACKGROUND

On July 13, 2019, the New York Times published an article about the use of images of people's faces culled from the internet to build facial recognition technology, noting that technologies being enabled by those data sets can be used in "potentially invasive ways."  Cade Metz, *Facial Recognition Tech is Growing Stronger, Thanks to Your Face*, N.Y. Times (July 13, 2019) [hereinafter, Metz, *Facial Recognition*], https://www.nytimes.com/2019/07/13/technology/databases-faces-facial-recognition-technology.html.  That article asserted that the founder of an "A.I. start-up" called Clarifai stated that "his company had built a face database with images from [the dating site] OkCupid" and that his company had access to those photos "because some of the dating site's founders invested in his company."  *Id.*  The article further reported that

> [a]n OkCupid spokeswoman said Clarifai contacted the company in 2014 "about collaborating to determine if they could build unbiased A.I. and facial recognition technology" and that the dating site "did not enter into any commercial agreement then and have no relationship with them now."  She did not address whether Clarifai had gained access to OkCupid's photos without its consent.

*Id.*  By the end of July 2019, Respondent had completed an investigation—prompted by a July 11, 2019 pre-publication request from the New York Times for a comment on the remark from Clarifai's founder, *see* ECF No. 15-10 at 2—and sent a letter to Clarifai demanding that Clarifai cease and desist accessing Respondent's services and systems and attempting to create profiles on those systems, as well as destroy any user-profile images it had copied and any derivative works created from those copies, ECF No. 17-7 at 3; *see also* ECF No. 17-2, ¶¶ 3–7.

As result of the New York Times article, the FTC initiated a "non-public investigation" into whether Match had engaged in unfair competition under Section 5 of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45, by "sharing . . . consumer information, including photos and other data of OkCupid users."  ECF No 17-4 at 2 & n.1.   In February 2020, FTC staff

informed Match of the investigation and directed it to retain all documents that might be relevant to the agency's inquiry.  *Id.* at 2–3.  In March 2020, the FTC issued the CID at issue here, seeking information, including documents, about representations made to customers regarding the collection, use, storage, and transfer of their data; security practices and procedures; any sharing of data with Clarifai; and "the investigation [and other activities] that [Respondent] conducted . . . in response to" the New York Times article, "which reported how [Clarifai] obtained access to OkCupid user photos that were used to build Clarifai's face database and facial recognition technology."  ECF No. 15-15 at 8–10, 12–13.  That access allegedly occurred in September 2014.  *See* ECF No. 2-1, at 3–4, ¶ 8; ECF No. 17-3 at 2, ¶ 3; ECF No. 17-5 at 8.

By the end of May 2020, Match had produced approximately 600 pages of documents and answered interrogatories in response to the March 2020 CID.  ECF No. 17-3, ¶ 4; *see also* ECF No. 17-5 (Respondent's Third Response to March 2020 CID).  Among those responses was an answer to an interrogatory in a prior unrelated CID issued to Ok Cupid in November 2014—that is, two months after the alleged sharing of data with Clarifai—in which the company asserted that neither it nor its affiliates had shared with any third party (that is, any party other than OkCupid users and OkCupid affiliates) users' personal information unless it was "aggregated with that of other users and/or anonymized."  ECF No. 15-13 at 13; *see also* ECF No. 2-1 at 3–4, ¶ 8.  That investigation was closed in 2015 (the "2014-2015 FTC investigation")—according to Match because evidence showed that OkCupid's users knew their profile information was publicly available and could be used by others.  ECF No. 15-2, at 3–4, ¶ 4.

Respondent reportedly expected the current investigation to be closed for similar reasons as the 2014–2015 FTC investigation.  ECF No. 17-1 at 19–20.  However, on August 5, 2020, just

over two months after Match's purportedly final response to the March 2020 CID, FTC staff informed Match of deficiencies, seeking, among other things, supplemental information about data-sharing with third parties, including Clarifai; additional documents about the investigation post-dating the New York Times article; and a privilege log. *See generally* ECF No. 15-16. So began a saga that continues today.

Match produced its first privilege log—containing 62 entries—near the end of August 2020. ECF No. 2-1 at 5, ¶ 13; *see also* ECF Nos. 28-7, 28-8. In September 2020, FTC staff replied with a letter complaining that Match's "application of the work product doctrine [was] overbroad," sweeping in documents that appeared to pre-date the involvement of any attorneys in the investigation, which, in any case, had a business purpose; that documents over which it claimed attorney-client privilege included communications between non-attorneys; and that the descriptions of certain documents did not meet Match's burden to establish the basis for protection. *See* ECF No. 17-11.

It appears that Match made supplemental document productions in September and October 2020, which together totaled 23 documents. ECF No. 28-2 at 2–3, ¶ 2; ECF Nos. 28-3, 28-6; *see also* ECF No. 17-10 at 4. FTC staff continued to press for further searches. For example, in November 2020, agency staff expressed disapproval of the allegedly limited terms used and custodians identified by Match in its searches. *See* ECF No. 17-19 at 2–5; ECF No. 17-10. Simultaneously, the privilege dispute at the heart of this action was heating up. In that same November 2020 letter, FTC staff charged that Match had not produced a single document that addressed the substance of the company's response to the July 11, 2019 inquiry from the New York Times or the ensuing article, had not responded to the agency's challenges to the privilege designations, and had not provided an updated privilege log. ECF No. 17-19 at 6–8. Match supplied a supplemental

privilege log on December 15, 2020, along with a letter asserting that it stood by all the attorney-client and work product designations and suggesting that it would explain "specific privilege calls" at the FTC's request.  ECF No. 15-18; *see also* ECF No. 2-1 at 9, ¶ 24.

Apparently dissatisfied with Match's document production and other responses, in February 2021, FTC staff issued notices seeking oral testimony from five of Respondent's current or former employees and officers, as well as from a corporate designee.[3]  ECF No. 15-23.  Those investigative hearings occurred between May 4, 2021, and June 2, 2021.  *See, e.g.*, ECF No. 2-1 at 68–82, 85–103, 106–26, 129–41, 148–49 (excerpts of hearing testimony).  During that period, Match produced six additional responsive documents, an additional privilege log entry, and a consolidated privilege log.[4]  *See* ECF No. 2-1 at 8–10, ¶¶ 22, 24, 27; *see also id.* at 50–65.  In September 2021, Match produced its final privilege log of 271 entries, while complaining that its efforts (including the testimony at the investigative hearings) had been "duplicative, cumulative, unreasonable, and unduly burdensome."  ECF No. 15-17 at 2, 5; *see* ECF No. 2-1 at 188–216.

FTC staff was still unsatisfied and, in a November 2, 2021 letter, demanded that Respondent produce four categories of documents identified on its privilege log: documents (1) withheld pursuant to a "blanket corporate policy" that press inquiries about privacy issues "give rise immediately to anticipation of litigation"; (2) relating to the company's response to the New York Times' inquiry and customer inquiries or complaints resulting from the publication of the article; (3) relating to the company's response to the New York Times' inquiry and later customer inquiries

---

[3] The civil investigative demands seeking testimony were addressed to Alice Hunsberger, OkCupid's former Director of Customer Experience; David McGee (known as Quinn McGee), an OkCupid customer service manager; Justine Sacco, Respondent's Chief Communications Officer ("COO"); Melissa Hobley, OkCupid's Chief Marketing Officer ("CMO"); and Sam Yagan, OkCupid's founder and former Chief Executive Officer and a member of Respondent's Board of Directors.  *See* ECF No. 15-23; ECF No. 2-1 at 7, ¶ 19.  Respondent identified Tom Jacques, the Vice President of Engineering and Chief Technology Officer of Tinder, one of Respondent's subsidiaries, as its corporate designee.  *See* ECF No. 2-1 at 7, ¶ 19.

[4] Respondent had produced a second supplemental privilege log on April 6, 2021.  ECF No. 2-1 at 9, ¶ 24.

that neither seek nor render legal advice; and (4) that provide the underlying facts as to the investigation prompted by the New York Times' inquiry, the preparation of the statement given to the paper, and the preparation of responses to consumer inquiries.  *See generally* ECF No. 2-1 at 238–41.  The letter asked for production of those documents by November 12, 2021.  *Id.* at 241.

Match did not produce the documents, instead asking to meet and confer with FTC staff to present a proposal to avoid litigation.  ECF No. 2-1 at 11, ¶ 32.  The FTC reports that the parties held a conference on December 10, 2021, during which Respondent's counsel offered to re-evaluate one of the categories of documents FTC staff had demanded in its November letter—without identifying which category—contingent on the agency withdrawing its objections to the company's privilege and work product designations and waiving further challenges to its discovery responses.  *Id.* at 11–12, ¶ 33.  The FTC declined and, on March 31, 2022, informed counsel for Respondent that the agency would file a petition to enforce the March 2020 CID.  *Id.* at 12, ¶ 34; *see also* ECF No. 17-13.  Respondent then sought another conference, this time with the FTC's Office of General Counsel to discuss its proposal.  ECF No. 15-19 at 5–6.  At that conference, which took place on April 28, 2022, Match asserted that it would produce the first fifteen documents on its privilege log, each of which is a communication (via email or the messaging application Slack) among non-attorneys that has been withheld as work product.  ECF No. 2-1 at 12, ¶ 36.  The FTC's Office of General Counsel rejected that proposal.  *Id.* at 12–13, ¶ 37; *see also* ECF No. 15-24 at 3.

Events accelerated after that.  Respondent's May 2, 2022 letter asserted that FTC staff had not identified specific privilege or work product designations that it challenged, leaving the company to assume that all such designations were at issue.  ECF No. 15-24 at 3.  It asked the FTC to narrow the dispute by identifying the challenged documents and the basis on which the agency

disputed the designations and suggested that the disputes be submitted to binding mediation.  *See id.* at 4–5.  The company also noted that the FTC's Office of General Counsel had indicated that the agency would likely not accede to Respondent's request that any litigation be filed against the company as a "Doe" defendant.  *See id.* at 4.  Two days later, FTC staff acknowledged that the agency had "categorically raised concerns about [Respondent's] withholdings" as overbroad because, not having access to the withheld documents, it was "operating in a vacuum," but also pointed out that it had early on—in September 2020—identified documents that "exemplif[ied] [its] concerns."  ECF No. 15-20 at 3.  The FTC rejected Respondent's offer to produce the first fifteen documents on the privilege log, reasoning that those documents would eventually be ordered produced because they are "patently not work product," and rejected the company's suggestion of mediation.  *See id.* at 4–5.  The agency indicated that it intended to proceed with court action challenging claims of privilege over only 136 documents "[t]o alleviate the burden on the [c]ourt" but would not refer to Respondent anonymously in its court filings, opting instead to file "portions of the papers under temporary seal to allow [the company] an opportunity to seek an appropriate protective order."  *Id.*  The agency further noted that it had thrice before—in November 2020, November 2021, and March 2022—alerted Respondent of its intention to pursue enforcement proceedings when the dispute appeared to be at an impasse.  *Id.* at 4.  Litigation could be avoided, however, if Respondent would produce those 136 documents by May 13, 2022.  *Id.*

On May 10, 2022, Respondent sent a letter to the Director of the Bureau of Consumer Protection within the FTC.  ECF No. 15-21 at 2.  While appreciating that the FTC had identified 136 documents to challenge out of over 270 on the September 2021 privilege log,[5] the company

---

[5] The numbered privilege log that the FTC has provided the Court has 271 entries.  *See* ECF No. 2-1 at 216.  Respondent has stated that there are 272 documents on its privilege log.  *See* ECF No. 15-21 at 2.  That discrepancy is immaterial here.

professed that it had "no insight" as to why they were being challenged.  ECF No. 15-21 at 2.  It nonetheless pledged to re-evaluate its claims of privilege over those documents and sought another conference where FTC staff could explain the bases for its objections to the privilege and work product designations.  *Id.* at 5.  It also reiterated its mediation proposal.  *Id.* at 6.  No further documents were produced, and in a May 16, 2022 letter, Respondent asked again to confer to "raise [its] concerns about the specific discovery disputes and the investigation more broadly with the Commissioners."  ECF No. 15-8 at 4.  Those concerns included FTC staff's failure to explain its privilege challenges on a document-by-document basis and to clarify why it had narrowed its focus to half of the documents on the privilege log; "improper efforts to circumvent and, at times, to penetrate [Respondent's] privilege and work product protections" in the face of the company's cooperation; continuation of the investigation in the face of evidence that users knew that their profile information was publicly available and could be collected by third parties; and suggestions that OkCupid's comment to the New York Times was deceptive and omitted information.  *Id.* at 3–5.

Ten days later, FTC staff sent a letter rebutting Respondent's claims, rejecting the requested conference as likely to be unproductive; acknowledging that, while some documents on the privilege log might well be protected, the "blanket assertion of privilege and work product over [virtually] all communications related to the NYTimes story . . . strongly suggests" that responsive unprotected material has been improperly withheld; and explaining that the FTC had determined that an enforcement action was necessary and would be filed "in short order," along with "a motion to temporarily seal any documents containing information that [Respondent] has designated as confidential in order to give [the company] an opportunity to seek a protective order if it deems confidential treatment is necessary."  ECF No. 17-15 at 2–4.  Counsel for Respondent asked that

the FTC provide them with a copy of the petition for enforcement "contemporaneously with filing" to allow them to "seek from the court the relief necessary to prevent the harm to [Respondent's] reputation that would result from naming [it] in the . . . filing." ECF No. 17-14 at 2.

That same day—May 26, 2022—the FTC submitted its Petition, along with a sealed motion to file under seal unredacted versions of it memorandum in support of the Petition and the bulk of its supporting exhibits "until the later of the following periods: (1) ten days after the FTC notifies the Court that [Respondent] . . . has been served with a signed Order to Show Cause and [the] Motion to Temporarily Seal," which attached the memorandum in support of the Petition and its exhibits; or (2) Respondent "files its own motion for a protective order or to seal, and the Court rules on such motion." ECF No. 2 at 1; *see also* ECF No. 1. On June 1, 2022, having been informed by the office of the Clerk of Court in an email that the initiating documents had been accepted for filing and providing a case number, the FTC emailed Respondent's counsel a copy of the papers. ECF No. 16-1 at 7, ¶ 22. The Petition and its supporting documents, including the motion to seal, were entered on the docket on June 2, 2022, with a filing date of May 26, 2022; most of those documents were filed under seal to provide "Match an opportunity to seek . . . protection" for material it believed to be confidential. Docket, *FTC v. Match Group, LLC* (D.D.C.); ECF No. 2 at 3. Among those sealed documents was a declaration from an FTC attorney (submitted in both redacted and unredacted form) that referred to a prior 2014 FTC investigation of OKCupid on "an unrelated privacy matter" that Match alleges had not yet been publicly disclosed; that information was not redacted in the redacted version. ECF No. 2-1 at 3–4, ¶ 8 (unredacted version); ECF No. 2-4 at 3–4, ¶ 8 (redacted version). That 2014 investigation will come up again below.

