## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20580,<br><br>               Petitioner,<br><br>*v.*<br><br>**MATCH GROUP, INC.,**<br>8750 N. Central Expy. Ste. 1400<br>Dallas, Texas 75231,<br><br>               Respondent. | Case No. 1:22-mc-0054-RJL-GMH<br><br>**MEMORANDUM IN SUPPORT OF PETITION TO ENFORCE MATCH CIVIL INVESTIGATIVE DEMAND** |

The Federal Trade Commission ("Petitioner," "FTC" or "Commission") submits this memorandum in support of its petition for an order requiring Match Group, Inc. ("Respondent" or "Match") to fully comply with a Civil Investigative Demand ("CID") issued on March 19, 2020. The Commission issued the CID as part of a law enforcement investigation to determine if Match, including its subsidiaries and individual employees, violated Section 5 of the FTC Act, 15 U.S.C. § 45, and whether FTC action to obtain monetary relief would be in the public interest. Match has significantly obstructed the FTC's investigation by refusing to produce nearly every responsive internal communication based on improper and overbroad claims of attorney-client privilege and work product.[1] The FTC brings this CID enforcement action to specifically challenge Match's withholding of 136 documents.

---

[1] Match has claimed attorney-client privilege and/or work product protection over 262 documents. Ex. 25 (Match Privilege Log). It has produced only 6 documents containing internal communications concerning the facts at issue, and did so one year after the production deadline. *See* Ex. 1 (Choi Decl.) at ¶¶ 21-23.

For the reasons set forth below, the FTC respectfully requests that this Court grant its petition and enter an order directing Match to appear and show cause why it should not comply with the CID in its entirety. The FTC requests that the Court order Match to produce all 53 documents withheld solely on the basis of work product and to produce 83 documents withheld on the basis of attorney-client privilege that are not described as communications seeking or rendering legal advice.[2] In the alternative, the FTC asks the Court to conduct an *in camera* review of the 136 documents (or a subset it deems appropriate), and order Match to produce all non-protected, responsive information thereafter.

## I.   SUMMARY OF FACTS

Match owns and operates the largest portfolio of online dating services in the world, including platforms such as Match.com, Tinder, and OkCupid.[3] OkCupid users post photos and other information to create profiles that help foster connections for social relationships, including dating. *See OkCupid Privacy Policy* (March 28, 2022), https://www.okcupid.com/legal/privacy. The FTC is investigating whether OkCupid's provision of user photos and other data in 2014 to a third-party facial recognition technology company, Clarifai, Inc., as well as Match and OkCupid's statements related to a 2019 New York Times ("NYTimes") story about OkCupid and Clarifai, constitute unfair or deceptive acts or practices in violation of Section 5 of the FTC Act and dishonest or fraudulent conduct pursuant to Section 19 of the FTC Act.

### A.   OkCupid Shares Data with Clarifai in 2014.

In September 2014, Clarifai's founder and Chief Executive Officer ("CEO"), Matthew Zeiler, asked Maxwell Krohn, a founder and former Chief Technology Officer ("CTO") of

---

[2] These 83 documents include 64 documents that Match also claimed are work product.

[3] OkCupid is owned and operated by Humor Rainbow, Inc. ("Humor Rainbow"), a subsidiary of Match. Ex. 3 (May 27, 2020 Match Response) at 1.

OkCupid, for assistance in procuring a large dataset from OkCupid to build and train Clarifai's facial recognition technology. Ex. 5 (C12081-83) at C12083. Zeiler solicited Krohn's assistance because Krohn and OkCupid's three other founders—Sam Yagan, Chris Coyne, and Christian Rudder—were early investors in Clarifai. Ex. 11 (Yagan Tr.) at 21:12-22:4; 36:18-37:4.

To facilitate Clarifai's request, Krohn reached out to the other OkCupid founders. Ex. 2 (C12081-83) at C12082; Ex. 3 (May 27, 2020 Match Response) at 28-29. Rudder, who was OkCupid's President at the time, promptly engaged OkCupid's CTO to assist in the matter. *Id*. Within one week, OkCupid handed over to Clarifai millions of user photos and associated personal data. *Id*.; Ex. 1 (Choi Decl.) at ¶ 3.