Also on June 2, 2023—the same date the electronic docket of this case became publicly available—Respondent filed a sealed emergency motion to temporarily seal the record in this case until the Court ruled on a forthcoming motion by Respondent to seal the filings in this case and to allow it to proceed anonymously.  *See* ECF No. 3.  Counsel for Respondent also emailed FTC staff to complain that the agency had not informed the company that the Petition had been filed until six days after it had submitted the material to the Court.  ECF No. 28-11 at 2.  Meanwhile, on May 31, 2022, Respondent had sent a letter to the Office of General Counsel arguing, among other things, that court action would be premature and again outlining allegations that the agency had acted improperly.  *See generally* ECF No. 19-5.

Judge Leon allowed the emergency motion to seal to remain sealed in part, ordering the Clerk of Court to "file and maintain" the memorandum in support of the motion and its supporting exhibits under seal until further order of the Court but directing that the motion and proposed order to be unsealed and counsel's notices of appearance to be re-filed on the public docket.  Minute Order re: ECF No. 3 (June 8, 2022).  After the Clerk of Court had refiled the sealed documents, *see* ECF No. 6, Judge Leon denied the emergency motion to temporarily seal the record and ordered the Petition to "remain unsealed and the remainder of the docket [to] remain as is until further order of [the] Court."  Minute Order re: ECF No. 6 (June 8, 2022).  That Order also allowed Match ten days to "file a motion to seal any filings, for a protective order, or to proceed under a pseudonym."  *Id.*  As to the FTC's motion to seal, Judge Leon directed redacted copies of the memorandum in support of the Petition and counsel's declaration to be filed publicly, with all other documents submitted in connection with the Petition (not including the Petition, itself, which was filed publicly) to be maintained under seal under further Court order.  ECF No. 8; *see also* Docket Text accompanying ECF No. 8.  As noted, the redacted version of counsel's declaration included an

unredacted reference to a prior FTC investigation, *see* ECF No. 12 at 2–3 (redacted version of declaration filed publicly).  Thus, as of June 8, 2022, the following documents were to be available publicly: the Petition; Match's emergency motion to temporarily seal the record and proposed order; redacted versions of the FTC's memorandum in support of the Petition and counsel's declaration; the FTC's memorandum in opposition to Match's motion to temporarily seal the record; the notices of appearance; and Judge Leon's orders.  The remaining documents—the unredacted memorandum in support of the Petition and counsel's declaration; all exhibits in support of the Petition; and the exhibits in support of Match's emergency motion to temporarily seal the record (which include the memorandum in support of that motion)—were (and currently are) under seal.  Since June 8, 2022, as noted above, *see* note 2, *supra*, every filing that Respondent has made has been filed under seal accompanied by a motion to seal, including the Motion for Discovery (also at issue here) and even its motions to seal.  The FTC has opposed all but one of them[6] and has filed all of its oppositions publicly, including its opposition to the Primary Motion to Seal, which also includes a reference to the 2014 FTC investigation of OKCupid, *see* ECF No. 16 at 3; ECF No. 16-1, ¶ 4.

In the midst of the briefing, Judge Leon referred this case to the undersigned to determine "all motions and matters in this case" except for the petition to enforce the March 2020 CID, on which the undersigned will prepare a Report and Recommendation.  Minute Order (Aug. 4, 2022).  Accordingly, the undersigned herein determines the Motion for Discovery, the Primary Motion to Seal and, by extension, the subsidiary motions to seal, all pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Local Civil Rule 72.2.

---

[6] In connection with the Petition, Respondent filed a motion for leave to file a surreply, accompanied by a motion to seal that motion for leave.  *See* ECF Nos. 23, 23-1.  Although the FTC informed Respondent that it opposed that motion to file a surreply and the motion to seal, *see* ECF No. 23 at 1; ECF No. 28-10 at 2, it appears that the FTC has not filed an opposition to either the motion to file a surreply or the motion to seal that motion.

## II.    DISCUSSION

In the Primary Motion to Seal, Respondent seeks to seal the bulk of these proceedings until the Court resolves the privilege issues presented in the Petition.  *See generally* ECF No. 15-1. Respondent's Motion for Discovery asks for leave to propound requests for production of documents on the FTC to unearth evidence that the agency filed the Petition for one or more improper purposes.  *See generally* ECF No. 20-1.  Although the two motions might seem independent, their arguments are intertwined.  For example, a foundation of the Motion for Discovery is the argument that the FTC filed the Petition for the improper purpose of publicizing information about Respondent that should remain confidential.  *See, e.g.*, ECF No. 20-1 at 2–3 (asserting that "the FTC's intention [in filing the Petition is] in . . . publicly revealing that Respondent is the subject of an FTC investigation, as well as other confidential information regarding Respondent's internal investigation and the present dispute"), 3 ("[T]he agency intended to use this proceeding to . . . pressure Respondent to waive the privilege or face public revelation of the confidential, inner-workings of its legal department[.]"), 5 ("[T]he FTC has repeatedly filed highly confidential and sensitive information about Respondent publicly without providing Respondent an opportunity to shield it from public view[.]"), 7 ("[The FTC] seeks to force Respondent between a rock and hard place: either withdraw its legitimate privilege log claims or pay the price of having the investigation, dispute, and confidential information regarding Respondent's internal investigation revealed to the public.").  The Primary Motion to Seal contends that the bulk of sealing these proceedings until the Petition is resolved is necessary "to ensure that the inevitable airing of the facts surrounding the attorney-led investigation and efforts to respond to the New York Times reporter's inquiry are protected from public scrutiny."  ECF No. 15-1 at 6; *see also, e.g.*, *id.* ("Respondent's concern here is that, without protection from this Court, the price for protecting its privileged documents

13

and work product will be public exposure of the most private aspects of the attorney-client rela-

tionship."). Similarly, the Primary Motion to Seal argues that sealing "is uniquely appropriate here

because of the [FTC's] overreach and abuse of process that has led the parties to this Court," ECF

No. 15-1 at 7, which is the backbone of the Motion for Discovery, *see generally* ECF No. 20-1

(arguing that the filing of the Petition constitutes an abuse of process). Thus, the outcome of one

motion affects the other. For example, if Respondent were to succeed on its Motion for Discovery,

that would counsel in favor of holding the Primary Motion to Seal in abeyance to allow the com-

pany to make its showing that the FTC had filed this enforcement proceeding for the improper

purpose of revealing information about Match that should remain confidential. If the FTC's op-

position to the Motion for Discovery were to succeed, it would undermine one of Respondent's

arguments in the Primary Motion to Seal. Similarly, if the Court agreed that the bulk of the docu-

ments filed in this proceeding should be sealed, that would strengthen Respondent's abuse of pro-

cess argument, which would be weakened if the Court finds it inappropriate to maintain the infor-

mation Respondent seeks to protect under seal. This is to say that neither of the motions the Court

addresses here is logically antecedent to the other. So, because the Primary Motion to Seal was

filed prior to the Motion for Discovery, the Court addresses it first.

### A.      The Primary Motion to Seal

Respondent contends that sealing the bulk of the record in this case[7] "will ensure that [its]

efforts to seek and obtain the benefits of legal advice, and its actions taken in anticipation of liti-

gation, will remain out of the public domain" and will not harm the FTC "in any way." ECF No.

---

[7] Judge Leon has already ruled that the Petition, Respondent's Emergency Motion to Temporarily Seal the Record and its proposed order and Respondent's counsels' notices of appearance should be publicly available. *See* Minute Order (June 8, 2022) (granting in part and denying in part Respondent's motion at ECF No. 3); Minute Order (June 8, 2022) (denying Respondent's motion at ECF No. 6). In addition, he ordered the FTC to file redacted copies of its memo-randum in support of the Petition and the accompanying declaration of Sarah Choi (without exhibits) on the public docket. Minute Order (June 8, 2022) (grating the FTC's motion found at ECF No. 2); *see also* ECF Nos. 11–12 (redacted versions of the memorandum in support of the Petition and the declaration of Sarah Choi). The FTC has

15-1 at 5.  It appears to argue that nearly *every substantive filing* it has made in this case must be sealed *in its entirety* to avoid "public exposure of the most private aspects of the attorney-client relationship" and to maintain "the cloak of confidentiality that Congress has guaranteed to the subjects of FTC investigations."  *Id.* at 6, 23.  It also seeks to seal its subsidiary motions to seal, which are merely pro forma, including no facts or legal argument.  Respondent overreaches and its motion will be denied.

    1.  Legal Standard

   The D.C. Circuit has recognized that the common law right of public access to judicial proceedings and records "is fundamental to a democratic state."  *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 665 (D.C. Cir. 2017) (quoting *United States v. Hubbard*, 650 F.2d 293, 315 n.79 (D.C. Cir. 1980)).  Thus, there is a "strong presumption" in favor of such access.  *Hubbard*, 650 F.2d at 317.  The right to public access extends to judicial records, such as "documents and exhibits filed with . . . a federal court."  *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 906 (D.C. Cir. 1996).  No party argues that the documents at issue are not judicial records.

   "Public access to judicial records is not limitless, however[.]"  *In re McCormick & Co., Pepper Prods. Mktg. & Sales Pracs. Litig.*, 316 F. Supp. 3d 455, 463 (D.D.C. 2018).  Rather, to determine whether a seal over judicial records should be maintained, a court must "fully account for the various public and private interests at stake."  *Metlife*, 865 F.3d at 666.  In the D.C. Circuit, that duty is dispatched by considering the following six factors derived from its decision in *Hubbard*:

> (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure,

---

filed its opposition to the Primary Motion to Seal and its oppositions to Respondent's subsidiary motions on the public docket.  *See* ECF Nos. 16, 21, 25, 26, 29, 31.

and the identity of that person; (4) the strength of any property or privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings.

*EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (citing *Hubbard*, 650 F.2d at 317–22).  The burden is on the party seeking to restrict disclosure "to come forward with specific reasons why the record, or any part thereof, should remain under seal." *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1278 (D.C. Cir. 1991); *see also Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 16 (D.D.C. 2010).  Indeed, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 510 (1984).

      2.     Analysis

The scope of Respondent's application puts it at a disadvantage out of the gate.  Match seeks to maintain under seal not only the documents currently sealed that pertain directly to the FTC's Petition, but also documents it has filed under seal (and/or that are subject to a pending motion to file under seal) relating to the Primary Motion to Seal, the Motion for Discovery, and the subsidiary motions to seal other filings, including motions to seal documents related to motions to seal.  *See supra* note 2.  Requests "to maintain a blanket seal of the case rather than requesting only that the allegedly damaging portions of the record remain under seal" are disfavored.  *Friedman v. Sebelius*, 672 F. Supp. 2d 54, 58 (D.D.C. 2009).  Indeed, as noted above, the Supreme Court has held that orders interfering with the openness of court proceedings must be "narrowly tailored." *Press-Enterprise*, 464 U.S. at 510.  As is demonstrated here, such broad requests tend to be self-defeating because they hinder the ability of the party seeking to limit disclosure to establish with specificity the reasons that materials should be sealed.  *See, e.g., In re McCormick & Co., Inc.,*

16

*Pepper Prod. Mktg. & Sales Pracs. Litig.*, 316 F. Supp. 3d 455, 465 (D.D.C. 2018) ("Here, de-fendants fail to specifically identify commercially sensitive information, but instead, they make overbroad requests to maintain information in confidence that is relevant to the Court's decision-making, and which should therefore be presumptively accessible to the public.").

          a.      The Need for Public Access to the Documents at Issue

The first *Hubbard* factor assesses the need for public access to the documents at issue.  This factor derives from the long-standing belief that public access to judicial records "serves the im-portant function[] of ensuring the integrity of judicial proceedings."  *Hubbard*, 650 F.2d at 314–15.  One note at the outset: the D.C. Circuit has recently clarified that the focus of this factor is on the public's need for the specific information that a litigant or third party seeks to protect, rather its need for access to a document "as a whole."  *Cable News Network v. FBI*, 984 F.3d 114, 119 (D.C. Cir. 2021).  Here, however, Match has not identified any specific material—for example, privileged communications, trade secrets, or confidential commercial information—that deserves protection; it asks that *everything* in the subject documents—facts in the public domain; tables of authorities and case citations; conjunctions, articles, and pronouns—remain sealed.  As noted above, it has chosen a difficult path.

In any event, courts assessing this factor may look both to the type of documents at issue and the type of judicial proceeding involved to determine the public's interest.  *See, e.g.*, *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*, 316 F. Supp. 3d at 465–66 (looking to the type of documents at issue to evaluate this factor); *Friedman*, 672 F. Supp. 2d at 58 ("There is a stronger presumption of transparency in some judicial proceedings than in oth-ers.").  Here, this factor weighs strongly in favor of public access.

First, "[it is] a fundamental norm of our judicial system[] that judges' decisions and their rationales must be available to the public." *Metlife*, 865 F.3d at 674–75. Thus, there is a strong public interest in the disclosure of documents that are or may be relied on in a judicial decision. *See Jackson v. Starbucks Corp.*, No. 19-cv-1487, 2022 WL 888180, at *3 (D.D.C. Mar. 25, 2022) ("Because the Court relied on the [information sought to be sealed] in order to reach its decision, there is a strong public interest in disclosure."). Here, the documents that Respondent seeks to keep under seal comprise legal briefs and accompanying exhibits in support of or opposition to the Petition and the motions currently before the Court. As such, they have been submitted with the explicit goal of influencing judicial decision-making, which militates against allowing them to remain sealed. *See, e.g.*, *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 316 F. Supp. 3d at 465–66 (finding that this factor weighed in favor of public access where the documents at issue were motions papers, which "are the clearest expression of relevant evidence and argumentation on any given dispute and necessarily influence a Court's decision"); *see also United States v. All Assets Held at Bank Julius Baer & Co.*, 520 F. Supp. 3d 71, 85 (D.D.C. 2020) (stating, "Generally, there is a strong presumption of public access to documents that a litigant submits with the intention that the court will rely on them" and collecting cases). Maintaining public access to such documents is "a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of an independent Judicial Branch." *Metlife*, 865 F.3d at 663.

Second, the "presumption of transparency," *Friedman*, 672 F. Supp. 2d at 58, is particularly strong in cases where, as here, a government agency is a party. *See, e.g.*, *Nat'l Children's Ctr.*, 98 F.3d at 1409 (citing *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987)); *Hyatt v. Lee*, 251 F. Supp. 3d 181, 184 (D.D.C. 2017) ("The interest of the public and press in access to civil proceedings is at its apex when the government is a party to the litigation." (quoting

*Doe v. Pub. Citizen*, 749 F.3d 246, 271 (4th Cir. 2014))).  "[I]n such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *Standard Fin. Mgmt.*, 830 F.2d at 410.  "[T]he public has a strong interest in monitoring not only functions of the courts but also the positions that its elected officials and government agencies take in litigation." *Hyatt*, 251 F. Supp. 3d at 184 (quoting *Doe*, 749 F.3d at 271)).