**B.   OkCupid Investigates NYTimes Story About Clarifai and Issues a Statement in 2019.**

Years later, the NYTimes shed light on Clarifai's use of OkCupid user images in an article published on July 13, 2019. Ex. 4 (NYTimes Article). Two days before the article's publication, a reporter, Cade Metz, informed OkCupid that he was "putting together a story on the use of larger face datasets to train facial recognition technology" and that "[a] startup called Clarifai has told us that it built a face dataset using images from OkCupid because some of OkCupid's founders were investors in Clarifai." Ex. 6 (C12213). Metz asked if OkCupid could chat or otherwise comment, noting a possible publication deadline as soon as the next day. *Id.*

In line with its handling of press inquiries, Match and OkCupid set about gathering facts to determine whether and how to comment on the story. *See*, *e.g*., Ex. 12 (Hobley Tr.) at 123:1-4; Ex. 13 (Sacco Tr.) at 43:20-47:19; 84:9-25; 190:8-17. After speaking with the NYTimes reporter (Ex. 6 (C12213)) and conducting an internal investigation (Ex. 13 (Sacco Tr.) at 100:4-15), OkCupid issued the following statement to the NYTimes: "In 2014, Clarifai contacted us about collaborating to determine if they could build unbiased AI and facial recognition technology. We

did not enter into any commercial agreement then and have no relationship with them now."
Ex. 7 (C12214). The NYTimes incorporated this statement into the published article. Ex. 4
(NYTimes Article) at 4.

C. **OkCupid Responds to Customer Inquiries About Clarifai in 2019 and 2020.**

OkCupid subsequently received a number of consumer inquiries about the NYTimes

story. *See*, *e.g.*, Ex. 9 (C12084-86). In individual responses to these consumers, OkCupid made a

series of statements expressly or implicitly representing that it had never shared data with

Clarifai and would never do so. For example, it stated:

> OkCupid did not enter into any commercial agreement" with Clarifai and its
> "Privacy Policy makes very clear how [it] use[s] data provided to OkCupid,
> and aiding companies to create facial recognition databases is absolutely not
> one of those. *Id*.

> We do not sell any data that allows the direct identification of any of our
> users. We can also confirm that we do not operate or contribute to any facial
> recognition programs. Ex. 10 (C12886).

D. **The Commission Seeks Information that Match Claims is Protected.**

The Commission issued a CID to Match on March 19, 2020. Ex. 2 (Match CID). Match

produced some responsive documents, but claims it is entitled to withhold nearly every internal

communication that took place after OkCupid's receipt of the NYTimes inquiry because they are

attorney-client privileged communications and/or work product.

After trying without success to obtain adequate explanations from Match that would

justify its all-encompassing work product and attorney-client privilege claims (*see* Ex. 1 (Choi

Decl.) at ¶¶ 12-18), Commission staff attempted to obtain relevant information about the

underlying incidents and explore the bases of Match's withholdings through witness testimony in

six investigational hearings. *Id*. at ¶ 19. During the hearings, however, the witnesses could not

recall basic facts about the investigation, the preparation of the OkCupid statement to the

NYTimes, and the handling of customer inquiries. *Id.* at ¶¶ 19-20; *see also* Section III.B.2.

Moreover, Match made it difficult in other ways for Commission staff to check Match's privilege claims, producing piecemeal privilege logs that obscured key chronology and did not individually identify each communication withheld. *Id.* at ¶¶ 24-28. Match did not close these gaps until late September 2021 (after staff insisted) and Match's final privilege log did not ameliorate staff's concerns about the propriety of Match's withholdings. *Id.* at ¶ 29.

After many rounds of fruitless communications with Match on these issues, it has become apparent that judicial review is needed to test Match's blanket assertions of privilege and work product. *See id.* at ¶¶ 14-18; 28-40; *see also* Ex. 21 (Sept. 11, 2020 FTC Letter to Match); Ex. 22 (Dec. 15, 2020 Match Letter to FTC); Ex. 23 (Nov. 2, 2021 FTC Letter to Match); Ex. 24 (April 8, 2022 Match Letter to FTC); Ex. 25 (May 4, 2022 FTC Letter to Match); Ex. 26 (May 10, 2022 Match Letter to FTC). Since December 2021, in an effort to forestall a CID enforcement action, Match offered to produce one small category of documents—but only if the FTC agreed to withdraw all privilege objections and waive any future discovery dispute. Ex. 1 (Choi Decl.) at ¶¶ 32-37. Match's proposal and its terms were patently unacceptable. *Id.* After Match suggested there may be room for further evaluation, the FTC stalled its CID enforcement action once again. *Id.* at ¶ 38. Wary of Match's intentions and further delay, however, the FTC gave Match a deadline of May 13, 2022 to re-evaluate and produce non-protected responsive documents. *Id.*; Ex. 25 (May 4, 2022 FTC Letter to Match). Match did not produce any documents. Ex. 1 (Choi Decl.) at ¶ 39.

## II.   LEGAL STANDARD FOR ENFORCEMENT

The Commission "may file . . . a petition for an order of [a U.S. district] court for . . . enforcement" when "any person fails to comply with any civil investigative demand duly served

upon him." 15 U.S.C. § 57b-1(e). A court must enforce a CID or investigative subpoena "if the information sought is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant." *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).