More, the claims regarding the FTC's alleged "overreach and abuse of process" lend additional heft to the public's already weighty concern because, as Match puts it (paraphrasing Louis D. Brandeis), "sunlight is the best disinfectant."  ECF No. 15-1 at 7, 23; *see* Louis D. Brandeis, *What Publicity Can Do*, Harper's Weekly, Dec. 20, 1913, at 10, https://www.sechistorical.org/collection/papers/1910/1913_12_20_What_Publicity_Ca.pdf ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman.").  And (according to a case that Match itself cites) so, too, does Match's acknowledgement that this action has itself inspired press coverage, *see* ECF No. 15-1 at 20 (noting articles about this litigation in Bloomberg Law, Biometric Update, and National Law Review); ECF No. 18-1 at 4 (noting that Reuters published an article about this litigation); and its assertions that information about the investigation would be of interest to the public, ECF No. 15-1 at 18 (asserting that unsealing would affect its reputation with the public).  In *Rudd Equipment Co. v. John Deere Construction & Forestry Co.*, which Respondent cites in its opening brief on the Primary Motion to Seal, *see* ECF No. 15-1 at 22, the Sixth Circuit stated that "[t]he greater the public's interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access."  834 F.3d 589, 594 (6th Cir. 2016) (quoting *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016)).

Match argues, however, that the public's interest in access to judicial records must give way to an even greater one: the public's interest in protecting attorney client communications and work product to "promot[e] the full and frank communications between attorneys, their agents, and clients which is 'necessary for vigorous and effective advocacy.'" ECF No. 15-1 at 23 (quoting *Kelly v. Ford Motor Co.* (*In re Ford Motor Co.*), 110 F.3d 954, 961–62 (3d Cir. 1997), *abrogated on other grounds*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)).  Attorney-client privilege protects "confidential communications made between clients and their attorneys . . . for the purpose of securing legal advice or services," *In re Lindsey*, 158 F.3d 1263, 1267 (D.C. Cir. 1998), and exists to "promote a 'free and open discussion between the client and the attorney," *Minebea Co. v. Papst*, 229 F.R.D. 1, 2 (D.D.C. 2005).  The work product doctrine shields "materials prepared by attorneys, or non-attorneys supervised by attorneys, in contemplation of litigation, that reveal information about an attorney's preparation and strategy relating to a client's case," *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 209 (D.D.C. 2010), to "promote[] the adversary process by insulating an attorney's litigation preparation from discovery," *United States v. Deloitte LLP*, 610 F.3d 129, 139–40 (D.C. Cir. 2010).  Critically, Match has not identified anything in the documents over which it seeks to maintain a seal that is actually protected by the attorney-client privilege or the work product doctrine.[8]  Rather, according

---

[8] The bulk of the currently sealed documents were submitted by Respondent, a party unlikely to disclose protected material for fear of waiving that protection.  *See, e.g.*, *Deloitte*, 610 F.3d at 140 (noting that both attorney-client privilege and work product protection can be waived by voluntary disclosure).  When it filed its opening brief on the Primary Motion to Seal in June 2022, Match "anticipate[d] that many of the facts that the FTC will put into issue will implicate the privilege."  ECF No. 15-1 at 6.  However, it is not clear that any facts that the FTC is privy to would be protected by the privilege.  *See, e.g.*, *FTC v. Boehringer Ingelheim Pharm., Inc.*, 180 F. Supp. 3d 1, 16 (D.D.C. 2016) ("Normally, only attorney-client communications themselves, not the underlying facts, are privileged."); *Banks v. Office of the Senate Sergeant-at-Arms*, 222 F.R.D. 1, 3 (D.D.C. 2004) ("The privilege only applies when the information is the product of an attorney-client relationship and is maintained as confidential between the attorney and client." (quoting *United States v. Motorola*, No. 94-cv-2331, 1999 WL 552553, at *1 (D.D.C. May 28, 1999)).  As to work product protection, Match insists that the FTC has "put[] directly at issue the specific *mental processes* and surrounding circumstances under which Respondent's lawyers and lawyer-agents acted," citing the FTC's argument from its memorandum in support of the Petition that "it is not objectively reasonable to believe that a specific claim had arisen or, at a minimum, that Match believed litigation was a 'real possibility' at the time that any or all of the

to Match, *non*-privileged, *non*-work product "details regarding the process by which Respondent and OKCupid obtained legal advice, and what they were thinking at the time, are facts that should and must remain confidential and keeping them so is the paramount public interest."  ECF No. 15-1 at 6; *see also* ECF No. 18-1 at 10 ("Detailed facts relating to the process by which a client seeks and obtains attorney advice should, by default, be treated as confidential.").  That is, Respondent asks this Court to shield an expanded universe of materials—information in the curtilage, if you will, of the recognized protections for work product and attorney-client communications—and recognize a kind of quasi-privilege that will outweigh the public's interest in disclosure of these judicial records.

Match cites no other court that has approved such broadened protection in this or any other context.  Rather, it offers authority merely supporting the general premise that attorney-client privilege and work product protection are important to the functioning of our judicial system.  *See* ECF No. 15-1 at 11–12 (citing *United States v. Thomas*, 919 F.2d 495, 496 (8th Cir. 1990), for the premise that "applicability of the attorney-client privilege is a 'serious' legal question"); *United States v. Upjohn*, No. K77-7 Misc. CA-4, 1978 WL 1163, at *10 (W.D. Mich. Feb. 23, 1978), *report and recommendation adopted*, 1978 WL 1221 (W.D. Mich. Apr. 29, 1978), *aff'd in part*, *rev'd in part*, 600 F.2d 1223 (6th Cir;. 1979), *rev'd*, 449 U.S. 383 (1981), for the premise that "applicability of the work-product doctrine is a 'serious question'"; and *Kelly*, 110 F.3d at 961–62, for the premise that "the attorney-client privilege is at the heart of the adversary system" and

---

communications identified as work product took place."  ECF No. 18-1 at 10; *see also* ECF No. 2-2 at 13.  That is, perhaps, an opinion that the FTC "put into issue" that "implicate[s]" the protection, ECF No. 15-1 at 6, but the Court fails to understand Respondent's alarm.  Whether an attorney had an objectively reasonable belief that litigation was a "real possibility" is "[t]he 'testing question' for the work product privilege," *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998), and thus arises often in disputes over the application of that doctrine without treading on its protections.  In any case, Respondent has not identified any work product or information shielded by the attorney-client privilege that the FTC (or, indeed, Match) has included or disclosed in any of the many briefs filed in this case since Respondent made its forecast.

"deeply rooted in public policy"), 23 (citing *Kelly*, 110 F.3d at 961–62, for the premise that attorney-client privilege is "necessary for vigorous and effective advocacy"); ECF No. 18-1 at 7 (citing *Kelly*, 110 F.3d at 961–62). That is not in dispute here. Equally fundamental, however, is the premise that those protections are to be "narrowly construed and . . . limited to those situations in which [their] purposes will be served." *Taylor Energy Co. v. U.S. Dep't of Interior Bureau of Ocean Energy Mgmt.*, 271 F. Supp. 3d 73, 91 (D.D.C. 2017) (alteration in original) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)); *see also, e.g.*, *Republic of Ecuador v. For Issuance of a Subpoena Under 28 U.S.C. § 1782(a)*, 735 F.3d 1179, 1187 (10th Cir. 2013) (noting the "core understanding that the work-product doctrine solely protects the inner workings of an attorney's mind"); *In re Sealed Case,* 676 F.2d 793, 807 n.44 (D.C. Cir. 1982) ("[A]ttorney-client privilege must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle[.]'" (quoting *In re Grand Jury Investigation,* 599 F.2d 1224, 1235 (3d Cir. 1979)); *Pres. & Fellows of Harvard College v. Elmore*, No. 15-cv-472, 2016 WL 7508832, at *2 (D.N.M. Apr. 13, 2016) ("The work-product doctrine, like any other privilege limiting discovery, is narrowly and strictly construed."); *Winston & Strawn LLP v. Law Firm of John Arthur Eaves*, 307 F.R.D. 259, 262 (D.D.C. 2014) ("[P]rivileges must be narrowly construed and applied only as necessary to achieve their purpose[.]" (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976))); *Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 536, 541 (N.D.W. Va. 2000) ("[C]ourts narrowly construe the work product doctrine consistent with its purpose of protecting the attorneys' work in representing a client."); *Bowne of N.Y.C. v. AmBase Corp.*, 150 F.R.D. 465, 473 (S.D.N.Y. 1993) ("[P]rivileges are disfavored and generally to be narrowly construed."). The vast body of case law applying those protections has struck the balance between material that must be safeguarded to further the goals of attorney-client privilege and

work product protection and material that need not be kept confidential to advance those goals, but rather is deemed disclosable to further other salutary interests.

Again, Match has not argued that any of the information presently filed on the docket it seeks to keep sealed should be considered protected as privileged or as work product. Rather, it argues that shielding some unspecified non-privileged, non-work product information in its filings *related to* its seeking of legal advice is necessary to "promot[e] the full and frank communications between attorneys, their agents, and clients" and consequently that keeping it confidential "is the paramount public interest" at stake here. ECF No. 15-1 at 6, 23. The Court sees no support in the law for that expansive position.[9] In any event, the Court finds that the public's interest in "access to documents that a litigant submits with the intention that the court will rely on them," *All Assets Held at Bank Julius Baer*, 520 F. Supp. 3d at 85, and in "monitoring not only functions of the courts but also the positions that its elected officials and government agencies take in litigation" *Hyatt*, 251 F. Supp. 3d at 184, outweighs whatever interest Respondent has in keeping non-privileged, non-work product information related to its seeking of legal advice confidential.

---

[9] More, Respondent's position is inconsistent. It argues, on one hand, that

> the details regarding the process by which Respondent and OkCupid obtained legal advice, and what they were thinking at the time, are facts that should and must remain confidential and keeping them so is the paramount public interest. These are facts as to which the public has no cognizable interest yet go to the heart of Respondent's and OkCupid's profound interest in ensuring that privileged communications and work product remain private.

ECF No. 15-1 at 6. On the other hand, it asserts that it is really not asking for much, merely maintenance of a seal "until the issues raised by the government's Petition are resolved." *Id.* at 7; *see also id.* at 5 (seeking a seal on the record "until the conclusion of this proceeding"); ECF No. 18-1 at 7 (contending that the seal should be maintained "at this time" and "at least for now"). But the Primary Motion to Seal is not focused on shielding the 136 documents that the FTC's Petition argues are not privileged or work product and the Court's decision on the Petition will not change the character of the material that Match seeks to insulate from public disclosure here. Match nowhere explains why its concern about revealing "the most private aspects of the attorney-client relationship," ECF No. 15-1 at 6 (which is how it describes the material it seeks to protect with its myriad motions to seal), should evaporate once the ultimate question of whether the challenged documents are discoverable is decided. As such, its concerns seem hyperbolic.

Match also contends that the public's interest in the judicial records at issue is undermined by "the nature and purpose of the FTC Act and attendant statutory protections" that mandate the confidentiality of material collected by the agency during its investigations.  ECF No. 18-1 at 8; *see also* ECF No. 15-1 at 7 ("[T]he Federal Trade Commission Act, the Freedom of Information Act, and the Commission's own rules guarantee to parties cooperating with an FTC investigation that all materials submitted in response to a [CID], and even the fact of the investigation itself, will remain confidential, unless, *possibly*, the FTC sues or files an action to enforce the CID, as the Commission has done here.").  A similar argument was attempted—and quickly rejected—in *Standard Financial Management*.  There, the targets of an FTC investigation and later defendants in an enforcement action in federal court sought to keep under seal financial statements they had submitted to the agency.  *Standard Fin. Mgmt.*, 830 F.2d at 405–07.  The defendants argued that the presumption of access to judicial records should be overcome by a provision of the FTC Act—15 U.S.C. § 57b-2—that, generally speaking, provides that "while in the possession of the FTC, no 'documentary material' secured in the course of an official investigation 'shall be available for examination by any individual other than a duly authorized officer or employee of the Commission without the  consent of the person who produced the material[.]'" *Id.* at 411 n.7 (quoting 15 U.S.C. § 57b-2(b)(3)(C)).  That appears to be precisely the provision of the FTC Act that Match relies on. *See* ECF No. 15-1 at 18 (quoting 15 U.S.C. § 57b-2(b)(3)(C) (mis-cited as 15 U.S.C. § 57b-2(c)).  However, as the First Circuit pointed out, "the very same enactment states that the statutory language upon which [the defendants] rely 'shall not be construed to prohibit the disclosure of relevant and material information in . . . judicial proceedings to which the Commission is a party.'" *Standard Fin. Mgmt.*, 830 F.2d at 411 (quoting 15 U.S.C. § 57b-2(d)(1)(C)).  The court of appeals

found that "the phraseology of the FTC Act brooks no doubt.  It plainly exempts judicial proceed-

ings like this one—in 'which the Commission is a party'—from the confidentiality of the statute."

*Id.* (internal citation omitted) (quoting 15 U.S.C. § 57b-2(d)(1)(C).  The First Circuit ultimately

held that the defendants had not overcome the presumption of public access.  *See id.* at 412–13.

So it is here.[10]  Match has not shown that the confidentiality provisions it cites militate against

disclosure of the universe of documents it seeks to protect.  Rather, Section 57b-2(d)(1)(C) *over-

rides* the mandated confidentiality of material collected in an FTC investigation where court action

is pursued.  That should not be a surprise, given the presumption of public access to judicial rec-

ords.