Proceedings to enforce administrative compulsory process are entitled to summary disposition and are properly instituted by a petition and order to show cause (rather than by complaint and summons). *See* Fed. R. Civ. P. 81(a)(5), (b); *FTC v. MacArthur*, 532 F.2d 1135, 1141-42 (7th Cir. 1976). Absent "extraordinary circumstances," evidentiary hearings or discovery are "improper in a summary subpoena enforcement proceeding." *FTC v. Carter*, 636 F.2d 781,789 (D.C. Cir. 1980) (quoting *United States v. Exxon*, 628 F.2d 70 at 77 n.7 (D.C. Cir. 1980)).

## III.    ARGUMENT

The facts here easily satisfy the standards governing enforcement of a CID. As explained below, the FTC had the authority to issue the CID to Match and followed all applicable procedural requirements when issuing the CID, the requested information is relevant to the FTC's investigation, and the CID is neither overbroad nor unduly burdensome.

Match has failed to fully comply with the CID, using blanket assertions of work product and attorney-client privilege to shield non-protected responsive communications from production. Match has the burden of demonstrating facts sufficient to establish the applicability of the attorney-client privilege and work product protection. *See In re CFTC Subpoena*, 439 F.3d 740, 750-51 (D.C. Cir. 2006) (the proponent of the privilege must put forth evidence "sufficient . . . to establish the privilege . . . with reasonable certainty"). Specifically, Match must "adduce competent evidence in support of its claims" and must offer more than "conclusory statements,

generalized assertions, and unsworn averments of its counsel." *FTC v. Boehringer Ingelheim Pharm., Inc*., 180 F. Supp. 3d 1, 15, 16 (D.D.C. 2016) (quoting *In re Veiga*, 746 F.Supp.2d 27, 33-34 (D.D.C. 2010)).

Match cannot meet its burden and the FTC is entitled to the documents Match is withholding for at least three reasons. First, documents that Match has identified as work product were not created in anticipation of litigation but rather for business reasons. Second, even if the Court concludes that the work product doctrine is applicable, responsive documents containing fact work product should be produced because the Commission can demonstrate substantial need and cannot obtain equivalent evidence relevant to assessing Match's conduct. Third, Match has incorrectly designated documents that do not involve the seeking or rendering of legal advice as attorney-client privileged communications.

### A. The CID Is Within the Commission's Authority and Was Properly Issued, Seeks Relevant Information, and Is Definite and Not Unduly Burdensome.

### 1. The CID Is Within the Commission's Authority and Complies with all Procedural Requirements.

Match has not disputed that the CID is within the Commission's authority. The FTC lawfully issued the CID as part of an investigation into whether Match and OkCupid have engaged in unfair or deceptive practices in violation of Section 5 of the FTC Act, a statute the FTC enforces. Section 20 of the FTC Act, 15 U.S.C § 57b-1, authorizes the Commission to issue CIDs to gather documents and information in its investigation of unfair or deceptive acts or practices in or affecting commerce.

Furthermore, the FTC followed all procedures required by the FTC Act and its implementing rules when it issued the CID. *See* Ex. 1 (Choi Decl.) at ¶ 5; 15 U.S.C. § 57b-1(c); 16 C.F.R. § 2.7 (2001). First, the CID specifies with "definiteness and clarity" the kinds of

documents and information to be produced. *See* Ex. 2 (Match CID) at 5-18. Second, the CID allowed for a "reasonable period of time" to respond by providing a return date 30 days after issuance and Commission staff extended the response deadline each time Match requested. *Id*. at 3; Ex. 1 (Choi Decl.) at ¶ 7. Third, the CID described the specific nature of the FTC's investigation and relevant law. *See* Ex. 2 (Match CID) at 5-19. Fourth, the CID identified records custodians to whom any responses should be sent. *Id*. at 3. Fifth, the CID was signed by Chairman Joseph J. Simons pursuant to Commission Resolution No. 1823036, which authorizes the use of compulsory process to investigate deceptive or unfair acts or practices related to consumer privacy and/or data security. *See id*. at 3, 19. Finally, the CID was mailed to Match's General Counsel and Corporate Secretary at Match's principal office on March 20, 2020. *Id*. at 1-2; Ex. 1 (Choi Decl.) at ¶ 5.

**2. The CID Requests Reasonably Relevant Evidence.**

The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudication. In an investigatory proceeding, the Commission merely seeks to learn whether there is reason to believe that the law is being violated and, if so, whether issuance of a complaint would be in the public interest. *See FTC v. Texaco*, 555 F.2d 862, 872 (D.C. Cir. 1977). The requested materials, therefore, need only be relevant to the investigation—the boundary of which may be defined by the agency quite generally. *See Carter*, 636 F.2d at 787-88; *Texaco*, 555 F.2d at 874 & n.26. Indeed, "a court must respect the agency's 'power of inquisition' and interpret relevance broadly." *FTC v. Invention Submission Corp.*, No. 89-272, 1991 WL 47104, at *5 (D.D.C. Feb. 14, 1991) (quoting *Morton Salt*, 338 U.S. at 642), *aff'd*, 965 F.2d 1086 (D.C. Cir. 1992). As the D.C. Circuit has explained, "in the pre-complaint stage, an investigating agency is under no obligation to propound a narrowly focused theory of a possible

future case." *Texaco*, 555 F.2d at 874.