Finally, Respondent accuses the FTC of an improper purpose in bringing this action (and

opposing the motions to seal) based on the agency's assertion in its opposition to the Primary

Motion to Seal that one of the reasons "access to filings in this case is important [is] so that the

public (and future CID recipients) are aware the Commission will pursue judicial enforcement of

CIDs when companies have resisted producing responsive information, including through over-

broad assertions of privilege."  ECF No. 16 at 5; ECF No. 18-1 at 3, 6.  Match asserts that this

allegedly improper purpose "undermin[es] the public interest in the integrity of the adversarial

---

[10] Match asserts that other enactments, such as the Freedom of Information Act ("FOIA") and regulations governing the FTC, as well as internal FTC documents and rules, evince a policy in favor of non-disclosure of "all materials submitted in response to a [CID], and even the fact of the investigation itself."  ECF No. 15-1 at 7; *see also* ECF No. 18-1 at 6, 8 n.5 (citing an FTC policy statement and the FTC's Freedom of Information Act & Privacy Act Handbook). However, it also acknowledges that those sources do not guarantee confidentiality when "the FTC sues or files an action to enforce the CID, as the Commission has done here."  ECF No. 15-1 at 7.  In relying on an overarching ethos of confidentiality, Match again fails to see the trees for the forest.  Notwithstanding the provisions governing confi-dentiality of materials provided to the agency pursuant to a CID, Congress has not made that material "legislatively sacrosanct," as Respondent argues.  ECF No. 15-1 at 7; *see also infra* Section II.B.2.  The court in *Standard Financial Management* rejected a similar proposition, where the defendants resorted to arguing that the legislative history of the FTC Act "indicate[d] a strong Congressional policy against disclosure" that "courts should honor."  830 F.2d at 411. Indeed, Section 57b-2(d)(1)(C) may be read to reflect Congress' embrace of the strong presumption in favor of public access to judicial records, rather than a grudging exception to the confidentiality of investigatory material held by the FTC.

process." ECF No. 18-1 at 2. But Match overreaches when it claims that the FTC "admits" that it filed this action "for the specific purpose of publicizing its investigation[]." *Id.* (emphasis omitted). The FTC says no such thing. The fact that the FTC mentions the potential deterrent effect of this litigation as one of a number of reasons—alongside the "compelling general interest in public access to judicial records," the "heightened" need for public access "where a governmental agency is a party to the action," and the undue restriction on access where a litigant makes a "blanket request" to seal, ECF No. 16 at 5—that the record in this case should not be sealed does not transform the purpose of this action into an allegedly "improper . . . effort to use this proceeding and the Court's docket to 'send a message,'" ECF No. 18-1 at 3. Rather, the "purpose" of this action is to enable the Court to determine whether Match is withholding discoverable documents on the basis of attorney-client privilege or work product protection—the same "purpose of the action" which Respondent itself recognizes elsewhere in its motion papers. *See* ECF No. 15-1 at 28 ("Granting the public access to the pleadings in this case would defeat the *purpose of the action*: to determine whether the Commission's CID is enforceable to obtain privileged documents as to which Respondent is entitled to confidentiality under well-settled privileges." (emphasis added)). The fact that deterrence may be a by-product of this action hardly "undermin[es] the public interest in the integrity of the adversarial process." Rather, it is a mere corollary to "the public's right to know what the executive branch is about."[11] *Standard Fin. Mgmt.*, 830 F.2d at 410. More, although the compelled airing of attorney work product might subvert the adversarial process, as discussed above, no work product is disclosed in the sealed materials.

---

[11] In this motion and in the Motion for Discovery, Match also faults the FTC for not agreeing to allow the company to proceed pseudonymously. *See* ECF No. 15-1 at 7 ("Congress has determined that but for the government's Petition (*and how it was filed*), Respondent's confidential communications, privileges and attorney-driven processes, the underlying dispute itself, and all of the surrounding investigational facts and developments would remain confidential." (emphasis added), 24 (noting that Respondent "had hoped to proceed pseudonymously in this action, which would likely have made the [Primary Motion to Seal] unnecessary."); ECF No. 18-1 at 2 (arguing that "Respondent is . . . en-

In short, this factor weighs strongly against allowing these documents to remain sealed. *See, e.g.*, *Rudd Equip.*, 834 F.3d at 594–95 ("'[I]n civil litigation, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of sexual assault),' is typically enough to overcome the presumption of access." (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002))).

        b.      The Extent of Previous Public Access to the Information

Although some cases denominate this factor as "the extent of previous public access to the *documents*," *Nat'l Children's Ctr.*, 98 F.3d at 1409 (emphasis added), later cases make clear that the focus is on previous public access to the *sealed information*. *See, e.g.*, *Cable News Network*, 984 F.3d at 119 ("A district court weighing the second factor should consider the public's previous access to the sealed information, not its previous access to the information available in the overall lawsuit."); *In re Application for Access to Video Exhibits*, 575 F. Supp. 3d 101, 109 (D.D.C. 2021) ("Generally, when 'much of the critical information is already in the public forum,' this factor weighs in favor [of] greater disclosure." (alteration in original) (quoting *United States v. Munchel*,

---

titled to protection of its confidentiality and privacy interests, notwithstanding the FTC's . . . ignoring . . . [Respondent's] efforts to proceed pseudonymously in this action."); ECF No. 20-1 at 4 (listing, among the facts allegedly supporting Respondent's argument that the FTC has engaged in abuse of process, that the FTC "flatly refused" Respondent's request that the agency "not oppose [Match] proceeding pseudonymously"). Match ignores that, even had the FTC agreed not to oppose an application for the company to proceed under a pseudonym, Respondent would still have to convince this Court to allow that "rare dispensation." *Roe v. Doe*, 319 F. Supp. 3d 422, 425 (D.D.C. 2018) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995)); *see also, e.g.*, *United Fin. Cas. Co. v. R.A.E., Inc.*, No. 20-cv-2467, 2020 WL 6117895, at *2 (D. Kan. Oct. 16, 2020) (denying the plaintiff's request for certain defendants to proceed under a pseudonym because it had not been shown that it was "an 'unusual case' that warrant[ed] the use of a pseudonym or how defendants' interest in privacy outweighs the public interest in open courts" (quoting *Raiser v. Church of Jesus Christ of Latter-Day Saints*, 182 F. App'x 810, 811 (10th Cir. 1979))). To do that, the Court would have to take into account factors similar to the *Hubbard* factors including "the presumption of transparency vis-à-vis the public" as well as whether the justification for proceeding under a pseudonym "is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature." *Roe*, 319 F. Supp. 3d at 425–26. In any case, although Respondent represented at the outset of this case that it would file a motion to proceed under a pseudonym, *see* ECF No. 3, it never did so.

567 F. Supp. 3d 9, 17 (D.D.C. 2021)).  Here, some information—indeed, information Match ap-

pears to deem critical—has been publicly available for some time now.  Both parties acknowledge,

of course, that the information in the New York Times article has been accessible by the public

since it was published.  See ECF No. 15-1 at 25; ECF No. 16 at 6.  The FTC also asserts that "some

of the information contained in the temporarily sealed materials in this case has been previously

disclosed to the public" in a case brought by an OKCupid user against Clarifai in the Northern

District of Illinois, *see* ECF No. 16 at 6 n.3, an allegation Respondent does not address.   More

importantly, the existence of the investigation was reported in one of Respondent's filings with

the Securities and Exchange Commission in May 2022.  *See* ECF No. 16-2 at 4 (paragraph headed

"FTC Investigation of Certain Subsidiary Data Privacy Representations").  And Match has not

attempted to show that *all* of the information in the extensive briefing that is currently sealed has

been hidden from public view, focusing, instead, on the fact that the public has not had access to

the "documents," *see* ECF No. 15-1 at 25 ("Here, with the exception of the New York Times article

at the center of the case, the public did not have prior access to any document currently under seal

or that will be sealed when filed if the Court grants Respondent's motion."); 18-1 at 9 ("The public

cannot have had previous access to court documents yet to be filed."), and relying on its blanket

arguments that the bulk of the record should be sealed.  It is Respondent's burden to establish that

a lack of public access to sealed information overcomes the presumption of access; its insistence

that the entirety of filings down to *pro forma* motions to seal papers supporting motions to seal

must remain confidential does not meet that burden.  *See, e.g.*, ECF No. 30 (Respondent's Motion

to Seal the Reply to the Motion to Seal the Motion for Discovery Reply, itself filed under seal,

which contains no facts or substantive legal argument).  Nevertheless, in light of the fact that the

FTC makes no real argument on this factor, the Court will treat it as neutral.

c.      The Identity of the Entity Objecting to Disclosure

This is another *Hubbard* factor that is subject to some confusion.  In *Upshaw v. United States*, for example, the court found that "[t]he fact that a party moves to seal the record weighs in favor of the party's motion."  754 F. Supp. 2d 24, 29 (D.D.C. 2010).  In doing so, it relied on a single sentence in *National Children's Center* stating, without analysis, that "only one *Hubbard* factor counsels in favor of sealing the consent decree—the fact that the [defendant] has objected to the disclosure."  98 F.3d at 1410.  Other cases, however, find that the fact that a *party* has objected does *not* weigh in favor of keeping the information sealed.  In its recent decision in *Cable News Network*, the D.C. Circuit cited with approval the finding in *Hyatt* that a party's objection did not support the motion to seal; rather, the fact that a third party had *not* objected weighed in favor of disclosure.[12]  984 F.3d at 120 (citing *Hyatt*, 251 F. Supp. 3d at 185 (noting that the objection of a party "do[es] not have the same strength as a third-party objection")).  And, indeed, *Hubbard* itself stated that "the fact that objection to access *is made by a third party* weighs in favor of non-disclosure."  650 F.2d at 319 (emphasis added).  Thus, a number of cases have found that "[t]his [third] factor focuses on the privacy interests of third parties, 'provid[ing] broader protection from disclosure "where a third party's property and privacy rights are at issue [and] the need for minimizing intrusion is especially great."'"  *In re Application for Access to Video Exhibits*, 575 F. Supp. 3d at 110 (third and fourth alterations in original) (quoting *United States v. Jackson*, No. 21-mj-115, 2021 WL 1026127, at *7 (D.D.C. Mar. 17, 2021)); *see also ICC Evaluation Serv., LLC v. Int'l Assoc. of Plumbing & Mech. Officials, Inc.*, No. 16-cv-54, 2022 WL 2785985, at *6 (D.D.C.

---

[12] The D.C. Circuit found, in the unique circumstances of that case, however, that the fact that no third-party had objected did not necessarily weigh in favor of disclosure because "the third parties with the most acute interest in the [sealed material were] the intelligence sources whose lives may depend on those redactions.  Those intelligence sources would out themselves by objecting to CNN's motion, risking the very harm they seek to avoid."  *Cable News Network*, 984 F.3d at 120.

July 15, 2022) ("This factor tends to favor sealing when a third party is lodging the objection to disclosure.   Given the lack of third-party objection, this factor favors disclosure." (internal citations omitted)); *Munchel*, 2021 WL 4709745, at *6 ("[W]here, as here, the only party to object is the defendant, courts in this district have concluded that this factor weighs in favor of disclosure."); *Hyatt*, 251 F. Supp. 3d at 185.

Here, the only objector is Respondent.   Under the recent precedent cited above, that fact weighs in favor of disclosure.   However, because the FTC does not make that argument—it merely contends that "a party's objection *alone* does not suffice to overcome the presumption in favor of public access to judicial proceedings," citing *National Children's Center* for the proposition that "it [is] error to grant sealing where the only *Hubbard* factor supporting it was that defendant objected to disclosure," ECF No. 16 at 6—the Court will also treat this factor as neutral.

> d.      The Strength of the Property or Privacy Interests Asserted

"The fourth *Hubbard* factor examines the objecting party's privacy and/or property interests in the documents at issue."  *All Assets Held at Bank Julius Baer*, 520 F. Supp. 3d at 83. "[U]nder this factor, the party seeking to avoid disclosure must identify specific privacy interests in the documents at issue."  *ICC Evaluation Serv.*, 2022 WL 2785985, at *7 (alteration in original) (quoting *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 94 (D.D.C. 2014)).   Match contends that the FTC's "Petition places at issue the details regarding the process followed by counsel and agents for counsel in investigating the facts that were the subject of the inquiry by the New York Times, and in preparing a response to that inquiry."  ECF No. 15-1 at 26.   That is, Respondent seems to be saying that because this action is, at its core, a dispute about attorney-client privilege and work product protection, the bulk of the filings should be sealed.  *See also id.* at 28 (arguing that the sixth *Hubbard* factor, which considers the purpose for which the documents were introduced, is

"inapposite" because "the central claim of this action is Respondent's assertion of the attorney-client privilege and work-product doctrine"). That bespeaks a misunderstanding of the focus of this factor, which asks not whether the party objecting to disclosure has a privacy or property interest in the core subject of the litigation, but rather whether it has such an interest in the information in the documents that it seeks to protect. *See, e.g.*, *Gilliard v. McWilliams*, No. 16-cv-2007, 2019 WL 3304707, at *4 (D.D.C. July 23, 2019) ("This [factor] is not analyzed by looking at the effect that disclosure of the record 'would have on the party's property and privacy interests generally,' but rather by 'examining the objecting party's privacy interest' in the record." (quoting *Friedman*, 672 F. Supp. 2d at 60)). Here, Match identifies no cognizable privacy or property interest in information in the record,[13] and, even with respect to its claims of privilege and work product, has not identified any such protected material in the sealed documents. Additionally, if correct, the argument would prove too much, tipping the scales toward sealing any litigation concerning privilege. As the FTC points out, "[i]f Match's position w[as] credited, we would not have the robust body of caselaw explaining particular application of the attorney-client privilege and work product doctrine that we do." ECF No. 16 at 7.

To the extent that Match is merely returning to its overarching theme that information "relating to the process by which a client seeks and obtains attorney advice" must remain untouchable to further the goals of attorney-client privilege and work product protection, that argument is rejected for the same reasons stated above in Section II.A.2.a. In any event, any privacy or property

---

[13] Although Match mentions "protecting its identity, reputation, and goodwill from ignominy from future filings of the FTC," ECF No. 15-1 at 6, it does not claim that as a property or privacy interest under this prong, *see id.* at 25–26; ECF No. 18-1 at 9–11. That forbearance is well-taken. Courts have determined that "[s]imply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records." *In re McCormick & Co.*, No. 15-mc-1825, 2017 WL 2560911, at *2 (D.D.C. June 13, 2017) (alteration in original) (quoting *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)).

interest that Respondent might have in information in the curtilage of those recognized protections

is not compelling enough to cause this factor to support sealing.

        e.      The Possibility of Prejudice to the Entity Opposing Disclosure

The prejudice with which the fifth *Hubbard* factor is concerned is prejudice "to 'fair trial

rights,' i.e., legal prejudice in ongoing or future litigation." *DRC, Inc. v. Republic of Honduras*,

No. 10-cv-3, 2011 WL 13257869, at *6 (D.D.C. Aug. 22, 2011) (quoting *Hubbard*, 650 F.2d at

321 n.107); *see also, e.g.*, *In re Application for Access to Video Exhibits*, 575 F. Supp. 3d at 111

("This factor considers 'whether defendants' rights in this proceeding will be prejudiced by re-

lease.'" (quoting *Munchel*, 567 F. Supp. 3d at 19)); *All Assets Held at Bank Julius Baer*, 520 F.

Supp. 3d at 85 ("The possibility of prejudice refers to whether disclosure of the documents will

lead to prejudice in future litigation to the party seeking the seal." (internal quotation marks omit-

ted) (quoting *United States ex rel. Durham v. Prospect Waterproofing, Inc.*, 818 F. Supp. 2d 64,

68 (D.D.C. 2011))).

        Addressing this factor, Match insists that

> putting on the public record the facts, including the mental impressions of attorneys,
> that lie at the core of OkCupid's efforts to seek and obtain legal advice could prej-
> udice [Respondent] in other, unrelated litigation by revealing the internal pro-
> cesses—including those relating to seeking and obtaining legal advice—by which
> [Respondent] responds to inquiries from the press that potentially implicate any
> privacy or similar matter.