Here, the information sought in the CID is reasonably relevant to determining whether OkCupid unlawfully shared users' data and whether Match and OkCupid's statements regarding the 2019 NYTimes story (including about OkCupid and Clarifai's relationship) violated the FTC Act. The FTC also seeks information relevant to the appropriateness of monetary relief.[4]

In line with the subject matter of the investigation, the CID includes specifications requiring Match to produce, among other things: (1) "[a]ll Documents and communications (both internal and with outside parties) related to the sharing of OkCupid user data with Maxwell Krohn and Clarafai"; (2) "[a]ll Documents and communications related to the investigation conducted by the Company and any other activities that the Company undertook in response to the New York Times article published on July 13, 2019 . . . including, but not limited to, Documents concerning the facts, analyses, and conclusions of the investigation or assessments conducted"; and (3) "[a]ll consumer inquiries or complaints from any source, and the Company's internal communications relating to those consumer inquiries and complaints, concerning the Company's sharing of OkCupid user data with Maxwell Krohn and Clarifai." Ex. 2 (Match CID) at 12 (Doc. Request Nos. 5, 6, 8). Such information is plainly relevant and within the scope of the investigation authorized by the Commission's Resolution.

### 3. The CID Requests are Definite and Not Unduly Burdensome.

There is no dispute that the specifications in the CID are sufficiently definite, and Match has not argued it is withholding documents based on the burden of production. *See generally*

---

[4] Section 19 of the FTC Act authorizes the Commission to bring an action in federal court for consumer redress after the Commission issues a final cease and desist order. 15 U.S.C.S. § 57b(a)(2). Such a claim requires establishing the challenged acts or practices are ones which a "reasonable man would have known under the circumstances [were] dishonest or fraudulent …[.]" *Id.*

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp*., 5 F.3d 1508,

1517 (D.C. Cir. 1993) ("The burden of proving undue hardship is not easily met where … the

agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that

purpose."). Not only are the documents that Match has withheld central to the FTC's

investigation, the number of documents under dispute is limited.

**B. The FTC is Entitled to Information that Match Has Withheld Because the Withholdings Are Based on Improper and Overbroad Assertions of Work Product, or Because of the Commission's Substantial Need for the Documents.**

**1. Match Wrongly Claims Work Product Protection for Documents Prepared for Business Reasons.**

Under the attorney work product doctrine, a party may withhold written materials

prepared for trial or in anticipation of litigation. *See*, *e.g.*, *In re Sealed Case*, 146 F.3d 881, 884

(D.C. Cir. 1998); Fed. R. Civ. P. 26(b)(3)(A). The doctrine protects the adversary process by

enabling an attorney to "assemble information, sift what he considers to be the relevant from the

irrelevant facts, prepare his legal theories and plan his strategy without undue and needless

interference." *Sealed*, 146 F.3d at 884 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11

(1947)).

This Circuit has applied two standards with respect to how specific the anticipated

litigation must be in order to merit work-product protection. One standard requires that "the

documents must at least have been prepared with a specific claim supported by concrete facts

which would likely lead to litigation in mind." *Coastal States Gas Corp. v. Dep't of Energy*, 617

F.2d 854, 865 (D.C. Cir. 1980). The other, more lenient, standard extends work-product

protection to "documents prepared in anticipation of foreseeable litigation, even if no specific

claim is contemplated." *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992). Under even the

more lenient standard, however, "the lawyer must at least have had a subjective belief that

litigation was a real possibility, and that belief must have been objectively reasonable." *Sealed*, 146 F.3d at 884; *American Immigration Council v. U.S. Dep't of Homeland Security*, 905 F.Supp.2d 206, 221 (D.C. Cir. 2012) ("the 'mere possibility' of litigation is not enough"); *see also Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 587 (D.C. Cir. 1987) (reasoning that documents prepared by lawyers cannot be withheld "simply because litigation might someday occur").

To determine whether a document was prepared in anticipation of litigation, this Circuit applies a "because of" test, asking "whether, in light of the nature of the document and factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *FTC v. Boehringer Ingelheim Pharm., Inc*., 778 F.3d 142, 149 (D.C. Cir. 2015) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)). Critically, this test considers whether the documents were created for non-litigation reasons. If a document would have been created "in substantially similar form" regardless of litigation concerns, work product protection is unavailable. *Boehringer*, 778 F.3d at 149 (citing *Deloitte*, 610 F.3d at 138). "[N]ot all documents generated from an internal investigation are protected by the work[-]product doctrine simply because an organizations' [sic] internal investigation coexists with a present or anticipated lawsuit." *Banneker Ventures, LLC v. Graham*, 253 F.Supp.3d 64, 72 (D.D.C. 2017) (citing *Duran v. Andrew*, No. 09-730, 2010 WL 1418344, at *4-5 (D.D.C. April 5, 2010) (listing examples of investigations that could be employed for both legal and business reasons)); *see Guo Wengui v. Clark Hill PLC*, 338 F.R.D. 7, 12 (D.D.C. 2021) (reasoning that the fact that the report was used for a range of non-litigation purposes reinforced the notion that it cannot be fairly described as prepared in anticipation of litigation); *see also In re Capital One Consumer Data Sec. Breach Litig*., No. 19-2915, 2020 WL 2731238, at *5 (E.D.