ECF No. 15-1 at 27. But, again, Match has not identified in the sealed materials any confidential

attorney-client communications protected by the privilege or any work product. That is, it has not

specified any information of a type that our system of justice deems should be kept confidential to

further the free flow of communication between attorney and client or to enforce the "zone of

privacy" within which an attorney may work "'free from unnecessary intrusion by opposing parties

and their counsel.'" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir.

1980) (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)).  And so, its contention that it may suffer legal prejudice from unsealing such information is unconvincing.

Respondent then makes a vague argument that "changes in judicial approach to selective waiver over the last decade (and corresponding changes in Department of Justice policy), the risk of third-party claims, and the likelihood that a court would decline to enforce a non-waiver agreement are persuasive reasons for maintaining the confidentiality of these proceedings."  ECF No. 15-1 at 27; ECF No. 18-1 at 12.  It does not further develop this point by, for example, elucidating the claimed changes in judicial approach and Justice Department policy and how they might affect Match's interests.  "In this circuit, '[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'"  *Davis v. Pension Ben. Guar. Corp.*, 734 F.3d 1161, 1166–67 (D.C. Cir. 2013) (alteration in original) (quoting *Consol. Edison Co. of N.Y. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007)).  Match has thus forfeited this argument.  Even if it had not, courts have rejected such vague and generalized contentions when evaluating prejudice under this factor.  *See, e.g.*, *Guttenberg*, 26 F. Supp. 3d at 95–96 (rejecting the plaintiffs' "speculative and generalized argument").  Finally, selective waiver becomes an issue only if material protected by the attorney-client privilege is disclosed.  *See, e.g.*, *Permian Corp. v. United States*, 665 F.2d 1214, 1219–22 (D.C. Cir. 1981).  As noted repeatedly herein, Match does not assert that the currently sealed information contains privileged material.  The Court thus finds that this factor does not weigh in favor of maintaining the confidentiality of the sealed material.

f.      The Purposes for Which the Documents were Introduced

"The sixth *Hubbard* factor favors disclosure where 'the parties explicitly intended the Court to rely on [the sealed] materials in adjudicating their dispute.'"  *Vanda Pharm., Inc. v. FDA*,

539 F. Supp. 3d 44, 57 (D.D.C. 2021) (quoting *Berliner Corcoran & Rowe LLP v. Orian,* 662 F. Supp. 2d 130, 135 (D.D.C. 2009)) (alteration in original)).  Indeed, "there is a strong presumption of public access to documents that a litigant submits with the intention that the court will rely on them." *All Assets Held at Bank Julius Baer*, 520 F. Supp. 3d at 85.  "The more relevant a pleading is to the central claims of the litigation, the stronger the presumption of unsealing the pleading becomes." *United States v. Harris*, 204 F. Supp. 3d 10, 17–18 (D.D.C. Aug. 31, 2016).  Here, the material Respondent seeks to keep under seal comprises briefs and exhibits filed in support of the Primary Motion to Seal, the Motion for Discovery, and myriad subsidiary motions to seal, as well as Match's opposition to the FTC's Petition to enforce the administrative subpoena.  That is, all of those papers were "submit[ted] with the intention that the court will rely on them," *All Assets Held at Bank Julius Baer*, 520 F. Supp. 3d at 85, and the opposition to the Petition is clearly "relevant . . . to the central claims of the litigation," *Harris*, 204 F. Supp. 3d at 17–18.

Match contends, however, that the ordinary presumption does not apply here because "[g]ranting the public access to the pleadings in this case would defeat the purpose of the action: to determine whether the Commission's CID is enforceable to obtain privileged documents as to which Respondent is entitled to confidentiality under well-settled privileges."  ECF No. 15-1 at 28.  But how?  That would be true if, to establish that the documents at issue are protected, Match would have to reveal protected information.  But, again, Match has identified no protected information in the sealed briefing.  And, if the Court finds that it needs to see the challenged documents in order to resolve this motion, those documents will be reviewed *in camera*.  Thus, this factor, like the other five factors, does not weigh in favor of granting Respondent's motion.

\*       \*       \*       \*       \*

34

To sum up, none of the six *Hubbard* factors weighs in favor of maintaining the seal on the currently sealed records.  Rather, four weigh in favor of unsealing because (1) the public has a significant interest in access to the documents, which (2) were submitted with the intention that the Court would rely on them, and Respondent has neither (3) asserted a significant privacy or property interest in the information under seal public nor (4) shown that it is likely to suffer legal prejudice if it is unsealed.  The other two factors are deemed to be neutral.  Therefore, Respondent's Primary Motion to Seal, ECF No. 15, is denied.  In addition, its subsidiary motions to seal, none of which includes independent substantive argument as to the appropriateness of sealing and all of which request sealing only until the Primary Motion to Seal is resolved, *see* ECF Nos. 17, 18, 20, 22, 23, 27, 28, 30, are also denied.

### B.    Respondent's Motion for Discovery

Respondent's Motion for Discovery seeks leave to propound three requests for production of documents on the FTC aimed at uncovering evidence that the agency filed the Petition for improper purposes, specifically, "to punish Respondent and damage its reputation for standing firm in defense of its privileged documents and attorney work product" and "to gain leverage in a collateral case against Respondent."  ECF No. 20-1 at 2; *see also* ECF No. 28-13.  That "collateral case" is an action filed in the Northern District of Texas prior to the issuance of the March 2020 CID that, following that court's partial grant of Respondent's motion to dismiss on March 24, 2022, now seeks injunctive relief and civil penalties related to Respondent's alleged violation of the Federal Trade Commission Act and the Restore Online Shoppers' Confidence Act with various misleading, deceptive, or unfair practices.[14]  *See generally FTC v. Match Grp., Inc.*, No. 19-cv-

---

[14] The complaint in that action sought injunctive relief, civil penalties, and equitable monetary relief and alleged that Respondent made false or misleading representations about users of its dating service (Count I), exposed consumers to risk of fraud (Count II), made deceptive representations about its guarantee that users would receive a six month subscription for free if they did not "meet someone special" during their initial six months on the site (Count III),

2281, 2022 WL 877107 (N.D. Tex. Mar. 24, 2022).  In arguing that it has a "colorable" claim of

improper purpose sufficient to justify discovery, Respondent focuses primarily on (1) the FTC's

statement in its opposition to Respondent's Primary Motion to Seal that "access to filings in this

case is important so that the public (and future CID recipients) are aware the [FTC] will pursue

judicial enforcement of CIDs when companies have resisted producing responsive information,

including through overbroad assertions of privilege," ECF No. 16 at 5; (2) the timing of the FTC's

decision to file the Petition, which came, in Respondent's words, "exactly one week after the U.S.

District Court for the Northern District of Texas effectively gutted the FTC's [collateral] case"

against Respondent, and ordered the parties to mediate, ECF No. 28-1 at 5; (3) the fact that the

FTC did not provide a copy of its Petition and supporting papers to Respondent contemporane-

ously with submitting them to this Court's Clerk's Office for filing, did not agree to identify Re-

spondent pseudonymously in the Petition, and has not redacted certain information from its public

filings in this case; and (4) the FTC's "conduct throughout this investigation," such as its failure

to "engage in an objection-by-objection discussion" about the withheld documents and its refusal

to resolve the dispute through binding mediation, *id.* at 7 (initial capitals omitted).  *See also* ECF

No. 20-1 at 4–5; ECF No. 28-13 at 7 (proposed requests for production seeking (1) documents

related to the FTC's decision to file the Petition on the public docket and its failure to agree to

send contemporaneous notice of the filing; (2) documents related to Respondent's offers to meet

and confer about the privilege dispute, the FTC's decision in May 2022 that further conferences

would not be productive, and the FTC's rejection of the mediation proposal; and (3) documents

---

unfairly barred customers who disputed charges (Count IV), and failed to provide a simple mechanism for consumers
to stop recurring charges (Count V).  Complaint at 20–24, *FTC v. Match Grp., Inc.*, No. 19-cv-2281 (N.D. Tex. Sept.
25, 2019), ECF No. 1.  On March 24, 2022, the district court dismissed any claims for equitable monetary relief and
dismissed counts I and II with prejudice, leaving claims for injunctive relief and civil penalties as to the six-month
guarantee, the denial of access, and the cancellation policy.  *See Match Grp.*, No. 19-cv-2281, 2022 WL 877107, at
*14 (N.D. Tex. Mar. 24, 2022).

referencing both the FTC's current data privacy investigation and the case against Respondent in the Northern District of Texas).

      1.     Legal Standard

The March 2020 CID is a species of administrative subpoena. *See, e.g.*, *Consumer Fin. Protection Bureau v. Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017) ("We have treated CIDs as a form of administrative subpoena."). As a federal agency, the FTC may use an administrative subpoena like the March 2020 CID "to 'investigate merely on the suspicion that the law is being violated, or even just because [it] want[s] assurance that it is not.'" *Id.* (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)). The Federal Trade Commission Act authorizes the FTC to file a petition to enforce a CID "in the district court of the United States for any judicial district in which the [entity subject to the subpoena] resides, is found, or transacts business." 15 U.S.C. § 57b-1(e). Proceedings to enforce an administrative subpoena "are generally summary in nature," *SEC v. Lavin*, 111 F.3d 921, 926 (D.C. Cir. 1997), and require a court to "consider only whether '[(1)] the inquiry is within the authority of the agency, [(2)] the demand is not too indefinite and [(3)] the information sought is reasonably relevant,'" *Accrediting Council*, 854 F.3d at 688 (alterations in original) (quoting *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001)). However, the Supreme Court in *Powell* recognized that a court should block enforcement as an abuse of process where the administrative summons, subpoena, or CID "ha[s] been issued for an improper purpose, such as to harass the [target] or to put pressure on [it] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964).

In *United States v. Lasalle National Bank*, the Supreme Court addressed the *Powell* exception in the context of an administrative summons issued by the Internal Revenue Service. 437 U.S.

298, 301 (1978). In opposing the government's petition to enforce the summons, the respondents argued (and the district court and Seventh Circuit agreed) that it was issued for an improper purpose—specifically, that it was issued in an investigation conducted "solely for the purpose of unearthing evidence of criminal conduct." *Id.* at 299; *see also id.* at 304–05 ("[T]he use of an administrative summons solely for criminal purposes is a quintessential example of bad faith . . . ." (alterations in original) (quoting *United States v. LaSalle Nat'l Bank*, 554 F.2d 302, 309 (7th Cir. 1977), *rev'd*, 437 U.S. 298)). The Supreme Court held that, to resist an administrative summons on that basis, the entity subject to the summons (1) cannot rely on the motivation of the investigating officer alone, but must show that the agency, itself, had an improper purpose and (2) "bear[s] the burden to disprove the actual existence of a valid civil tax determination or collection purpose by the [IRS]." *Lasalle Nat'l Bank*, 437 U.S. at 315–16. As the cases indicate, the teaching of *LaSalle National Bank* applies outside the context of IRS summonses. For example, in *United States v. Markwood*, a case addressing the enforcement of a CID in a False Claims Act investigation, the Sixth Circuit described *Lasalle National Bank* as "refin[ing] the 'bad faith' defense first articulated in *Powell*" and holding that "agency 'bad faith' could not be asserted based on the improper motivations of individual agency employees, but must be institutionalized bad faith." 48 F.3d 969, 978 (6th Cir. 1995); *see also, e.g.*, *Smith v. United States*, 14 F. App'x 542, 545 (6th Cir. 2001) (similar, in a case concerning an administrative subpoena in a health care fraud investigation); *In re Plavin*, No. 15-cv-4286, 2016 WL 11775142, at *4 n.10 (N.D. Ga Feb. 4, 2016) (similar, in a case concerning a CID in a False Claims Act investigation). The Third Circuit has cited *LaSalle National Bank* for the proposition that "the burden on the party to whom the subpoena is addressed is not a meager one. It must come forward with facts suggesting that the subpoena is intended solely to serve purposes outside the purview of the jurisdiction of the issuing agency."

38

*NLRB v. Interstate Dress Carriers, Inc.*, 610 F.2d 99, 112 (3d Cir. 1979) (internal citation omitted); *see also United States v. McGovern*, 87 F.R.D. 590, 591 (M.D. Pa. 1980) ("The party to whom the subpoena is addressed must sufficiently articulate facts suggesting that the subpoena is intended solely to serve improper purposes.").  The D.C. Circuit agrees, *see FTC v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980) (("[T]he Supreme Court in another context has stated that even if an improper purpose by an agency or member of the staff is shown, enforcement of a subpoena is called for so long as proper purposes exist as well." (citing *Donaldson v. United States*, 400 U.S. 517, 534–35 (1971), *superseded by statute on other grounds as recognized in Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310 (1985))), as recognized by both of the judges in the case from this district on which Respondent primarily relies, *see FTC v. Bisaro*, 757 F. Supp. 2d 1, 11 (D.D.C. 2010) [hereinafter *Bisaro III*] (Kollar-Kotelly, D.J.) ("[E]ven if an improper purpose by an agency or member of the staff is shown, enforcement of a subpoena is called for so long as proper purposes exist as well." (quoting *Carter*, 636 F.2d at 789)); *FTC v. Bisaro*, No. 10-cv-289, 2010 WL 4910268, at *8 (D.D.C. Aug. 17, 2010) [hereinafter *Bisaro II*] (Kay, M.J.) (same).

Thus, the heavy burden of establishing an abuse of process is on the target of the administrative subpoena.  *See id.*  Although, in light of the summary nature of enforcement proceedings where "discovery is not usually permitted," *Lavin*, 111 F.3d at 926, courts have recognized that without "some opportunity to substantiate [such] allegations" it would be "virtually impossible for a [target] to prove that a facially valid summons was, in fact, issued for an improper purpose." *FEC v. Comm. to Elect Lyndon LaRouche*, 613 F.2d 849, 862 (D.C. Cir. 1979).  Still, the standard is not a low one.  Rather, "[f]aced with th[e] (unlikely) situation" that "a government agency is acting without authority or where its purpose is harassment," a district court must still be "cautious" in exercising its discretion to grant discovery rights.  *United States v. Aero Mayflower*

*Transit Co.*, 831 F.2d 1142, 1146–47 (D.C. Cir. 1987).  Respondent insists that it has presented

"colorable allegations of an improper purpose" and so is entitled to the discovery it seeks.  ECF

No. 20-1 at 1, 3, 5 (quoting *FTC v. Bisaro*, No. 10-mc-289, 2010 WL 3260042, at *4 (D.D.C. July

13, 2010) [hereinafter *Bisaro I*]); *see also* ECF No. 28-1 at 1, 3, 5.  To be sure, the D.C. Circuit

suggested in *Committee to Elect Lyndon LaRouche* (as did the district court in *Bisaro I*) that courts

have provided an individual or entity subject to an administrative subpoena that "has raised color-

able allegations of an improper purpose underlying a summons with an opportunity [as] an evi-

dentiary matter to substantiate those allegations," 613 F.2d at 863, but the phrase "colorable alle-

gations" is, at best, imprecise; to the extent that it suggests, as Match insists, merely a "genuine

suspicion," ECF No. 28-1 at 4, it is misleading.  Rather, claims of improper purpose may be further

explored through discovery only in "extraordinary circumstances," *Accrediting Council*, 854 F.3d

at 689, where "substantial allegations" are supported by "meaningful evidence," *SEC v. Wheeling-

Pittsburgh Steel Corp.*, 648 F.2d 118, 128 (3d Cir. 1981); *see also, e.g.*, *Standing Akimbo, LLC v.