Va. May 26, 2020) (rejecting work-product protection for forensic report "used by Capital One for various business and regulatory purposes").

Match has misused the work product doctrine, claiming protection for nearly every internal communication that followed the NYTimes' request for comment. Of the 271 documents on the privilege log, Match withheld 241 based on the work product doctrine, including 53 documents withheld exclusively on that basis. Match's blanket assertion of work-product protection is unjustified: it erroneously claims work product over documents that pre-date any attorney involvement, where the prospect of litigation was not sufficiently particularized or immediate to qualify for protection, and where documents were generated for non-litigation purposes.

To start, Match improperly claims work product protection over communications that took place immediately after the NYTimes' request for comment, even though those communications do not include a single attorney and took place before attorneys had even been consulted. Ex. 19 (Numbered Match Privilege Log), Docs. 1-15. Notably, only after an attorney is first identified in the log does Match begin to describe the investigative efforts as "attorney-led." *Id*. (*compare* Docs. 1, 2 *with* Docs. 18, 19). In defense of its withholdings, Match argues that certain press inquiries "give rise *immediately* to anticipation of litigation and set off litigation-related follow-up efforts on receipt[,]" such as those involving "privacy claims related to photo collection[, which are] a hot-button legal issue[.]" Ex. 22 (Dec. 15, 2020 Match Letter) at 5. Match asserts that within minutes of receiving the NYTimes reporter's email on July 11, 2019, an investigation was launched by non-attorney personnel pursuant to company practices to obtain legal advice and to prepare for potential litigation. *Id*. But crediting Match's position that it is entitled to withhold documents as attorney work product based only on a general corporate

policy that certain inquiries categorically foretell litigation and absent attorney involvement would render meaningless the requirement of claim specificity or foreseeability of litigation. *See Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 514 (D. Minn. 1997) ("to allow legal counsel to promulgate a corporate policy, which would insulate the records of an internal investigation from discovery—no matter what their source or purpose—would expand the protections of Rule 26(b)(3)[] beyond their intended bounds").

Match's claim of work product protection falters on other grounds, as well. The documents withheld as work product include emails between public relations and marketing personnel who were the first to contend with the NYTimes inquiry. But those individuals acknowledged having no understanding of what the reporter's email was referring to, let alone what legal claims might be at issue. *See*, *e.g.*, Ex. 19 (Numbered Match Privilege Log), Docs. 1-3; Ex. 12 (Hobley Tr.) at 97:9-98:20; 119:11-122:24; 132:19-23; Ex. 13 (Sacco Tr.) at 210:11-211:4; *see* Ex. 20 (Match Priv. Log Index). If that is so, it is not objectively reasonable to believe that a specific claim had arisen or, at a minimum, that Match believed litigation was a "real possibility" at the time that any or all of the communications identified as work product took place.[5]

Ultimately, the question of whether the documents are protected rests on Match's ability to show that the documents generated as part of the internal investigation, in response to the

---

[5] Some courts have roughly equated the anticipation element underlying work product protection claims and the anticipation of litigation triggering such preservation duties. *See Crown Castle USA Inc. v. Fred A. Nudd Corp.*, No. 05-CV-6163, 2010 WL 4027780, at *4 (W.D.N.Y. Oct. 14, 2010); *Anderson v. Sotheby's Inc. Severance Plan*, No. 04-CV-8180, 2005 WL 2583715, at *3 (S.D.N.Y. Oct. 11, 2005). Here, none of the witnesses could confirm that a litigation hold was initiated in response to the NYTimes inquiry or that one was initiated at any point before the FTC contacted Match in February 2020. Ex. 12 (Hobley Tr.) at 17:10-18:3; Ex. 13 (Sacco Tr.) at 16:12-23; Ex. 15 (Hunsberger Tr.) at 88:16-20; Ex. 11 (Yagan Tr.) at 20:8-21:1.

NYTimes inquiry, and in response to customer complaints, would not have otherwise been created in substantially similar form in the ordinary course of business—and this is something Match cannot show. Match's and OkCupid's employees testified how they regularly handle press inquiries, gather facts, and determine whether, what, and how to comment—these ordinary course business practices correspond with the actions they took with respect to the investigation and in response to the NYTimes inquiry. *See*, *e.g.*, Ex. 12 (Hobley Tr.) at 35:5-36:6; 67:5-69:2; 188:6-9; Ex. 13 (Sacco Tr.) at 36:24-37:11; 39:14-19; 40:14-20; 43:20-47:19; 84:9-25; 85:7-17; 190:8-17. Likewise, responding to customer inquiries, complaints, or requests for deletion was nothing out of the ordinary course of OkCupid's business. *See*, *e.g.*, Ex. 15 (Hunsberger Tr.) at 25:5-11; Ex. 14 (McGee Tr.) at 25:5-26:1; 33:10-34:1; 67:19-68:5.