United States ex rel. IRS*, 955 F.3d 1146, 1155 (10th Cir. 2020) ("[I]t is . . . clear that the [target]

must make a substantial preliminary showing before even limited discovery need be ordered."

(ellipsis in original) (quoting *United States v. Morgan Guar. Tr. Co.*, 572 F.2d 36, 42–43 n.9 (2d

Cir. 1978))); *Markwood*, 48 F.3d at 983 ("Our rule in [*United States v.*] *Will* . . . permit[s] discov-

ery in an administrative subpoena enforcement proceeding only after the party subject to the sub-

poena makes a 'preliminary and substantial demonstration of abuse' of the court's process." (quot-

ing *United States v. Will*, 671 F.2d 963, 968 (6th Cir. 1982));  *United States v. Thriftyman*, 704

F.2d 1240, 1249 (Temp. Emer. Ct. App. 1983) (similar); *United States v. Stuckley*, 646 F.2d 1369,

1374 (9th Cir. 1981) (similar); *United States v. Moon*, 616 F.2d 1043, 1047 (8th Cir. 1980) (simi-

lar); *United States v. Newman*, 441 F.2d 165, 169 (5th Cir. 1971) ("[T]he summoned party must

raise in a substantial way the existence of substantial deficiencies in the summons proceedings. Only when so raised is there any need for an evidentiary hearing or—in anticipation of it—the traditional pretrial discovery mechanisms . . . with appropriate limitations.") (internal footnote omitted); *United States v. Gel Spice Co.*, 601 F. Supp. 1214, 1218 (E.D.N.Y. 1985) ("Before obtaining an evidentiary hearing on the issue of the government's good faith, defendants must make a substantial preliminary showing of bad faith."); *FTC v. Carter*, 464 F. Supp. 633, 638 (D.D.C. 1979) ("To warrant discovery in a summary subpoena enforcement proceeding respondents must make a strong showing of need."), *aff'd*, 636 F.2d 781 (D.C. Cir. 1980).

To explain it a different way, a court deciding whether the target of an administrative subpoena has raised "colorable allegations of an improper purpose," *Comm. to Elect Lyndon La-Rouche*, 613 F.2d at 863, or "doubts about the agency's good faith," *SEC v. Dresser Indus.*, 628 F.2d 1368, 1388 (D.C. Cir. 1980), must make that determination in light of the "presumption of administrative regularity and good faith" accorded to agency action, *FTC v. Owens–Corning Fiberglas Corp.,* 626 F.2d 966, 975 (D.C. Cir. 1980); the mandate that only "extraordinary circumstances" merit discovery in administrative subpoena enforcement proceedings, *Accrediting Council*, 854 F.3d at 689; and the need to guard against "transform[ing] subpoena enforcement proceedings into exhaustive inquisitions into the practices of the regulatory agencies," *Dresser Indus.*, 628 F.2d at 1388.[15]  Whether to grant a motion for discovery in such circumstances is within the district court's discretion.  *See, e.g.*, *Carter*, 636 F.2d at 789; *FTC v. Browning*, 435 F.2d 96, 104 (D.C. Cir. 1980).

---

[15] Needless to say, Match's "genuine suspicion" standard, ECF No. 28-1 at 4, does not comply with those precepts.

2.    Analysis

Respondent does not make the showing necessary to support a request for discovery.  The Court therefore denies its motion.

At the outset, it is worthwhile to define, precisely, the task Respondent has set itself.  The bulk of cases addressing abuse of process/improper purpose related to an administrative subpoena focus on challenges to the *issuance of the subpoena*.  For example, in *Powell*—as quoted above— the Supreme Court noted that it would be an abuse of process to use a court to enforce a subpoena that "*had been issued* for an improper purpose" or in bad faith.  379 U.S. at 58 (emphasis added). The same is true of *United States v. LaSalle*, where the Court resolved whether IRS summonses issued in an investigation with the sole purpose of discovering criminal conduct were unenforceable because they were "not *issued* in good-faith pursuit of the congressionally-authorized purposes" of the statute authorizing them.  437 U.S. 298, 308 (1978) (emphasis added); *see also, e.g.*, *United States v. Buscaglia*, 420 U.S. 141, 146 (1975) ("Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose and is not meant 'to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.'" (quoting *Powell*, 379 U.S. at 58)); *Donaldson*, 400 U.S. at 536 ("We hold that under [26 U.S.C.] § 7602[, which authorizes the IRS to issue summonses for the purpose of ascertaining the correctness of a tax return,] an internal revenue summons may be issued in aid of an investigation if it is *issued* in good faith and prior to a recommendation for criminal prosecution." (emphasis added)); *Comm. to Elect Lyndon LaRouche*, 613 F.2d at 862 (characterizing improper purpose cases as asking whether "a facially valid summons was, in fact, *issued* for an improper pur-

pose" (emphasis added)); *United States v. McCarthy*, 514 F.2d 368, 373–75 (3d Cir. 1975) (addressing whether a summons was unenforceable because "*issued* for criminal purposes" or not "*issued* 'in good faith'" (emphasis added) (quoting *United States v. Wall Corp.*, 475 F.2d 893, 895 (D.C. Cir. 1972)); *United States v. Salter*, 432 F.2d 697 (1st Cir. 1970) (addressing whether "discovery is needed to disclose the 'purpose' or 'motive' behind the administrative summons"); *Bisaro II*, 2010 WL 4910268, at *7 ("The facts before this Court now do not establish a direct attempt by the FTC to misuse the Court's process for it has not been shown that the subpoena itself was *issued* to harass [deponent] or that the investigation has been conducted for an improper purpose." (emphasis added)); *Bisaro I*, 2010 WL 3260042, at *4–6 (addressing whether the target of a CID issued by the FTC was entitled to discovery to support "allegation[s] that the subpoena was *issued* for an improper purpose" (emphasis added)).  Here, Respondent does not argue that an improper purpose motivated either the issuance of the March 2020 CID or the commencement of the investigation—rather, it all but concedes that the FTC had grounds for the investigation by asserting that its Chief Legal Officer expected "an investigation by the FTC and, possibly, other agencies . . . arising from publication of an article regarding the collection and use of OkCupid user images by a third party."  ECF No. 17-2, ¶ 3.  Instead, Respondent argues that the FTC "initiated this petition proceeding" for an improper purpose.  ECF No. 20-1 at 1; *see also id.* at 8 (arguing that the FTC has "misused its CID enforcement authority by filing and litigating the Petition").  That is, it contends that the FTC's use of the statutorily sanctioned method of compelling compliance with an otherwise enforceable administrative subpoena is an abuse of process.  As with Match's argument for blanket sealing discussed above, it is a tall order.[16]

---

[16] This is not to imply that the Court is without power to provide Respondent the relief it seeks.  *See Wheeling-Pittsburgh Steel*, 648 F.2d at 124–25 (stating that the fact that "the Supreme Court has never confronted allegations like the ones before us does not mean that the federal judiciary is powerless to structure relief when necessary" and interpreting the equitable power of federal courts to deny enforcement broadly).

As noted, Respondent alleges two improper purposes.  First, it contends that the FTC has used this enforcement proceeding "to punish Respondent and damage its reputation for standing firm in defense of its privileged documents and attorney work product"; the agency purportedly accomplished this by: "pressur[ing] Respondent to waive the privilege or face public revelation of the confidential, inner-workings of its legal department"; "harass[ing] Respondent for standing upon its right to withhold privileged documents and work product"; and using the proceeding to "send a message to 'future CID recipients' that the FTC will 'pursue judicial enforcement of CIDs' when companies stand on their legal right not to disclose privileged and work product protected documents during the course of an otherwise confidential investigation."  ECF No. 20-1 at 2–3. Second it asserts that the agency "quite possibly" brought this enforcement proceeding "to gain leverage" in the Northern District of Texas case.  *Id.* at 2.

One initial observation: Match's allegations of "harassment," etc., are problematic because they take, as a premise, a legal conclusion that has not yet been made: that the documents it seeks to shield are privileged or work product.  There is nothing inherently harassing or punishing about a litigant seeking assistance from a court to determine whether documents withheld as attorney-client privileged or work product protection are actually protected.  But there is no need to harp on that rhetorical complaint because Match's submissions demonstrate substantive weaknesses, as well.  As explained above in the discussion of the Primary Motion to Seal, there has been and will be no "public revelation of the confidential, inner workings" of Respondent's legal department because nothing in the briefing connected with the Petition or any other pending motion in this case has revealed any information covered by the attorney-client privilege or the work product doctrine.  *See supra* Section II.A.2.a.  That is, Respondent has identified *nothing* that the public has learned or will learn about the workings of Respondent's legal department following denial of

the motions to seal that is actually "confidential information" under applicable law.  Also as explained above, Match makes too much out of the FTC's so-called admission that this action may have a deterrent effect on other entities that are subject to CIDs, *see* ECF No. 20-1 at 8–9; ECF No. 28-1 at 4; any "message to 'future CID recipients'" is merely a potential by-product of an enforcement action that there is no reason to keep under seal.  *See id.*

Match's other complaints that the FTC has not respected the confidentiality of the company's information suffer from similar infirmities.  It claims that the FTC refused "without explanation" to agree not to oppose a request by Respondent to proceed pseudonymously in this action; "has repeatedly filed highly confidential and sensitive information about Respondent publicly," including "reveal[ing]" in certain filings—particularly the FTC's opposition to the Primary Motion to Seal, *see* ECF No. 18-1 at 3–4—"the prior, separate 2014–15 investigation that was entirely confidential prior to this proceeding"; and "ignored" Respondent's "requests to be notified immediately of the filing [of the Petition] so that it could seek relief from the Court."  ECF No. 20-1 at 4–5.  The Court addresses each in turn.

First, as explained above, *see supra* note 11, the question of whether a party will be allowed to proceed pseudonymously is not up to the parties; the Court must make that decision, weighing factors similar to those outlined in *Hubbard*, including the public's common law right of access to judicial proceedings and whether the justification for proceeding under a pseudonym "is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature."  *Roe*, 319 F. Supp. 3d at 425–26 (quoting *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993)).   "[I]t is the litigant seeking to proceed under pseudonym that bears the burden to demonstrate a legitimate basis for proceeding in that manner."  *Qualls v. Rumsfeld*, 228 F.R.D. 8, 13 (D.D.C. 2005).  Courts must engage in the required analysis

even where the motion is unopposed.  *See, e.g.*, *Doe, Inc. v. Roe*, No. 21-mc-43, 2021 WL 3622423 (D.D.C. Apr. 28, 2021) (denying an unopposed motion to proceed pseudonymously).  Thus, it is not clear that the FTC's agreement not to oppose such an application would have had any substantial effect on the likelihood of success of such a motion.[17]  More, the FTC was under no obligation to agree not to oppose the contemplated motion and, in any case, such a motion would have postdated the filing of the Petition, which identified Match as required by Rule 10(a) of the Federal Rules of Civil Procedure.  Courts have declined to find that actions taken by agencies that are consistent with existing law constitute evidence of bad faith or improper purpose.  *See, e.g.*, *Markwood*, 48 F.3d at 986 (rejecting the respondent's argument that the agency's "failure to seek immunity for him" was evidence of an improper purpose where the statute governing CID at issue "merely allows, and does not require, the government to grant immunity"); *Dresser Indus.*, 628 F.2d at 1388 (affirming the district court's denial of discovery where "[t]here was nothing improper" about the actions of the agency under the D.C. Circuit's jurisprudence); *United States v. Kamal Kabakibou, MD, PC*, 522 F. Supp. 3d 1307, 1314 (N.D. Ga. July 9, 2020) (finding no evidence of an improper purpose in the issuance of a CID where the agency made no "affirmative misrepresentations" and breached no duty to disclose); *CFTC v. Harker*, 615 F. Supp. 420, 424 (D.D.C. 1985) (rejecting the respondent's argument that evidence that the agency "'leaked' information about [its] investigation" supported granting discovery where the relevant statutory and regulatory provisions "[did] not provide respondents with a guarantee of confidentiality").  Thus, the import of this failure to agree is negligible.

Second, Match's complaint that the FTC revealed the existence of the 2014–2015 FTC investigation in its papers is problematic for two reasons: (1) it ignores certain material facts and

---

[17] As noted above, although Match stated that it would file a motion to proceed pseudonymously, it never did so.  *See supra* note 11

(2) fails to recognize, again, that any revelation did not violate any statute or regulation.  Match charges that in the FTC's opposition to the Primary Motion to Seal, the agency "[went] so far as to reveal the prior, separate 2014-15 investigation that was entirely confidential prior to this proceeding," which "swiftly" resulted in "damaging" reports in the press, and insists that the FTC would have redacted that information but for its intent to harm the company.  ECF No. 20-1 at 5; *see also* ECF No. 18-1 at 3–4 ("The FTC publicly filed its Opposition [to the Primary Motion to Seal] along with a supporting declaration, failing to redact that the FTC opened and closed a *prior*, *separate* investigation of OkCupid in 2014 and 2015.  Rather than redact the reference to that investigation, which would not have impaired the interests of the agency in any way, the FTC chose to disclose it, fully aware of the harm it would cause Respondent[.]" (emphasis in original)).  That is factually inaccurate.  As discussed above in Section I, on June 2, 2022, the Petition and its supporting documents were entered on the docket, with the supporting documents filed under seal subject to a motion to temporarily seal certain portions of those submissions in order "to afford Match the opportunity to assess whether they contain Match's protected information and to file a motion to seal of its own."  ECF No. 2 at 3; *see also* ECF No. 1.  The (then-sealed) declaration in support of the Petition includes an unredacted reference to the 2014–2015 FTC investigation, noting that the FTC issued a CID to OKCupid in 2014 dealing with "an unrelated privacy matter" that nonetheless "bears significance to the FTC's current investigation because the 2014 CID included a specification requesting OkCupid to '[i]dentify and describe all Third Parties, other than OKCupid users, with whom OKCupid has shared or shares Personal Information . . . and describe the purposes for which the information was or is shared'"—and recall that 2014 is when the alleged sharing with Clarifai is supposed to have occurred.[18]  ECF No. 2-4 at 3–4, ¶ 8.  Judge Leon did

---

[18] As the FTC explains in later filings, in response to the 2014 CID, Match "did not then disclose OkCupid's 2014 data-sharing with the facial recognition company Clarifai, even though the FTC asked for such information at that

47

not address that motion to seal until June 8, 2022, granting it but ordering the FTC to publicly file a redacted version of the declaration (which, as noted, did not redact a reference to the 2014–2015 investigation). ECF No. 8. By that time, Match had appeared and had (on June 2, 2022) filed an Emergency Motion to Temporarily Seal the Record, seeking to seal all filings in the record. ECF Nos. 3-1, 6. That is, Match attempted to prevent that information from appearing on the public docket, but Judge Leon effectively denied that motion as to the declaration in question when he ordered the redacted version of it to be filed on the public docket (again, the information about the prior investigation was unredacted in the redacted version of the declaration). ECF No. 8 at 2. Thus, the first time that the FTC filed on the public docket a document that revealed the existence of the prior investigation was on June 8, 2022, in response to an Order requiring it to do so. *See* ECF No. 12, ¶ 8. That having occurred, it is unclear why the FTC would believe it necessary to redact information about that investigation from later filings—such as the FTC's opposition to the Primary Motion to Seal, filed almost one month later, on July 5, 2022—or why Match would think an application to keep that information confidential would succeed.