At least 53 documents that Match has withheld solely on the grounds of work product consist of communications where Match and OkCupid were taking steps to address a public relations concern in order to mitigate damage to Match's brands, avoid public scrutiny, and limit the potential for financial fallout. Irrespective of whether Match and OkCupid anticipated litigation at the time, these documents do not warrant work product protection because they were prepared, and would have been prepared in substantially similar form, for ordinary business pursuits.

## 2. Match Should be Required to Produce Fact Work Product Based on the Commission's Substantial Need and Undue Hardship.

Even if the Court determines that the documents Match has withheld are valid work product, all fact work product should nevertheless be produced.[6] Protection for fact work product is qualified, and production may be required if the litigant seeking such documents demonstrates

---

[6] *See, e.g.*, *Boehringer*, 778 F.3d at 151-53 (discussing principles distinguishing fact work product from opinion work product).

a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A); *see also Boehringer*, 778 F.3d at 154-56. A showing of need can be met if the party demonstrates (1) that the materials are relevant to the case; (2) the materials have a unique value apart from those already in the movant's possession; and (3) "special circumstances" excuse the movant's failure to obtain the requested materials itself. *Id.* at 155.

The FTC can meet the showing of need based on all three criteria. First, the information sought goes directly to assessing the validity and strength of potential Section 5 deception and unfairness claims and whether Match's conduct rises to a level of fraud or dishonesty that would support seeking monetary relief under Section 19. *See also* Section III.A.2. Moreover, the documents may shed light on ancillary issues such as whether any individuals involved in the potential misconduct should be held individually liable.

Second, the FTC must have an opportunity to evaluate Match's interrogatory responses with the contemporaneous documents.[7] Match claims, for example, that it was unable to corroborate Clarifai CEO Zeiler's account of the assistance he received from OkCupid. Ex. 3 (May 27, 2020 Match Response) at 7-8. What Match may or may not have learned in the course of the investigation and what measures it took to obtain information about Clarifai would be reflected in the contemporaneous communications at issue.

Likewise, the FTC must be able to weigh the credibility of witness testimony against the

---

[7] The ability to cross-check Match's interrogatory responses with other evidence is particularly important here because of OkCupid's past failure to disclose any mention of Clarifai in response to a November 2014 CID issued by the FTC. Ex. 1 (Choi Decl.) at ¶¶ 8-9. OkCupid's omission is inexplicable—the CID was issued only two months after the data-sharing took place and the individuals who facilitated the data transfer were directly involved in responding to the 2014 CID. *Id.*; *see* Ex. 3 (May 27, 2020 Match Response) at 7.

contemporaneous documents. For example, Yagan, an OkCupid founder, former OkCupid CEO, and former Match CEO, testified that he was wholly unaware that OkCupid had shared data with Clarifai. Ex. 16 (Yagan Tr.) at 19:2-19; 215:2-6. But Yagan's testimony is undermined by the fact that he had ample reasons, financial and otherwise, for hiding what he knew and was identified in the 2014 email exchanges between Clarifai, Krohn, and OkCupid as someone whose permission would be required before OkCupid could share the data with Clarifai.[8] *See* Ex. 5 (C12081-83) at C12082. Given these questions about the reliability of certain witness testimony, the contemporaneous documents offer a valuable means of potentially exposing what transpired.

Third, the fact that the FTC could not obtain the non-privileged content contained in the withheld documents through witness testimony constitutes special circumstances which justify the production of fact work product. When Match refused to produce any internal communications concerning the NYTimes inquiry and Clarifai, Commission staff attempted to gain a better understanding of the relevant facts by taking investigational hearings.[9] During the hearings, however, witnesses failed to recall basic facts about Match's and OkCupid's handling of the NYTimes inquiry.[10] The witnesses also appeared to have done little to prepare for their

---

[8] Moreover, in a March 2021 federal court decision dismissing a class action against Clarifai, the court revealed that Clarifai had gained access to OkCupid user photos from Yagan and Krohn—two of OkCupid's founders who were invested in Clarifai. *See Stein v. Clarifai, Inc.*, No. 20-C-1937, 2021 WL 1020997, at *1, 3, 5, n. 2 (N.D. Ill. March 16, 2021) (noting that the court's discussion of confidential information in the opinion was necessary to explain the path of its reasoning).