Match nevertheless argues that the existence of the investigation "should have been protected from disclosure," citing 16 C.F.R. § 4.10. Section 4.10 provides that "[m]aterial obtained by the [FTC] . . . [t]hrough compulsory process" or material that is "received by the FTC" and "designated by the submitter as confidential" by "mark[ing] or otherwise identif[ying]" it as such may be disclosed only after the submitter has been "afforded an opportunity to seek an appropriate protective or in camera order." 16 C.F.R. § 4.10(e), (g). Respondent's theory is that, because FTC

---

time." ECF No. 16 at 3. Therefore, the agency argues, "[b]oth the 2014 data-sharing incident and Match's and OkCupid's later representations about it (to the New York Times and individual consumers) are . . . properly the subject of the FTC's present investigation." *Id.* at 3–4.

staff "first learned about its own prior investigation as a result of Respondent's compelled production of documents and information in this CID matter," that information "should not have been publicized without giving the subjects an opportunity to oppose the agency's action."  ECF No. 17-1 at 46.  But it strains the rules of logic to find that the existence of a prior investigation by the FTC could constitute material "obtained by" or "received by" the agency from the entity investigated, even where that entity brought the prior investigation to the attention of certain FTC staff members.  In any event, the FTC asserts that the conversation in which Respondent called the attention of FTC staff members to the prior investigation pre-dated any compulsory process, so Section 4.10 would not apply to that information.  *See* ECF No. 19-2, ¶ 4.

Match points to further regulations to support its assertion that the mere existence of an investigation can be confidential information, but they do not help.  ECF No. 17-1 at 43–44 (citing 16 C.F.R. §§ 2.7(a)(4), 2.9(b), and 2.11).  The subpart in which all those provisions appear governs FTC "inquiries; investigations; [and] compulsory processes."  16 C.F.R. ch.1, subch. A, pt. 2, subpt. A (initial capital letters omitted).  Section 2.7(a)(4) defines the term "protected status" as "information or material that may be withheld from production or disclosure [in response to compulsory process issued by the FTC] on the grounds of any privilege, work product protection, or statutory exemption."  *Id.*, § 2.7(a)(4).  Section 2.9(b) governs the rights of witnesses in depositions or investigative hearings and says nothing about confidentiality.  *Id.*, § 2.9(b).  Section 2.11 governs the mechanics of assertions of "protected status" as defined in Section 2.7(a)(4)—that is, assertion of attorney-client privilege, work product, or statutory exemption.  *Id.*, § 2.11.  None of those provisions states or indicates that the fact of an investigation must remain confidential and none applies to confidentiality in court proceedings.  Again, courts have refused to consider actions taken in compliance with the law to be evidence of improper purpose.  *See, e.g.*, *Markwood*, 48

F.3d at 986; *Dresser Indus.*, 628 F.2d at 1388; *Kamal Kabakibou, MD, PC*, 522 F. Supp. 3d at 1314.   Indeed, in *Harker*, a court in this district specifically found that allegations the agency leaked the existence of an investigation did not justify discovery because, as here, the governing statute and regulations did not guarantee confidentiality.  *See* 615 F. Supp. at 424.

Third, and finally, Match complains that the FTC did not notify it immediately that it had filed the Petition, so as to allow Match to "seek relief from the Court."  ECF No. 20-1 at 4.  The FTC explains that it notified Match on May 26, 2022—the date it sent the Petition and accompanying submissions to the Clerk's Office for filing—that it would be filing the petition "in short order."  ECF No. 16-1, ¶ 18.  The FTC also understood that the process of docketing the submissions could take a number of days.  *Id.*, ¶ 20.  The FTC followed up with the Clerk's Office and, on June 1, 2022, received an email stating that the "docket would be accessible online within 24 to 48 hours."  *Id.*, ¶ 21–22.  FTC staff, "[w]ithin moments," notified Match.  *Id.*, ¶ 23.  The docket confirms that the Petition was not entered on the docket until June 2.  *See* ECF No. 1.  Match asserts that, "[i]f the agency's goal was to publicize the proceeding, depriving Respondent of the opportunity to protect its identity and confidentiality by waiting until the Court referred the Petition to the Clerk for filing *on the public record* is *exactly* what the agency would have done."  ECF No. 28-1 at 6 (emphasis in original).  But the facts show the illogic of that argument.

It appears from the record that FTC first informed Match that it had determined to file a petition to enforce the CID in an email dated March 31, 2022.  ECF No. 17-13.  That email indicated that the agency could not estimate when it would file given the "many layers of review and parties involved within the agency," but assured Match that it would move to "temporarily seal information and documents submitted to [it] by Match during the course of the investigation" so that Match would "have the opportunity to file its own motion for a protective order or to seal if

[the company] so desires." *Id.*  Then, on May 26, 2022, FTC informed Match that it would be filing a Petition "in short order" and assured the company, again, that it would file a motion to temporarily seal information Match had designated as confidential so that Match could seek relief. ECF No. 17-15 at 3.  That same day, the agency did just that.  *See* ECF Nos. 1–2.  Thus, Match had notice of the filing and an opportunity to prepare any response aiming to protect any information it thought should be protected.  The FTC also informed Match on June 1, 2022, that the docket would be publicly accessible in 24 to 48 hours.  The docket was created and became publicly accessible the next day, on which Match filed its emergency motion to temporarily seal.  It is not clear what benefit Match would have reaped from receiving earlier notice that the FTC had submitted its papers to the Clerk's Office.  Those papers named the parties in compliance with Rule 10.  *See* Fed. R. Civ. P. 10(a).  Match also knew that it would have to file a motion if it sought to proceed pseudonymously—as noted above, it had asked the FTC to agree not to oppose such a motion.  Even were it possible to file any such motion prior to the public accessibility of the Petition, it is unlikely the motion would have been ruled on before that.  And, of course, the emergency motion to temporarily seal the record that Match did submit was denied by the Court.  *See* Minute Order re ECF No. 6 (June 8, 2022) .  Moreover, Match had already publicly disclosed the existence of the investigation before the Petition was filed in its May 2022 Form 10-Q filed with the SEC. *See* ECF No. 16-2 at 4 (paragraph headed "FTC Investigation of Certain Subsidiary Data Privacy Representations").  As a factual matter, then, it is unclear how the FTC's conduct "depriv[ed] Respondent of the opportunity to protect its identity and confidentiality."  ECF No. 28-1 at 6.

As a legal matter, Respondent asserts that "no . . . requirement exists" mandating that the agency "wait to notify Respondent of the filing until the Clerk's Office opened the action on the Court's docket."  ECF No. 18-1 at 6 n.4.  That may be true.  But, more importantly to the issue

presented here, no requirement exists mandating that the FTC inform Match contemporaneously

that it had filed the Petition, or even provide the notice it did.  *See Harker*, 615 F. Supp. at 422,

426 (finding "insufficient indicia of bad faith or harassment on the part of the [agency] to justify

granting respondents any discovery" in a case where "respondents' counsel demanded, and was

denied, [agency] assurances that [they] receive notice before the [agency] instituted legal action");

*see also Markwood*, 48 F.3d at 986; *Dresser Indus.*, 628 F.2d at 1388; *Kamal Kabakibou, MD,*

*PC*, 522 F. Supp. 3d at 1314.  In short, the circumstances Match cites regarding the FTC's treat-

ment of allegedly confidential information "do[es] not justify a departure from the normal rule that

'[d]iscovery requests are not looked upon favorably in subpoena enforcement proceedings . . . .'"

*Harker*, 615 F. Supp. at 425 (quoting *Carter,* 636 F.2d at 789).

Respondent also contends that the FTC's behavior during the investigation is evidence of

an improper purpose.  Specifically, the company takes issue with the FTC's (1) alleged "pivot"

from investigating third-party access to user data to investigating the comment reported in the New

York Times article that OKCupid "did not enter into any commercial agreement" with Clarifai in

2014 and had "no relationship with them" in 2019, *see* Metz, *Facial Recognition*; (2) focus on

Respondent's attorney-client privilege and work product designations, while allegedly refusing to

engage in "proper meet-and-confer[s]" on the dispute; (3) questioning of Respondent's current and

former employees "about privileged and/or work-product protected investigational and response

efforts"; and (4) refusal to submit this dispute to binding mediation instead of filing a court action

to enforce the CID.  ECF No. 20-1 at 4.  Again, none of these alleged actions by the agency satisfies

the substantial burden Match must show to merit discovery in an administrative subpoena enforce-

ment proceeding.

As to the "pivot" of the investigation, remember that Respondent argues here that the FTC *filed the Petition* for an improper purpose.  Although Respondent asserts that "[t]he purpose of the investigation is . . . unclear and highly suspect," it has not contended that the investigation or the March 2020 CID exceeded the agency's authority.   *See, e.g.*, *Accrediting Council*, 854 F.3d at 688 (noting that in a proceeding to enforce an administrative subpoena a court must "consider only whether '[(1)] the inquiry is within the authority of the agency, [(2)] the demand is not too indefinite and [(3)] the information sought is reasonably relevant'" (alterations in original) (quoting *Ken Roberts Co.*, 276 F.3d at 586)).  And the Court sees nothing indicating bad faith or improper purpose in the fact that, as the agency received more information from Respondent, it may have refocused its inquiry.  Importantly, the March 2020 CID explicitly sought information about Respondent's 2019 internal investigation.  *See* ECF No. 15-15 at 10, 13.  That is, it appears the events of 2019 surrounding the New York Times article were always relevant to the investigation.

Nor does the Court, having reviewed every communication submitted by the parties relating to this dispute as well as the declarations of counsel, find irregularity indicative of an improper purpose in the negotiations over Respondent's privilege and work product designations.  That history is detailed above in Section I, but here is an outline.  The FTC first challenged Match's privilege and work product designations in September 2020, explaining the basis of its objections and providing examples of allegedly deficient entries on the then-operative privilege log.  *See* ECF No. 17-11.  The parties continued to exchange letters addressing the issue through December 2020.  *See* ECF Nos. 15-18, 17-10, 17-19.  Between February and June 2021, as authorized by 15 U.S.C. § 57b-1(c), the FTC noticed and held investigational hearings that addressed, in part, this dispute.  *See* ECF No. 15-23; *see also, e.g.*, ECF No. 2-1 at 68–82, 85–103, 106–26, 129–41, 148–49 (excerpts of hearing testimony).  Respondent's final privilege log was produced in September 2021,

and there were then further exchanges of letters and two meet-and-confers between November 2021 and May 2022, prior to the filing of the Petition.  *See* ECF No. 2-1 at 11–12, ¶¶ 32–35, 36–37; *id.* at 238–41; ECF No. 15-8; ECF No. 15-17; ECF No. 15-19 at 5–6; ECF No. 15-20; ECF No. 15-21; ECF No. 15-24.  Although that history is protracted and the communications include (on both sides) some grandstanding and suggestions of entrenchment, the Court finds nothing that indicates that the FTC was proceeding in bad faith or with an improper purpose.[19]

Finally, Respondent questions the timing of (1) the FTC's March 31, 2022 email informing the company that the agency planned to file an action to enforce the March 2020 CID and (2) the eventual filing of the Petition on May 26, 2022, linking them both to events in the FTC's litigation in the Northern District of Texas.  ECF No. 20-1 at 4; *see also* ECF No. 17-13.  Specifically, Match points out that the March 31, 2022 email was sent "after 110 days of silence" and "came exactly one week after the U.S. District Court for the Northern District of Texas effectively gutted the FTC's pending complaint against [the company] in another case[] and ordered the parties to me-diate what little remained of that dispute" and that the filing of the Petition on May 26, 2022, came barely two weeks after [that] mediation . . . failed."  ECF No. 20-1 at 4; ECF No. 28-1 at 5.  This string of events Respondent takes as evidence that the FTC filed the Petition to "gain leverage" in the Northern District of Texas case.  ECF No. 20-1 at 2.  Again, these facts do not suggest an improper purpose.

First, counsel for the FTC has asserted that the two cases are "not related" and are being handled by different divisions of the agency—this case by the Division of Privacy and Identity

---

[19] The Court finds puzzling Match's assertion that the FTC's "refus[al] to take the ordinary and necessary steps to resolve the present dispute" weighs in favor of discovery.  ECF No. 20-1 at 2.  Is it suggesting that, since the dispute over privilege began, the FTC has been stonewalling in order that it would be able to file a petition to enforce the CID and thereby reveal Match's identity?  *See* ECF No. 17-1 at 11 ("[P]ublic revelation has been the FTC's motive, in whole or in part, all along.").  The notion that the FTC was playing such a long game—and one where, according to Match, the agency had no intention of winning its many skirmishes with Match over privilege before bringing its Petition—is implausible and finds no support in the parties' lengthy correspondence over the privilege dispute.

Protection based in Washington, D.C., and the Texas case by the Southwest Regional Division. ECF No. 26-1, ¶ 31.  In addition, Match is represented not only by different counsel in the two cases, but by different law firms.  Respondent complains that the FTC's declaration does not say more—that it does not state "that the different teams did not communicate with each other, and that the decision in the Texas case had no bearing on the FTC's decision to file the Petition."  ECF No. 28-1 at 5 (emphasis omitted).  But surely what Respondent is alleging is that the cases *are* related—that events in one have caused events in the other.  The FTC has expressly stated that they are "not related," ECF No. 26-1, ¶ 31, and "the government is entitled to a 'presumption of administrative regularity and good faith,'" in its assertions, *Resolution Tr. Corp. v. Burke*, 869 F. Supp. 15, 20 (D.D.C. 1994) (quoting *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1091 (D.C. Cir. 1992)).  More, the burden is on Respondent to make the requisite showing before discovery will be ordered, *see, e.g.*, *Standing Akimbo*, 955 F.3d at 1155 (10th Cir. 2020); *Markwood*, 48 F.3d at 983; *Thriftyman*, 704 F.2d at 1249; *Will*, 671 F.2d at 968; *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 128; *Stuckley*, 646 F.2d at 1374; *Moon*, 616 F.2d at 1047 (8th Cir. 1980); *Morgan Guar. Tr. Co.*, 572 F.2d at 42 n.9; *Newman*, 441 F.2d at 169; *Gel Spice Co.*, 601 F. Supp. at 1218; *Carter*, 464 F. Supp. at 638, and it has provided no evidence countering the FTC's representation and sufficiently demonstrating that the Texas case had any "bearing on the FTC's decision to file the Petition," ECF No. 28-1 at 5 (emphasis omitted).