[9] Commission staff conducted 5 individual witness hearings for Sam Yagan, Melissa Hobley, Justine Sacco, David (Quinn) McGee, and Alice Hunsberger, and a hearing of Match's corporate representative, Thomas Jacques. Ex. 1 (Choi Decl.) at ¶¶ 19-20.

[10] For example, Hobley, OkCupid's Global Chief Marketing Officer, could not recall what she learned during her call with NYTimes reporter Metz, when or how she reached out to in-house counsel, or what she knew about Clarifai at the time the OkCupid statement to the NYTimes was prepared. *See, e.g.*, Ex. 12 (Hobley Tr.) at 96:2-20; 109:2-19; 118:2-119:10; 123:1-133:2219; 135:10-136:11; 136:22-137:7; 137:23-138:16; 140:3-16; 154:5-15; 158:19-159:12; 160:214-19; 162:8-163:22. Yagan could not recall what he discussed with individuals during Match and

hearings.[11]

The concern over what witnesses could recall is further exemplified by the testimony of OkCupid's customer support personnel—McGee and Hunsberger—and Match's late production of a handful of Slack messages, which are the only internal communications about the NYTimes inquiry that the FTC has at its disposal. Ex. 1 (Choi Decl.) at ¶¶ 21-23. While McGee and Hunsberger testified that they could not recall how the responses to the OkCupid user inquiries about the NYTimes story were drafted or how they were involved in preparing those responses (*see*, *e.g.*, Ex. 14 (McGee Tr.) at 55:8-23; 76:24-77:2; 78:6-79:11; 99:14-100:16; 115:7-11), the Slack messages revealed that McGee and Hunsberger fielded the customer complaints, deliberated how to respond, and reviewed draft responses that were sent to customers. *See*, *e.g.*, Ex. 8 (C13242-43).

Moreover, the Slack messages call into question whether all customer inquiries received in connection with the NYTimes story were escalated for review by in-house counsel and/or received a response drafted with the advice of counsel, as represented by Match. Ex. 22 (Dec. 15, 2020 Match Letter) at 2, 6, 7; Ex. 1 (Choi Decl.) at ¶ 23; *see also* Ex. 14 (McGee Tr.) at 81:17-82:19; 102:4-109:12. Because Match did not produce these documents until after all five individual witness hearings were completed, Commission staff did not have the opportunity to refresh the witnesses' recollections or question the customer support personnel about their communications.[12] *Id*. at ¶ 21. These obstacles compromised the FTC's ability to uncover

---

OkCupid's investigation of the NYTimes allegations. *See*, *e.g.*, Ex. 11 (Yagan Tr.) at 100:7-11; 107:18-108:1; 115:7-118:6; 118:11-21; 129:1-130:196; 131:1-9; 133:6-134:8; 192:9-193:19.

[11] Hobley, who could not recall basic facts at issue, reviewed only one document in advance of her hearing. Ex. 12 (Hobley Tr.) at 16:1-9. Jacques, Match's designated corporate representative, testified that he did not conduct any interviews or speak with any individuals prior to his hearing other than the legal team. Ex. 16 (Jacques Tr. - Vol. 1) at 31:14-20; Ex. 1 (Choi Decl.) at ¶ 20.

[12] The witnesses' memory problems were exacerbated by Match counsel's objections. Not only

underlying facts to which it is entitled. *See Upjohn Co. v. U.S.*, 449 U.S. 383, 395-96 (1981).

At this juncture, the FTC has a substantial need for the contemporaneous documents withheld by Match and cannot obtain the information through other means without undue hardship. Therefore, the Court should require Match to produce all responsive documents consisting of non-privileged fact work product.

### C.  Match Improperly Claims Attorney-Client Privilege Over Communications That Are Not for the Purpose of Seeking or Rendering of Legal Advice.

The attorney-client privilege protects confidential communications "between [an] attorney and [her] client if that communication was made for the purposes of obtaining or providing legal advice to the client." *In re Kellogg, Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014); *see also In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (privilege applies only if the communication was made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding"). This Circuit employs the "primary purpose" test to determine whether a communication qualifies for attorney-client privilege, which examines "whether obtaining or providing legal advice was one of the *significant* purposes of the attorney-client communication." *Kellogg*, 756 F.3d at 756, 760 (emphasis added).

---

were witnesses explicitly instructed at times not to answer certain questions, Match counsel's use of objections that included "to the extent" language in various forms increased the witnesses' uncertainty with respect to the appropriate boundaries of protected information and had a chilling effect. *See*, *e.g.*, Ex. 12 (Hobley Tr.) at 154:7-15 (related to specifics of the internal deliberations and process); Ex. 13 (Sacco Tr.) at 151:15-21 (related to how, whether, and when the witness communicated to lawyers, or those working under their direction or supervision). Moreover, Match's counsel admonished witnesses not to disclose information that went to "deliberative process" or the company's "general process," notwithstanding the fact that the qualified deliberative process privilege applies only to government officials' pre-decisional recommendations and opinions. *See*, *e.g.*, Ex. 12 (Hobley Tr.) at 155:6-156:22; Ex. 13 (Sacco Tr.) at 174:10-175:13; *see Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (the deliberative process privilege is "[a] privilege unique to the government").

The attorney-client privilege "must be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Lindsey*, 158 F.3d at 1272; *see also Banneker*, 253 F.Supp.3d at 70-71 ("Attorney-client privilege is narrowly construed by the D.C. Circuit because of its adverse effects on the full disclosure of truth."). It is common for in-house counsel to serve in both business and legal capacities, and the mere fact that an attorney is involved in a communication does not make that communication privileged. *See Vento v. I.R.S.*, 714 F.Supp.2d 137, 151 (D.D.C. 2010); *Banneker*, 253 F.Supp.3d at 70 ("[t]he attorney-client privilege does not protect any and all communications between a client and a lawyer"). Consultation with a lawyer that is unrelated to that person's role as a lawyer is not protected. *Lindsey*, 158 F.3d at 1270 (noting that description of the advice rendered did not specify that the attorney was rendering legal advice and reasoning that the attorney's advice on "political, strategic, or policy issues, valuable as it may have been, would not be shielded from disclosure by the attorney-client privilege").

The fact that Match has withheld nearly every internal communication involving the events in question strongly indicates that Match has applied the attorney-client privilege indiscriminately, wrongly treating all communications involving attorneys and/or addressing the NYTimes and Clarifai as categorically protected. Moreover, Match's sweeping application of attorney-client privilege is not even supported by the privilege log on its face. At least 83 documents that Match has listed as attorney-client privileged do not warrant protection because they do not seem to involve the seeking or rendering of *legal advice*. (Sixty-four of these 83 documents also include a claim of work product, which the FTC also disputes for the reasons stated above.)

None of these 83 purportedly attorney-client privileged documents that the Commission

19

is challenging is described <mark>as a communication made for the purpose of seeking or rendering legal advice or some variation thereof</mark>. Sixty-six of the 83 documents are described <mark>along the lines of "[e]mail[s] reflecting attorney-client communications and attorney-led investigative efforts" or "[e]mail[s] reflecting attorney-led internal investigation."</mark> Fourteen of the documents consist of messages that were not sent by or to an attorney.[13] Seventeen of the documents are attachments for which Match merely referenced the privileged nature of the parent document.[14]

<mark>Match's decision—carefully considered, one presumes—not to describe these 83 documents as involving the seeking or rendering of legal advice is telling when compared with other descriptions in the privilege log that at least reference in some respect "seeking legal advice and communications relaying legal advice" or "attorney-client communications regarding legal direction and guidance of investigation."</mark>[15] *Compare* Docs. 16, 22 *with* Docs. 136, 140.

It is all the more dubious that the 83 challenged documents are communications made for the *significant* purpose of obtaining or providing legal advice, given <mark>the backdrop of the public relations frenzy that Match and OkCupid were dealing with</mark>. Indeed, Match and OkCupid had compelling business reasons to <mark>investigate the Clarifai allegations in order to respond to the NYTimes inquiry</mark>. That being the case, Match's wholesale invocation of privilege ignores <mark>that aspects of the investigation, preparation of the NYTimes statement, or drafting of consumer responses likely involved unprotected business input, discussions, and decision-making related to</mark>

---

[13] Ex. 19 (Numbered Match Privilege Log), Docs. 17, 19, 24, 103, 191, 193, 195, 206, 207, 208, 228, 229, 266, 267.

[14] Ex. 19 (Numbered Match Privilege Log), Docs. 111, 115, 116, 142, 150, 162, 167, 175, 184, 189, 191, 193, 220, 225, 227, 240, 244 *see also Boehringer*, 180 F. Supp.3d at 31 (observing that email attachments to privileged communications are not automatically privileged).

[15] Although the FTC has questions with respect to these other 127 documents that Match claims are protected, it is focusing its challenge on the most obvious offenses, i.e., the 136 documents identified in the Petition.

==handling a sensitive public relations matter.==

Where Match has provided no indication that the communications it has withheld on privilege grounds involve the seeking or rendering of legal advice, the Court should order their production. This is especially the case when the context of the communications indicates that they were fundamentally business-related and did not involve attorneys or call for their legal expertise.

## IV.    CONCLUSION

For the reasons stated herein, the FTC respectfully requests that this Court grant its petition.

Dated: May 26, 2022                                    Respectfully submitted,

ANISHA S. DASGUPTA
General Counsel

MICHELE ARINGTON
Assistant General Counsel for Litigation

*s/ Sarah Choi*
SARAH CHOI (D.C. Bar No. 977025)
ELIZABETH AVERILL (D.C. Bar No. 491216)

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.,
Mail Stop CC-8232
Washington, D.C. 20580
Tel: 202-326-3157 (Arington); 202-326-2212
(Choi); 202-326-2993 (Averill)

*Attorneys for Petitioner*