Take, for example, Respondent's assertion that "after months of silence, [the FTC] suddenly notified Respondent of its intent to file the Petition on March 31, 2022. This surprise announcement came *exactly one week after the FTC suffered a stinging defeat in its pending litigation in Texas against MGI* and after the court ordered the parties to mediate."  ECF No. 20-1 at 6 (emphasis in original).  It is not clear how Respondent could have been "surprise[d]" by the March

31, 2022 communication.  The FTC first raised the possibility of an enforcement action in November 2020 and again in November 2021.  *See* ECF No. 15-20 at 4; *see also* ECF No. 2-1 at 238; ECF No. 17-19.  Indeed, on November 2, 2021, the FTC asked "for the final time" for Respondent to produce four identified categories of documents by November 12, 2021.  ECF No. 2-1 at 238.  Counsel for the FTC reports (without contradiction) that Match failed to do so but, instead, sought another meet-and-confer, which took place on December 10, 2021.  ECF No. 26-1, ¶ 19.  The FTC ultimately rejected Match's proposal (which was to "re-evaluate one [unidentified] category of documents" conditioned on the FTC's agreement to withdraw all other then-current privilege and work product objections and to waive all future discover-related challenges) and informed the company of the agency's decision, taken "after careful deliberation," on March 31, 2022.  ECF No. 2-1 at 11–12, ¶¶ 33–34; ECF No. 17-13; ECF No. 26-1 at 7, ¶ 19.  That email was followed by further negotiations that culminated in a May 4, 2022 letter from the FTC to Match providing the company until May 13, 2022, to produce 136 documents from the September 2021 privilege log (the same 136 documents at issue here), or else it would file an enforcement proceeding.  *See generally* ECF No. 15-20; ECF No. 26-1 at 8–9, ¶¶ 21–24.  Match did not produce any documents, and the FTC filed this action.  *See* ECF No. 26-1, ¶¶ 25–26.

Respondent's argument that the timing is "suspicious" and points to an improper attempt by the FTC to influence a "collateral proceeding"—the Northern District of Texas case—is pure conjecture.  ECF No. 20-1 at 3, 6, 8, 9.  Indeed, Match signals as much in its motion, stating that one of the FTC's motives was "*quite possibly*[] to gain leverage" in that case.  ECF No. 20-1 at 2 (emphasis added).  But if the agency's intent was to influence the Match's conduct in that other litigation, wouldn't that have to be communicated to Match in some way?  Surely, some connection

would have to be made by the agency between the two actions in order for one to exert any influence on the other.  But Respondent presents no evidence of that; and the fact that the Court and Respondent itself are left to speculate as to some possible connection indicates either that there was none or that this was a singularly inept attempt at gaining leverage.[20]  In any event, Respondent has provided nothing that meets its burden of sufficiently demonstrating an improper purpose.

Mathematically, "zero plus zero equals zero"; but the Court will not fall into the "trap[]" of assuming that, because "no single item of evidence" indicates an improper purpose, the "evidence as a whole" cannot.  *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 14 (D.D.C. Apr. 8, 2004) (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002)).  Indeed, Respondent argues that "[j]ust as in [*Bisaro I*], discovery is warranted because the agency's pattern of conduct *together*" supports the company's request.  ECF No. 28-1 at 1 (emphasis in original).  A glance at *Bisaro I*, however, demonstrates the difference between the two cases.  There, the target of a CID had significant evidence that the FTC had issued the administrative subpoena for improper purposes.  Specifically, the FTC had initiated a prior investigation "into the anticompetitive nature of several settlement agreements" between a brand name pharmaceutical company (Cephalon, Inc.) and several generic pharmaceutical companies, including one known as Watson Pharmaceuticals, whose president was Paul M. Bisaro.  *Bisaro I*, 2010 WL 3260042, at *1–2.  The agency's theory was that Cephalon had settled with the generics by paying them to delay entry of their generic products into the marketplace.  *See id.*  After those settlements, Cephalon listed a new patent for the same drug and Watson Pharmaceuticals sought (via an Abbreviated

---

[20] And why would the agency wait until *after* the mediation in the Texas case failed to file the Petition?  *See* ECF No. 20-1 at 6.  If the notion is that the threat of an enforcement action was meant to convince Match to acquiesce to the FTC's demands in the Texas mediation, that does not indicate that the *filing of this Petition* was motivated by an improper purpose to gain such leverage in that other action.  In any event, it does not aid Match's arguments in favor of discovery.

New Drug Application ("ANDA") filed with the Food and Drug Administration ("FDA")) to "mount a validity challenge" to the patent that, if it was the first such challenge, would result in a 180-day exclusivity period during which no other competing generic drug could be approved by the FDA.[21]  *See id.*  Thereafter, according to a declaration submitted by Watson's outside counsel, the assistant director of the FTC bureau concerned with competition in the health care industry made a series of phone calls (1) informing counsel that the agency had been in contact with the FDA and "it might be in Watson's financial interest to relinquish or 'waive' any exclusivity" associated with its ANDA "in order to clear the way for generic competition" and (2) attempting to broker a deal between Watson and another generic company—Apotex—in which Watson would give up any exclusivity and jointly with Apotex market a generic version of the drug  *Id.* at *2–3. The attorney also testified that the assistant director indicated "that failure to waive its first filer rights would likely cause the FTC . . . to initiate an investigation against Watson." *Id.* at *3.  While Watson was considering its options, the FTC initiated an investigation concerned with whether Watson had made a deal with Cephalon "to withhold relinquishment of any marketing exclusivity." *Id.*  Evidence in the form of an internal Apotex email also revealed that the FTC had "several conversations" with Apotex about Watson's "refusal to deal." *Id.*  When the FTC issued a subpoena to Bisaro, he moved to quash it on several grounds, including that it was issued "to put

---

[21] The Food, Drug, and Cosmetic Act requires a company that seeks to market a new brand-name drug to submit a New Drug Application that includes "among other things, evidence of the drugs' safety and effectiveness, as well as information about patents that cover or might cover the drugs." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 879 (D.C. Cir. 2004).  The so-called "Hatch-Waxman" amendments to that statute allow companies seeking to sell generic versions of approved brand-name drugs to submit ANDAs "that 'piggyback' on the safety-and-effectiveness information that the brand-name manufacturers submitted in their NDAs." *Id.*  To address the patents that cover or might cover the generic drugs, companies can "include[e] in their ANDAs one of several 'certifications' that explain why the FDA should approve the application despite the patent's claim on the drug." *Id.*  Among these is a certification, known as a Paragraph IV certification, that the patent is invalid or will not be infringed by the new drug. *Id.*  "As an incentive to generic manufacturers who take the risk of 'sparking costly [patent infringement] litigation' and 'to compensate [generic] manufacturers for research and development costs,' the statute awards a 180–day period of market exclusivity to the first ANDA applicant to gain final FDA approval of its paragraph IV certification."  *Mylan Pharms., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 201 (D.D.C. 2012) (alterations in original) (quoting *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010)).

pressure on Watson to enter into a business deal the FTC was attempting to broker between Watson and Apotex to get Watson to relinquish its statutory 'first filer' rights" and "to harass Watson for refusing to enter into the deal with Apotex"; he sought discovery to explore those issues. *Id.* at *4. The court allowed Bisaro to pursue limited discovery because the evidence before it "present[ed] a strong possibility" that the FTC "exceeded its authority" by using "its investigative power to pressure a company to waive statutory rights it had legitimately acquired or to enter into a business deal with a competitor." *Id.* at *5. As the court explained in *Bisaro II*, the evidence supporting an improper purpose in that case comprised "declarations taken under penalty of perjury by Watson's attorneys . . . setting forth facts showing the FTC was pressuring Watson to relinquish any exclusivity rights it had with respect to the [relevant] patent, and threatening to start an investigation if Watson did not soon relinquish those rights"; an admission from the FTC that "if Watson had just agreed to relinquish any marketing exclusivity with respect to the . . . patent, it never would have pursued th[e] investigation"; and "an email from Apotex's President that indicates the FTC had been sharing potentially confidential information about Watson with Apotex." 2010 WL 4910268, at *7. That is a far cry from the declarations and argument Respondent has provided here, which largely rely on speculation, interpretation, and suggestion.

Respondent suggests, for example, that this enforcement proceeding was triggered by the fact that the FTC "has been doggedly pursuing Respondent for years, with little success," citing the Northern District of Texas litigation. ECF No. 15-1 at 8. The D.C. Circuit has, on at least one occasion, credited assertions made by the target of an investigation that the investigating agency was pursuing a vendetta against him, but the circumstances were quite different. In *United States v. Fensterwald*, an attorney selected by the IRS for a "special audit" had represented "one of the original seven Watergate defendants," who "contributed . . . greatly to the judicial, congressional,

and public knowledge of the Watergate conspiracy"; had represented the man convicted of assassinating Reverend Dr. Martin Luther King, Jr.; had served as "chief counsel of the Senate committee which investigated alleged illegal activities of the [IRS] itself"; and had "knowledge of efforts at retaliation against him by prominent persons in the administration at that time . . . , and that such efforts at retaliation could easily have spurred the [IRS] to take an extraordinary interest in [the attorney]." 553 F.2d 231, 232 (D.C. Cir. 1977). The court of appeals found that such allegations placed the taxpayer "out[side] of the category of an ordinary taxpayer challenging the good faith of the [IRS] in conducting a special audit" and thus he should have been allowed discovery by the district court. *Id.* at 232. That case appears to be *sui generis*, however, as in *SEC v. McGoff*, the D.C. Circuit affirmed the district court's denial of discovery to an individual who asserted that he was targeted in an investigation by the SEC because he was critical of the presidential administration. 647 F.2d 185, 187–88 (D.C. Cir. 1981). The court swept aside his comparisons to *Fensterwald*, finding "scant resemblance between the two cases," because he could "point to nothing concrete paralleling the McCord Watergate revelations, disclosures which occasioned 'great embarrassment' to persons highly placed in the Executive Branch" or to "prior involvement with the agency conducting the investigation [that] might have stimulated that agency to retaliate against him." *McGoff*, 647 F.2d at 193. This Court will not equate allegations of the agency's perceived partial defeat in run-of-the-mill unfair or deceptive practices litigation—however "stinging," ECF No. 20-1 at 6 (emphasis omitted)—to the allegations in *Fensterwald*.

Finally, Respondent does not assert that the FTC's sole purpose in initiating the enforcement proceeding was improper. Rather, it asserts that "the facts strongly suggest that the FTC's *ulterior and, perhaps, primary motives* were to punish Respondent . . . and, quite possibly, to gain leverage in a collateral case" and that "the FTC is using this process—*at least in part . . .* —to

achieve improper and unlawful aims." ECF No. 20-1 at 2, 5. The Court does not find it appropriate to allow Respondent to engage in discovery to attempt to show that an improper purpose was *among* the agency's motivations for seeking court assistance to enforce the March 2020 CID, because such a showing, even if made, would not be sufficient to block enforcement of the administrative subpoena. *See Carter*, 636 F.2d at 789; *Interstate Dress Carriers*, 610 F.2d at 112; *McGovern*, 87 F.R.D. at 591; *Bisaro III*, 757 F. Supp. 2d at 11; *Bisaro II*, 2010 WL 4910268, at *8.

In sum, the evidence and argument Respondent has presented, taken singly or together, have not raised "colorable allegations of an improper purpose," *Comm. to Elect Lyndon LaRouche*, 613 F.2d at 863, establishing "extraordinary circumstances," *Accrediting Council*, 854 F.3d at 689, sufficient to overcome the "presumption of administrative regularity and good faith" accorded to agency action, *Owens–Corning Fiberglas Corp.,* 626 F.2d at 975 (D.C. Cir. 1980). Accordingly, the Court exercises its discretion and denies Respondent's motion for discovery.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Respondent's request for oral argument on its motions to seal, *see* ECF No. 24, is **DENIED**, as the merits of the motions are sufficiently clear from the briefing.[22] *See* LCvR 7(f) (providing that whether to hold oral argument on a motion is within the discretion of the Court); *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 23 n.2 (D.D.C. 2013) ("[T]he Court concludes in its discretion that the issues have been amply briefed and that a hearing for oral argument is therefore unnecessary."). It is further

**ORDERED** that Respondent's Primary Motion to Seal, ECF No. 15, and subsidiary motions to seal, ECF Nos. 17, 18, 20, 22, 23, 27, 28, 30, are **DENIED**. However, in an abundance of

---

[22] The Court does not rule at this time on Respondent's request for oral argument on the Petition. *See* ECF No. 24. Respondent did not seek oral argument on the Motion for Discovery. *See id.*

caution, the undersigned directs the Clerk of Court to allow the currently sealed documents on the docket to remain temporarily sealed until further order of the Court to allow Match an opportunity to propose "narrowly tailored, specifically supported redactions" not inconsistent with this opinion to those documents (including the documents supporting the Petition and the Reply in further support of the Petition). *In re McCormick & Co.*, 316 F. Supp. 3d at 471. To accomplish this, the parties shall meet and confer and, on or before May 15, 2023, file a sealed joint status report proposing redactions, if any, along with Respondent's argument in support of any redactions, and any argument by Petitioner in opposition. Respondent is cautioned that the fact that it designated material "confidential" when produced to the FTC is not dispositive on the issue of whether that material should remain shielded. *See All Assets Held at Bank Julius Baer & Co.*, 520 F. Supp. 3d at 78. Similarly, "[s]imply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983)). Rather, the Court will entertain proposals to redact information such as *bona fide* trade secrets and confidential business practices or strategies, if any such information is included in the papers and Respondent can identify and support those proposed redactions consistent with the teaching of this opinion. *See, e.g.*, *In re McCormick & Co.*, MDL No. 2665, No. 15-mc-1825, 2017 WL 2560911, at *2 (D.D.C. June 13, 2017). To the extent that the papers include personally identifiable information, that information must be redacted pursuant to Rule 5.2(a) of the Federal Rules of Civil Procedure and Local Civil Rule 5.4(f). It is further

**ORDERED** that Respondent's motion for discovery, ECF No. 20-1, is **DENIED**.


**SO ORDERED.**


Date:  May 1, 2023

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE