**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Petitioner,** | |
| **v.** | **Case No. 1:22-mc-54 (RJL/GMH)** |
| **MATCH GROUP, INC.,** | |
| **Respondent.** | |

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

The Federal Trade Commission ("FTC" or "Petitioner") has filed this action to enforce a March 2020 civil investigative demand ("March 2020 CID") served on Match Group, Inc. ("Respondent" or "Match"). The March 2020 CID is part of an FTC investigation spurred by a July 13, 2019 New York Times article suggesting that the founders of OkCupid,[1] a dating site owned by Respondent, allowed Clarifai, a start-up developing facial recognition technology, to access and use images from the dating site to help build its product.[2] The agency is investigating whether OkCupid's provision to Clarifai of that user data and/or its public statements in response to the New York Times article violated the Federal Trade Commission Act's ("FTC Act") prohibition on unfair or deceptive acts or dishonest or fraudulent conduct. The FTC filed a petition seeking production of 136 documents Match withheld on the basis of attorney-client privilege and/or work

---

[1] In the record of this case, "OkCupid" is sometimes rendered "OKCupid."

[2] The history and corporate structure of Respondent is complex. According to testimony from OkCupid's co-founder Sam Yagan, Humor Rainbow, Inc., which does business as OkCupid, was incorporated in 2003. ECF No. 2-1 at 70. In 2011, Humor Rainbow was sold to a subsidiary of Match Group, Inc., which was itself subsidiary of an entity called Interactive Corporation, or IAC. *See id.* At some point after September 2019, Match Group, Inc., was spun off as a separate entity. *See id.* Respondent explains that Match Group, Inc., is a holding company with no independent employees. ECF No. 17-2, ¶ 2. Match Group LLC, a subsidiary of the holding company, provides services to other subsidiaries, including Humor Rainbow which, as noted, owns and operates the OkCupid brand. *Id.*

product protection that are related to the internal investigation Match initiated after a July 11, 2019 pre-publication inquiry from the author of that New York Times article about the relationship between Clarifai and OkCupid.

After briefing on the petition was completed (and after Match filed a number of subsidiary motions), Judge Leon referred this case to the undersigned to "hear and determine all motions and matters in this case" except for the petition, for which a Report and Recommendation was to be prepared. Minute Order (Aug. 4, 2022). Having reviewed the extensive briefing in this case, the undersigned ordered Match to lodge copies of the documents at issue for *in camera* review. *See* ECF No. 40. After those documents were lodged and the undersigned held a status conference, the parties agreed to meet and confer to attempt to narrow the disputes at issue. As a result of those discussions, the FTC agreed in January 2024 to withdraw its challenges to the withholding of 56 documents and Match agreed to produce 16 documents, although the parties still have a dispute as to redactions that Match has proposed to 4 of those 16. *See* ECF No. 43. Thus, the parties now dispute Match's claims of attorney-client privilege or work product protection over 64 full documents and over proposed redactions of allegedly non-responsive material in 4 others.[3] Having considered the parties' arguments and reviewed the documents (including, for added context, the documents lodged with the undersigned for *in camera* review but no longer at issue here), the undersigned recommends that 37 of those documents should be produced in full, 5 should be

---

[3] Those documents remaining in dispute can be identified by comparing the September 2021 Privilege Log found at ECF No. 36-20, which contains highlighting (blue and yellow) to identify the documents originally at issue, with the status report found at ECF No. 43, which identifies the documents over which the parties have come to agreement. The documents still at issue are document nos. 1–15, 17–21, 23–27, 32 (redaction dispute), 39, 48 (redaction dispute), 50–52, 54, 57, 60, 67, 72–73, 75, 78, 87, 91, 97, 103, 105–08, 111, 115–17, 156, 165, 175, 181, 185, 186, 196 (redaction dispute), 198, 207–08, 209 (redaction dispute), 228–29, 240, 244, and 266–67. *Compare* ECF No. 36-20 *with* ECF No. 43. The documents over which the FTC has withdrawn its challenges are document nos. 16, 22, 28–29, 31, 41–44, 46, 53, 55, 113, 142, 145, 150, 162, 167, 171, 184, 189, 191, 193, 195, 206, 220, 225, 227, 231–32, 236–39, 241–43, 245–55, 257–60, 263, 265, 268, and 270. *See* ECF No. 43 at 1–3. Match has agreed to produce in full document nos. 49, 89, 96, 100–01, 104, 121, 155, 169–70, 197, and 210. *See id.* at 3.

produced with redactions, 22 should be withheld in full, and that Match's proposed redactions to 4 of the documents it has already agreed to produce should be approved.[4]

# I.    BACKGROUND

## A.    Procedural History

The procedural history of this case is documented in detail in the undersigned's prior opinion denying Match's request for discovery and its many motions to seal.  *See FTC v. Match Grp., Inc.*, No. 22-mc-54, 2023 WL 3181351, at *2–7 (D.D.C. May 1, 2023) ("*Match Grp. I*").  To recap, the FTC initiated an investigation into Match's potential violation of the FTC Act "in connection with the sharing of consumer information, including photos and other data of OkCupid users," which was spurred by the publication of a July 13, 2019 New York Times article mentioning the acquisition and use of such data by Clarifai in 2014.  *See id.* at *2.  The agency issued the CID at issue in March 2020, and discovery commenced, including written responses and production of documents.  *See id.*  The parties had numerous disputes about that discovery, which were not quieted by Match's production of documents or initial privilege log.  *See id.* at *2–3.  Rather, the FTC commenced five investigative hearings of Match executives or employees in May and June 2021—specifically, of Sam Yagan, a co-founder of OkCupid, former OkCupid Chief Executive Officer, and former Match Group Chief Executive Officer; Melissa Hobley, OkCupid's Chief Marketing Officer; Justine Sacco, former Senior Director Corporate Communications at IAC and later Vice President of Communications for Match Group; Alice Hunsberger, OkCupid's former Director of

---

[4] The documents most relevant to this Report and Recommendation are: (1) the FTC's petition for enforcement of the March 2020 CID, ECF No. 1; (2) the FTC's memorandum in support of its petition and the documents filed along with it, ECF Nos. 36, 39 (note that ECF No. 36 is the unsealed, redacted version of most of documents filed under seal in ECF No. 2; ECF No. 39 includes a single document that was filed under seal in ECF No. 2 and included in ECF No. 36 in an inaccurate form); (3) Match's opposition to the petition, along with its attachments, ECF No. 17; (4) the FTC's reply and its attachments, ECF No. 19; and (5) the parties' joint status report of January 17, 2024, ECF No. 43.

Customer Support and later its Director of Customer Experience; David McGee (also known as Quinn McGee), an OkCupid Customer Support Manager; and corporate designee Tom Jacques, former Chief Technology Officer and Managing Director of DateHookup (a Match brand) and later Vice President of Engineering and Chief Technology Officer of Tinder (another Match brand). *See id.* at *3 & n.3; *see also* ECF No. 36-2, ¶19; ECF No. 36-21.  After the production of Match's final privilege log on September 24, 2021 (the "September 2021 Privilege Log") and a significant amount of further sparring, the FTC filed its petition to enforce the March 2020 CID in this Court, which originally challenged Match's claims of attorney-client privilege and work product protection over 136 of the 271 documents on the September 2021 Privilege Log, the bulk of which were created between July 11, 2019, and the end of that month.  *Match Grp. I*, 2023 WL 3181351, at *4–5; *see generally* ECF No. 36-20.  As noted, the parties' recent negotiations have contracted the universe of documents at issue significantly following a hearing with the undersigned January 3, 2024.  *See* Minute Entry (Jan. 3, 2024).

### B.     Factual Background

The FTC is attempting to determine "whether OkCupid unlawfully shared users' data and whether Match and OkCupid's statements regarding the 2019 NYTimes story (including about OkCupid and Clarifai's relationship) violated the FTC Act," ECF No. 36-1 at 9, which prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a).  Because the veracity of Match's statement to the New York Times is in the FTC's sights, the communications surrounding its creation and promulgation are of interest to the agency.  Match, for its part, claims that the receipt of the inquiry from the paper straightaway prompted an attorney-led internal investigation in anticipation of litigation to determine whether the alleged data-sharing occurred and to craft a response.  *See* ECF No. 17-1 at 10.

As should be clear, although the parties are battling over documents created on and after July 11, 2019, the seeds of this dispute were sown approximately five years earlier, when Clarifai was provided access to OkCupid user data. The following discussion first addresses the events of 2014, which are necessary background to the disputes at issue here. It then skips ahead to the period when the challenged documents were created (between July 11, 2019 and April 6, 2020), dividing that span into three segments: (1) July 11, 2019, the date the inquiry from reporter Cade Metz of the New York Times was received, to July 12, 2019, the date OkCupid provided its response to that inquiry; (2) July 13, 2019, the date the New York Times article was published, to July 27, 2019, the day after Match sent a cease-and-desist letter to Clarifai; and (3) August 2019 to April 2020, the period after the sending of the cease-and-desist letter and including the commencement of the FTC's investigation. Although those divisions are somewhat artificial, they make logical sense and help to organize the discussion of these privilege disputes.

        1.      September 2014: Request from Clarifai

According to Match's written responses to the interrogatories in the March 2020 CID (provided to the FTC in May 2020), as well as representations made in other litigation Clarifai's CEO Matthew Zeiler approached Maxwell Krohn, a co-founder and former employee and officer of OkCupid, to request access to profile data, including image data, posted by OkCupid users "for the purpose of training Clarifai's face detection technology" in September 2014. ECF No. 17-5 at 30; *see also* ECF No. 36-6 at 4. Ultimately, Krohn, with the participation of at least three then-current OkCupid employees—specifically, President and co-founder Christian Rudder, Chief Technology Officer Michael Maxim, and engineer Till Varoquaux—and perhaps Match Group's then-CEO Yagan, provided Clarifai with such user-posted data, estimated to comprise a couple million images. *See* ECF No. 17-5 at 30–32; ECF No. 36-3 at 2–3; *see also Stein v. Clarifai, Inc.*,

526 F. Supp. 3d 339, 342 (N.D. Ill. 2021) ("According to OKCupid, Clarifai contacted it in 2014 in hopes of collaborating on artificial intelligence and facial recognition technology. Clarifai gained access to OKCupid users' profile photographs from one of its investors, Corazon, a Chicago-based venture capital fund, and its principals, Sam Yagan and Max Krohn, who founded OKCupid. Krohn used his personal email account to provide the photographs to Clarifai's chief executive officer, Matthew Zeiler."); *but see* ECF No. 17-6 at 5 (Yagan in a May 2021 investigative hearing testifying, "I don't know anything about any sharing that you're suggesting took place in 2014."); ECF No. 19-10 at 5 (corporate designee Tom Jacques in a May 2021 investigative hearing testifying, "It's the company's understanding and belief that Sam Yagan was not aware of this request and that the 2020 investigation reaffirms his noninvolvement.").

At around the same time, the FTC was engaged in a separate investigation into the collection and usage of OkCupid's user data. *See* ECF No. 17-5 at 8. In January 2015, in response to an FTC request for OkCupid to identify all third parties, other than OkCupid users, with whom it shared users' personal information, OkCupid failed to identify Clarifai. *See* ECF No. 15-13 at 13; *see also* ECF No. 36-2, ¶ 8. That earlier investigation was closed in 2015, according to Match because evidence showed that OkCupid's users knew their profile information was publicly available and could be used by others. ECF No. 15-2, at 3–4, ¶ 4.

2.     July 11, 2019, to July 12, 2019: Receipt of the New York Times Inquiry Through the Issuance of OkCupid's Response the Next Day

The sharing of user data with Clarifai did not come to the public's notice until July 2019. Specifically, on the evening of July 11, 2019, New York Times reporter Cade Metz sent an email to Hobley, OkCupid's Global Chief Marketing Officer, warning that a story that "may publish as soon as tomorrow" would report that "[a] startup called Clarifai"—apparently through its CEO and founder Zeiler—informed the paper that "it built a face dataset using images from OKCupid

because some of OKCupid's founders were investors in Clarifai."[5]   ECF No. 36-7 at 2; *see also* ECF No. 36-5 at 5.  That email appears to have spurred a flurry of activity at Match.  Documents produced to the FTC and submitted to the Court show that, at some point after the email was received on July 11, 2019, Metz and Hobley had a brief phone call.  *See* ECF No. 36-7 at 2.  Then, on the afternoon of July 12, 2019, Hobley emailed Metz to say that a statement would be forth-coming.  That evening, Hobley emailed Metz the following statement: "In 2014, Clarifai contacted us about collaborating to determine if they could build unbiased AI and facial recognition technol-ogy.  We did not enter into any commercial agreement then and have no relationship with them now."  ECF No. 36-8 at 2.  That statement was included in the New York Times article that was published on July 13, 2019.  ECF No. 15-5 at 2, 4.

Testimony taken in May 2021 in connection with the March 2020 CID provides a bit more information about what happened at Match between the time that Hobley received the email from Metz on the evening of July 11, 2019, and the evening of July 12, 2019, when she provided OkCupid's statement to the reporter.  Yagan indicated that during that time there were a number of communications between or among executives at Match and Clarifai—specifically, Yagan (OkCupid co-founder and then Match Group board member), Zeiler (CEO of Clarifai), Sacco (Match Group Vice President of Communications and Chief Communications Officer), and Hobley (OkCupid Chief Marketing Officer).  *See* ECF No. 39-1 at 9–13; ECF No. 36-21; *see also* ECF No. 36-14 at 12.  Yagan remembered few details about those communications, however.  *See, e.g.*, ECF No. 39-1 at 9–13.

---

[5] The time stamp on that email is 6:53 p.m., *see* ECF No. 2-1 at 54, but it is not clear what time zone corresponds to that time stamp, which is an issue with many of the emails in the record.  However, the undersigned does not believe that the resolution of this dispute will hinge on the precise timing of the relevant communications.  In any case, it appears that the entries on the September 2021 Privilege Log are organized chronologically using a consistent time zone, although the parties do not identify which time zone it is.  *See* ECF No. 36-2, ¶ 26 ("Match agreed to produce a single log combining all of the entries in the privilege logs, organize all documents in chronological order using a consistent time zone, and include a date and timestamp for each entry.").

Hobley, whose department at OkCupid dealt with public relations and the media, testified before the FTC that she was confused by the inquiry from the New York Times. She had "no context" for it: the company Clarifai "was not on [her] radar" and the request was "foreign to [her]." ECF No. 36-13 at 9, 11, 14. She could not remember her initial reaction or the precise steps she took after receiving Metz's email; however, she testified that because it dealt with data and privacy it would have "trigger[ed] a process" whereby she would let the company's leadership and its attorneys know "[b]ecause it could lead to litigation." *Id.* at 5, 9, 11. Thus, she would "likely" have notified "the other leadership folks at OkCupid" and Sacco at Match, as well as OkCupid's attorneys to get "legal guidance"; she then would have started to "gather the facts and be able to get some legal advice." *Id.* at 6–7, 9, 20. She did not, however, know what type of litigation was likely, just that "the U.S. is a litigious country" and "there's a reason why . . . the field of law exists." *Id.* at 11. Hobley would also have been concerned about the "impact of [the] story on [the] brand" and whether it required correction because it was inaccurate. *Id.* at 15, 17. She had no recollection of what she discussed in her phone conversation with Metz or whether that call was between the two of them alone or included attorneys or other executives, although it was "very likely" that she was the only individual at Match to have spoken with Metz. *See id.* at 12–13, 15–16. Further, she could not remember any details about what was done in response to Metz's inquiry (such as whether personnel at Match investigated the accuracy of the representation made by Zeiler that Clarifai had built its face database using images from OkCupid or about the preparation of OkCupid's responsive statement, except that the company's "attorneys were involved"). *Id.* at 13–16, 18–19.

Sacco testified before the FTC that, as Match's head of communications, she would "get[] involved" in press inquiries that were "related to legal, privacy business, financials, [and] earnings" and would "work with the legal team on those topics."  ECF No. 36-14 at 4–5.  In relation to a press inquiry about a story to be published, her team, sometimes in tandem with personnel from the brand that received the inquiry (such as OkCupid), would gather facts with an eye to deciding whether to respond and, if so, how.  *See id.* at 6–7.  As to the New York Times' inquiry, she and her team "set about trying to determine if Clarifai and OkCupid had worked together and if what Matt Zeiler was saying . . . was accurate" before they decided whether to comment.  *Id.* at 10.  In the course of that internal investigation, she spoke to Yagan to ask whether he remembered "any partnership or deal or anything in place with Clarifai" connected to the provision of user images to a third party, and spoke to Zeiler to get "any documentation that would explain whatever th[e] relationship was that had been referenced"—she was "going out on a limb to see what [Zeiler] could produce that would explain why he was giving the quotes he was giving to the reporter."  *Id.* at 13–14, 15; *see also* ECF No. 17-16 at 8 (quoting an email from Sacco to Zeiler sent "late night" on July 11, 2019).  She also spoke to Jacques, who in 2014 was the Chief Technology Officer and Managing Director of DateHookup and later became Vice President of Engineering and Chief Technology Officer of Tinder, to see if he had "any recollection of Clarifai."  *Id.* at 17; *see also* ECF No. 36-21 at 3.  Additionally, the "entire legal department searched for any contracts or anything that would indicate a working relationship with the company."  ECF No. 36-14 at 18.  According to Sacco, no one, either internally or externally, could verify at that time what Zeiler had told Metz.  *See id.* at 19; *see also* ECF No. 17-5 at 9 (stating, in written responses to the March 2020 CID, that "OkCupid, given the Metz deadline, was unable to corroborate Metz's reporting").  However, it appears from corporate designee Jacques' testimony before the FTC that, of the four

co-founders of OkCupid—Yagan, Krohn, Rudder, and Chris Coyne—only Yagan was contacted prior to Hobley's statement denying a commercial agreement or relationship with Clarifai. *See* ECF No. 19-10 at 9–10.

Jared Sine, who in 2019 was Match Group's Chief Legal Officer, asserts in a declaration filed in connection with Match's opposition to the petition to enforce the March 2020 CID that Match's legal department had a well-known policy that "the investigation of and response to media and other external inquiries touching on privacy and data security matters should be conducted under the direction and supervision of [Match's] legal department." ECF No. 17-2, ¶¶ 3–4; *see also* ECF No. 15-14 at 4, 7 (Match's corporate designee Jacques testifying before the FTC that "it was understood that [if an inquiry was received regarding privacy and data security] this could lead to litigation . . . and the practice would be for . . . the team members to gather facts and seek legal advice in putting together a response"). In compliance with that policy, Sine was briefed by email about the New York Times' inquiry three hours after the investigative process began. *Id.*, ¶ 5. He then "alerted other members of the legal team by email, including senior litigators," and based on the subject of the inquiry from the New York Times and "the initial factual briefing," the team "had an immediate expectation that litigation was likely." *Id.* More specifically, because Sine was aware that allegations of data breaches often led to litigation, and because of his experience with an FTC investigation of Match.com for deceptive practices that had begun in 2017, he "feared that the New York Times' claims were likely to prompt consumer class action litigation, regulatory investigations and litigation, or both." *Id.*, ¶¶ 3, 5; *see also FTC v. Match Grp. Inc.*, No. 19-cv-2281 (N.D. Tex. Sept. 25, 2019). The legal department therefore "began to direct and supervise the overnight investigation and response efforts," including by drafting OkCupid's response to the New York Times' inquiry. ECF No. 17-2, ¶ 6.

The September 2021 Privilege Log suggests the inquiry from the New York Times sparked an uproar the late evening of July 11, 2019, through the evening of July 12, 2019: it lists 92 documents created between 11:21 p.m. on July 11, 2019, and approximately 7:30 p.m. on July 12, 2019, which is soon after Hobley sent OkCupid's statement to Metz.  *See* ECF No. 36-20 at 2–12; *see also* ECF No. 36-7 at 2 (Hobley email to Metz dated "Friday, July 12, 2019 7:04 PM").  Of those, 41 are still at issue here, although the only dispute over 2 of them relates to Match's proposed redactions of allegedly non-responsive material.[6]  The initial 15 documents on the September 2021 Privilege Log (that is, document nos. 1–15), created in the late-night hours of July 11, 2019, or the early-morning hours of the next day, are all between or among OkCupid non-attorney businesspeople.  The first three are between Hobley and Michael Kaye, Communications and Global Relations Manager for OkCupid and a subordinate of Hobley's.  *See* ECF No. 36-3 at 5; ECF No. 36-20 at 2; ECF No. 36-21 at 3.  The next 12 are largely among some combination of Hobley; Kaye; Ariel Charytan, OkCupid's CEO; Marcus Lofthouse, OkCupid's Chief Product Officer; Mike Cirello, OkCupid's Chief Technology Officer; and Bill Archer, an OkCupid finance and analytics executive.  *See* ECF No. 36-20 at 3–4; ECF No. 36-21 at 2, 4.  Charytan also involved Elie Seidman, then CEO of Tinder and former CEO of OkCupid, and Hobley contacted Sacco.  *See* ECF No. 36-20 at 2–3 (document nos. 8, 13); ECF No. 36-21 at 5.  The first communication that includes an attorney—the 16th document listed on the September 2021 Privilege Log, over which the FTC has now withdrawn its challenge—is an email sent at 2:41 a.m. on July 12, 2019, by Hobley to Sine, Sacco, Seidman, and Charytan (copied to Kaye).  *See* ECF No. 36-20 at 3.  Of the

---

[6] Those 41 disputed documents are document nos. 1–15, 17–21, 23–27, 32 (redaction dispute), 39, 48 (redaction dispute), 50–52, 54, 57, 60, 67, 72–73, 75, 78, 87, 91.  *See* ECF No 36-20; *see also* ECF No. 43.  Of those 41, 28 have been withheld as work product alone—document nos. 1–15, 18, 21, 32 (redaction dispute), 39, 48 (redaction dispute), 50–52,, 67, 73, 78, 87, and 91; the remaining 13 have been withheld as both work product and attorney-client privileged—document nos. 17, 19–20, 23–27, 54, 57, 60, 72, and 75.  *See* ECF No. 36-20 at 8–12; *see also* ECF No. 43.

remaining documents at issue during this period (that is, late night on July 11, 2019, to approximately 7:00 p.m. on July 12, 2019), Sine appears as a recipient on 2, *see id.* at 10 (document nos. 72, 75), and is copied on 7, *see id.* at 4–8 (document nos. 20, 23, 25–27, 54, 60).  Fellow Match Group in-house attorneys Samuel Kitchens and Jeanette Teckman make an appearance at 3:52 a.m. on July 12, 2019, copied on an email from Sine to Hobley (which is no longer at issue), and also appear on an additional 4 communications at issue between 3:09 p.m. and 5:02 p.m. on July 12, 2019.  *See id.* at 4–8, 10 (document nos., 54, 60, 72, 75); ECF No. 36-21 at 4, 6.

Of the 41 total communications still at issue during this time period prior to the approximate time of OkCupid's responsive statement to Metz, 2 include an attorney as sender or recipient (document nos. 72, 75), 7 are merely cc'd to attorneys (document nos. 20, 23, 25–27, 54, 60), and 32 do not include an attorney, at all (document nos. 1–15, 17–19, 21, 24, 32 (redaction dispute), 39, 48 (redaction dispute), 50–52, 57, 67, 73, 78, 87, 91).  Included in various communications during this period are additional executives such as Yagan; Jacques; Joseph Ciesla, Tinder's Senior Vice President of Finance and Analytics; and Devin Colleran and Jane Reynolds from OkCupid's marketing department.  *See, e.g.*, ECF No. 36-20 at 3–8 (documents nos. 19, 21, 32, 48, 57); ECF No. 36-21 at 2, 5.

### 3.   July 13, 2019, to July 27, 2019: Publication of the New York Times Article Through the Issuance of the Cease-and-Desist letter to Clarifai

The New York Times article was published on July 13, 2019.  *See* ECF No. 36-5 at 2 (New York Times article dated July 13, 2019).  Soon after its publication, OkCupid began getting inquiries and complaints from users, ECF No. 36-10 (emails from customers dated July 13 & 14, 2019); ECF No. 36-11 (emails dated July 13 & 15, 2019)—according to Sine, 11 in total, ECF No. 17-2, ¶ 8.  McGee, OkCupid's Customer Support Manager, testified before the FTC that, as a general matter, he would sort customer emails and assign run-of-the-mill ones to customer support

agents to respond; he himself would handle communications that implicated certain privacy stat-

utes or regulations (specifically, the European Union's General Data Protection Regulation and

the California Consumer Privacy Act).  ECF No. 36-15 at 5.  Emails regarding press inquiries or

legal issues would be "escalate[d]" to his boss, OkCupid's Director of Customer Experience Huns-

berger.  *See* ECF No. 17-9 at 5–6.  Documents produced to the FTC show that on July 15, 2019,

McGee communicated with Hunsberger for advice on how to reply to some emails regarding the

New York Times article.  *See* ECF No. 36-9.  Hunsberger suggested parroting OkCupid's state-

ment included in that article and updating the website's page on privacy controls.  *See id.*  The

next day, McGee sent responses along the lines suggested and reviewed by Hunsberger: "As our

spokeswoman says in the article, OkCupid did not enter into any commercial agreement to process

user data in this way.  Our Privacy Policy makes very clear how we use data provided to OkCupid,

and aiding companies to create facial recognition databases is absolutely not one of those."[7]  *See*

*id.* at 3; ECF No. 36-10.  Match has admitted that "a small number of responses to consumer

inquiries may have been sent without prior legal consultation," ECF No. 17-1 at 19 n.7; *see also*

ECF No. 17-2, ¶ 8.  In his testimony, McGee did not remember whether he had any discussions

with Hunsberger or any other OkCupid employee about the July 13, 2019 New York Times article.

*See* ECF No. 36-15 at 6.  Nor did he remember anything about the response to the customer emails,

except that he did not draft it.  *See id.* at 8–9, 11, 13, 15.  Hunsberger testified that "emails about

[OkCupid's] privacy policy are drafted by the legal department" and that the legal department

"very likely" drafted the one at issue.  ECF No. 17-8 at 6–8.  Sine asserted that the 11 relevant

---

[7] There is one variation on that response, sent by McGee on July 19, 2019, in response to an inquiry from a customer about opting out "of any facial recognition programs" or from having data sold to third parties: "The privacy and trust of our users is of paramount importance.  We do not sell any data that allows the direct identification of any of our users.  We can also confirm that we do not operate or contribute to any facial recognition programs."  ECF No. 36-11 at 2.  As noted below, Jacques testified that in-house counsel became involved in drafting responses to consumer inquiries on July 19, 2019.  *See* ECF No. 19-10 at 14.

consumer inquiries received by OkCupid were "generally referred to the legal department by the OkCupid customer experience team, consistent with the legal department's investigative policy, for the purpose of seeking legal advice before a response could be sent to the consumer."[8]  ECF No. 17-2, ¶ 8.  Jacques, however, testified as corporate designee that "the company's understanding [is] that prior to July 19th, [2019]," replies to consumer inquiries were "prepared by Ms. Hunsberger and Mr. McGee" without legal advice.  ECF No. 19-10 at 14.

Meanwhile, according to Sine, the "legal-investigative efforts" continued.  ECF No. 17-2, ¶ 7.  The legal department began drafting a cease-and-desist letter to be sent to Clarifai and held an "internal meeting" on July 16, 2019.  *See id.*  On July 25 or 26, 2019, Match sent the cease-and-desist letter (dated July 15, 2019 and signed by Benjamin Setnick, an in-house attorney from Match), which referenced the New York Times article and demanded that Clarifai "cease and desist any and all access to the OkCupid service and systems . . . [,] cease and desist from all attempts to create any profiles on any of those services," and "destroy any user-profile images copied from any of its services, along with derivative works created from them" because Clarifai's "collection and use of images from OkCupid violate[d] the OkCupid Terms of Use."  ECF No. 17-7 at 2–3; ECF No. 17-3, ¶ 2.

Still at issue for the period between July 13, 2019 (the date the New York Times story was published) and July 27, 2019 (approximately one day after the cease-and-desist letter was sent) are 23 documents.[9]  Of those, 6 include at least one attorney, although the cast of lawyers now expands

---

[8] It appears from the document descriptions in the September 2021 Privilege Log that a number of those consumer inquiries were received in late 2019 and early 2020.  *See* ECF No. 36-20 at 26–28 (document nos. 231–32, 236–38, 241–42, 258).

[9] Those 23 documents are document nos. 97, 103, 105–08, 111, 115–17, 156, 165, 175, 181, 185, 186, 196 (redaction dispute), 198, 207–08, 209 (redaction dispute), 228–29.  *See* ECF No. 36-20 at 13–26; *see also* ECF No. 43.  Of those, 12 have been withheld on the basis of work product protection alone—document nos. 97, 105–08, 117, 156, 165, 185, 196 (redaction dispute), 198, 209 (redaction dispute); an additional 11 have been withheld as both work product and

somewhat—Sine; Teckman; Setnick; Idriss Kechida, Match Group Associate General Counsel and Chief Privacy Officer; Brandon Kerstens, Match Group Senior Corporate Counsel, Privacy; Laura Michel, Match Group Senior Director and Senior Counsel; and Brittany Perez, Tinder Associate General Counsel. *See* ECF No. 36-20 at 14–22 (document nos. 111 115–16, 175, 181, 186,). The remaining 17 are between or among non-attorney businesspeople—many of the same ones listed above, plus Chris Aurelio, OkCupid's Director of Information Security; Katie Minard, an OkCupid copywriter; Mark Buse, Match Group Senior Vice President, Government Relations–Legal; Bernadette Libonate, an OkCupid Senior Marketing Manager; and Sonia Oblitey, OKCupid's Global Marketing Director. *See, e.g.*, *id.* at 13–26 (document nos. 97, 103, 105–08, 117, 156, 165, 185, 196 (redaction dispute), 198, 207–08, 209 (redaction dispute), 228–29); ECF No. 36-21 at 2, 4. None include Hunsberger or McGee.[10] Descriptions on the September 2021 Privilege Log indicate that investigation of the allegations in the New York Times article, as well as "attorney-led efforts to respond" to them, continued. *See, e.g.*, ECF No. 36-20 at 13 (document no. 97). Neither the documents nor the testimony submitted in connection with the petition to enforce the March 2020 CID provides further insight into the events of this period.

4.   August 2019 to April 2020: Post-Cease-and-Desist Letter through the Commencement of FTC Investigation

A lull followed the end of July 2019. The September 2021 Privilege log lists only 6 communications between August and October 2019, 2 of which the FTC originally challenged. *See*

---

attorney-client privileged—document nos. 103, 111, 115–16, 175, 181, 186, 207–08, 228–29. *See* ECF No. 36-20 at 13–26; *see also* ECF No. 43.

[10] There are a few allegedly responsive documents on the September 2021 Privilege Log from this period that include Hunsberger and/or McGee, but none are among the documents the FTC has sought in its petition. *See* ECF No. 36-20 at 20, 24 (document nos. 173, 211–15).

ECF No. 36-20 at 26.  The FTC has withdrawn its challenge as to both of those.  *See* ECF No. 43 at 2.

Then, on February 21, 2020, the FTC sent a litigation hold notice to Match noting that it was "conducting a non-public investigation into whether Match Group, Inc. . . . may have violated Section 5 of the Federal Trade Commission Act . . . in connection with the sharing of consumer information, including photos and other data of OkCupid users."  ECF No. 17-4 at 2.  The run-up to and reception of that notice saw a resurgence of activity allegedly relevant to the New York Times article and its aftermath: between January 22, 2020, and February 28, 2020, dozens of allegedly protected communications were made.  However, only 4 are now at issue.[11]  *See* ECF No. 36-20 at 27, 29 (document nos. 240, 244, 266–267).  Of those, 1 is described as an "attorney-client privileged attachment" to a prior email over which the FTC has withdrawn its challenge (document no. 240) and 1 is described simply as an "attachment" to a prior email over which the FTC has withdrawn its challenge (document no. 244).  Both of those were sent by an attorney (Teckman) to attorneys and at least one non-attorney businessperson, and both are allegedly protected by attorney-client privilege and work product protection.[12]  Match also claims both protections over a February 28, 2020 three-message Slack thread among non-attorney businesspeople Hunsberger, Charytan, and Lofthouse (document no. 267).  Finally, a page described as notes taken by Hunsberger on or about February 27, 2020 has been withheld as attorney-client privileged (document no. 266).

---

[11] Those are document nos. 240, 244, 266–67.  *See* ECF No. 36-20 at 27, 29; *see also* ECF No. 43.  Of those, 1 has been withheld on the basis of attorney-client privilege alone—document no. 266; the remaining 3 have been withheld as both work product and attorney-client privileged—document nos. 240, 244 267.  *See* ECF No. 36-20 at 27, 29; *see also* ECF No. 43.

[12] One of those non-attorney businesspeople, Shelby Angel, is not identified by corporate role on the list of individuals from the September 2021 Privilege Log provided to the Court.  *Compare* ECF No. 36-20 at 27 (document no. 244) *with* ECF No. 36-21 (list of individuals).

C.      **Petition for Enforcement**[13]

1.      The FTC's Opening Brief

The FTC first argues that it has met the requirements for enforcement of an administrative subpoena because the agency followed all procedural requirements in issuing the March 2020 CID, which seeks information within the authority of the FTC, requests evidence relevant to determining whether OkCupid unlawfully shared data with Clarifai in 2014 and whether its statements in response to the July 2019 New York Times article were deceptive or false, is sufficiently definite, and is not unduly burdensome.  ECF No. 36-1 at 7–10.  As discussed below, Match does not argue otherwise.

The agency then moves on to challenge Match's claims of work product protection.  The agency recognizes that work product protection attaches to documents prepared for trial or in anticipation litigation to "protect the adversary process by allowing an attorney to assemble information, sift relevant from irrelevant facts, and prepare legal theories and strategies without "undue and needless interference."  *Id.* at 10 (quoting *In re Sealed Case*, 146 F.3d 81, 884 (D.C. Cir. 1998)).  But, according to the FTC, the D.C. Circuit

> has applied two standards with respect to how specific the anticipated litigation must be in order to merit work-product protection.  One standard requires that "the documents must at least have been prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind." The other, more lenient, standard extends work-product protection to "documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated."

*Id.* (internal citations omitted) (first quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980), and then quoting *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992)).  A document cannot be said to have been prepared "because of the prospect of litigation"

---

[13] Some arguments made in the briefing have been rendered largely irrelevant since the parties' negotiations resulting in Match's withdrawal of certain claims of privilege, the FTC's withdrawal of certain challenges, and the *in camera* review of the documents still in dispute.  Those arguments are omitted from the discussion below.

if it "would have been created 'in substantially similar form' regardless of litigation concerns." *Id.*
at 11 (quoting *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015)).

Having set out those standards, the FTC contends that Match "has misused the work prod-
uct doctrine, claiming protection for nearly every internal communication that followed the NY-
Times' request for comment," a "blanket assertion of work-product protection [that] is unjustified"
because it "erroneously claims work product over documents that pre-date any attorney involve-
ment, where the prospect of litigation was not sufficiently particularized or immediate to qualify
for protection, and where documents were generated for non-litigation purposes." *Id.* at 12.  More
specifically, the agency objects that "Match improperly claims work product protection" over the
first 15 documents on the September 2021 Privilege Log—all created during the late night of July
11, 2019, or the early morning of July 12, 2019, in the immediate aftermath of OkCupid's receipt
of the New York Times inquiry—which "do not include a single attorney[,] . . . took place before
attorneys had even been consulted," and are not described as reflecting an "attorney-led" investi-
gation, as later documents are.  *Id.*; *Compare* ECF No. 36-20 at 2–3 (document nos. 1–15) *with,
e.g.*, *id.* at 3 (document nos. 16–19).  It pushes back against Match's position that a corporate
policy that certain types of inquiries always generated an investigation in anticipation of litigation
even absent attorney participation, stating that "would render meaningless the requirement of claim
specificity or foreseeability of litigation."  ECF No. 36-1 at 12–13.  The agency further asserts that
withheld emails "between public relations and marketing officials who were the first to contend
with the NYTimes inquiry"—apparently, Hobley, Sacco, and Kaye—cannot have been prepared
in anticipation of litigation because Hobley and Sacco "acknowledged having no understanding of
what the reporter's email was referring to, let alone what legal claims might be at issue." *Id.* at 13.
As further support for that position, the FTC asserts that some courts have "roughly equated the

anticipation element of underlying work product claims and the anticipation of litigation triggering preservation duties" and notes that no witnesses "could confirm that a litigation hold was initiated in response to the NYTimes inquiry or that one was initiated at any point before the FTC contacted Match in February 2020." *Id.* at 13 n.5. Then, widening its argument to numerous documents "that Match has withheld solely on the grounds of work product," the FTC maintains that Match cannot show that those documents "would not otherwise have been created in substantially similar form in the ordinary course of business" because they were in the service of the routine gathering of facts to determine whether and how to respond to a press inquiry.[14] *Id.* at 13–14.

The FTC then asserts that, even if the documents Match has withheld as work product are protected by that doctrine, Match should be ordered to produce any fact work product therein because the agency has substantial need for the information and cannot obtain their substantial equivalent by other means without undue burden. *See id.* at 14–18. According to the FTC, the documents sought are relevant, they have unique value apart from those materials already in its possession, and special circumstances excuse the agency's failure to obtain the requested information itself. *See id.* at 14–15.

First, as to relevance, the agency notes that the standard to be applied in an investigatory proceeding is "relaxed," because an agency's investigation may be defined expansively and may broadly seek "to learn whether there is reason to believe that the law is being violated and, if so, whether issuance of a complaint would be in the public interest." *Id.* at 8. As noted, the FTC is attempting to determine "whether OkCupid unlawfully shared users' data and whether Match and OkCupid's statements regarding the 2019 NYTimes story (including about OkCupid and Clarifai's

---

[14] Originally, the FTC challenged "[a]t least 53" of the documents Match withheld solely as work product. ECF No. 36-1 at 14. That number has now dwindled to 40—document nos. 1–15, 18, 21, 32 (redaction dispute), 39, 48 (redaction dispute), 50–52, 67, 73, 78, 87, 91, 97, 105–08, 117 156, 165, 185, 196 (redaction dispute), 198, 209 (redaction dispute). *See* ECF No. 36-20; *see also* ECF No. 43.

relationship) violated the FTC Act," as well as whether, if there was a violation, monetary relief would be appropriate. *Id.* at 9. Thus, the March 2020 CID sought, among other things, all documents and communications related to the sharing of OkCupid data with Krohn and Clarifai, all documents and communications related to the investigation following the inquiry from the New York Times and any other activities taken in response to the July 13, 2019 article, and any consumer inquiries or complaints concerning the data sharing and internal communications relating to those consumer inquiries or complaints. *See id.* That information, the agency asserts, "goes directly to assessing the validity and strength of potential . . . deception and unfairness claims" under the FTC Act, and "whether Match's conduct rises to the level of fraud or dishonesty that would support seeking monetary relief." *Id.* at 15.

Second, the FTC states that it "must have the opportunity to evaluate Match's interrogatory responses with the contemporaneous documents," noting specifically that it needs to determine the accuracy of Match's assertion that "it was unable to corroborate Clarifai CEO Zeiler's account of the assistance he received from OkCupid"; and that it "must be able to weigh the credibility of witness testimony against the contemporaneous documents," pointing to Yagan's testimony that he was unaware that OkCupid had shared data with Clarifai. *Id.* at 15–16. According to the FTC, the contemporaneous documents have unique value to those efforts. *See id.*

As to special circumstances, the agency notes that it was unable to procure non-privileged content contained in the withheld documents because, when it conducted its investigative hearings, "witnesses failed to recall basic facts about Match's and OkCupid's handling of the NYTimes inquiry," in part because they apparently "did little to prepare for their hearings." *Id.* at 16–17. For example, McGee and Hunsberger "could not recall how the responses to the OkCupid user inquiries about the NYTimes story were drafted or how they were involved in preparing those

responses," although certain documents already produced suggest that they prepared the response themselves without involving counsel. *Id.* at 17. The agency also asserts that counsel for Match interposed objections during the hearings that confused the witnesses and wrongly instructed witnesses "not to disclose information that went to 'deliberative process' or the company's 'general process,' notwithstanding that the qualified deliberative process privilege applies only to government officials' pre-decisional recommendations and opinions." *Id.* at 17 n.12.

Proceeding to Match's claims of attorney-client privilege, the FTC sets out the legal standard: a communication is protected by attorney-client privilege where "obtaining or providing legal advice was one of the significant purposes of the attorney-client communication." *Id.* at 18 (emphasis omitted) (quoting *In re Kellogg, Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014). Because in-house counsel often serves in both a business and a legal capacity, "the mere fact that an attorney is involved in a communication does not make it privileged"; rather, the communication must be related "to that person's role as a lawyer." *Id.*

The agency maintains—similarly to its contention as to work product—that "[t]he fact that Match has withheld nearly every internal communication involving the events in question strongly indicates that Match has applied the attorney-client privilege indiscriminately, wrongly treating all communications involving attorneys and/or addressing the NYTimes and Clarifai as categorically protected."[15] *Id.* at 19. The FTC notes that many of the documents withheld as attorney-client privileged—originally 14, now 11 (document nos. 17, 19, 24, 57, 103, 207–08, 228–29, 266–67)—do not include an attorney; and a number of them—originally 17, now 6 (document nos. 111, 115–

---

[15] Originally, there were 83 purportedly attorney-client privileged documents at issue, 65 over which Match also claimed work product protection. *See generally* ECF No. 36-20. There are now 28 purportedly attorney-client privileged documents remaining in dispute— document nos. 17, 19–20, 23–27, 54, 57, 60, 72, 75, 103, 111, 115–16, 175, 181, 186, 207–08, 228–29, 240, 244, 266–67. *See id.*; *see also* ECF No. 43. Match claims work product protection over all but one of those—document no. 266. As to the claims of work product protection, the FTC disputes that designation "for the reasons stated" in the section challenging Match's assertions of work product protection, discussed above. ECF No. 36-1 at 19.

16, 175, 240, 244)—"are attachments for which Match merely referenced the privileged nature of the parent document." *Id.* Finally, the agency considers it "dubious that the . . . challenged documents are communications made for the significant purpose of obtaining or providing legal advice, given the backdrop of the public relations frenzy that Match and OkCupid were dealing with," which provided Match with "compelling business reasons to investigate the Clarifai allegations in order to respond to the NYTimes inquiry." *Id.*

        2.      Match's Opposition

Match does not counter the FTC's contention that the March 2020 CID was procedurally proper, within the agency's authority, sufficiently definite, and not unduly burdensome. Instead, it argues that "the FTC has abused its authority by filing the Petition for an improper purpose—namely, "pressuring [Match] into giving up its protected legal investigative communications and . . . to punish [Match] for standing by its privilege and work product claims"—and the relief it seeks should therefore be denied under the standard established by the Supreme Court in *United States v. Powell*, 379 U.S. 48 (1964). ECF No. 17-1 at 8. 10. The undersigned has rejected that argument and will not further address it here. *See Match Grp. I*, 2023 WL 3181351, at *16–25.

Addressing the FTC's substantive arguments about Match's privilege and work product claims, Match asserts that the documents identified in the entries that reflect attachments to allegedly privileged communications (document nos. 111, 115–16, 175, 240, 244) are themselves privileged. *See* ECF No. 17-1 at 26 n.10. Next, Match notes that, under D.C. Circuit precedent, "the party asserting [attorney-client] privilege need only show that obtaining or providing legal advice was *one of the significant purposes* of a communication." *Id.* at 27 (citing *Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014). More, the privilege also protects communications by or between non-attorneys acting as agents of attorneys if they are made for the purpose of securing

or providing legal advice, so "communications between corporate employees who are working together to compile facts for in-house counsel to use in rendering legal advice to the company" are privileged. *Id.* at 27–28 (quoting *Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 34 (D.D.C. 2016)). According to Match, its investigation following the inquiry from the New York Times reporter was, from the beginning, led by attorneys and focused on "gathering facts needed to solicit legal advice and to enable members of the legal department to take appropriate legal action and disseminate legal advice." *Id.* at 28 & n.12. "The central role of [Match's] Chief Communications Officer [Sacco] and *multiple* in-house counsel . . . in steering the investigation demonstrates that [it] was *not* typical of an ordinary business response to a press inquiry," which would have been addressed "internally by the OkCupid public relations team." *Id.* at 28–29. Match complains that the FTC's argument regarding the assertions of attorney-client privilege "relies primarily on the fact that the investigation was prompted by a press inquiry," arguing that the agency's position would strip protection from any response to a press inquiry; however, attorney-client privilege attaches, Match says, as long as legal advice is a significant purpose of a communication, even if it was not the exclusive purpose. *Id.* at 29. As to the 11 documents allegedly protected as attorney-client privileged that do not include an attorney (document nos. 17, 19, 24, 57, 103, 207–08, 228–29, 266–67), Match asserts that they were created "with the purpose of enabling counsel to render legal advice in response to the NY Times Inquiry" pursuant to Match's policy. *Id.* at 31. It also faults the FTC for ignoring the fact that Match's attorneys issued a cease-and-desist letter to Clarifai near the end of July 2019. *See id.*

Moving on to the work product doctrine, Match disagrees that the standard from *Coastal States Gas Corp.*, which used language that appears to require documents to be created with a specific claim in mind in order to be deemed prepared in anticipation of litigation, governs in this

Circuit; instead, Match maintains that it has been rejected in favor of a standard that looks at whether "the document can fairly be said to have been prepared or obtained because of the prospect of litigation" even without the identification of a specific claim to motivate that preparation. *Id.* at 33 & n.16 (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).  Under that standard, the proponent of work product protection must only show "(1) that at the time the materials were prepared, the party possessed a subjective belief that litigation was a real possibility, and (2) that that belief was objectively reasonable." *Id.* at 33.  Work product protection can also extend to material created by non-attorneys that is sufficiently "intertwined with the legal analysis." *Id.* at 34 (quoting *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 134 (D.D.C. 2012)).

As to the subjective expectation of litigation, Match cites Sine's declaration and testimony from Hobley and Jacques to support its contention that "[w]hen notified of the NYT Inquiry on July 11, 2019, OkCupid employees and other . . . representatives [from Match] acting under the legal investigations policy believed they were acting in anticipation of litigation," specifically, litigation over whether Clarifai was violating OkCupid's "terms and conditions, violating its IP rights, and/or implicating OkCupid in potential consumer privacy violations," as well as worrying that the New York Times article, itself, might prompt litigation. *Id.* at 34.  According to Match, "[t]he course of the investigation proves that [it] acted upon these concerns," as the drafting of the response to the New York Times "was supervised by the legal department and involved direct input from in-house lawyers" and the "attorney-led investigation" continued after the publication of the article, to include the drafting and sending of the cease-and-desist letter to Clarifai. *Id.*

Match's anticipation of litigation was also objectively reasonable, it says, because the in-quiry from the New York Times "implicated OkCupid in unauthorized use of user photos and self-

dealing by unnamed OkCupid founders," which "would have reasonably put *any* company on no-tice of likely, imminent consumer litigation, FTC litigation, and the need to defend OkCupid's legal rights from possible intellectual property violations by Clarifai." *Id.* at 35.  Regulatory in-vestigation was also reasonably anticipated, given the FTC's prior investigations by the FTC; in-deed, Match's SEC filings for the quarter ending on March 31, 2019, noted the existence of an extant FTC investigation into Match.com business practices.  *See id.* at 35–36; *see also* ECF No. 15-25 at 3.  And, Match asserts, the fact that an FTC investigation actually occurred bolsters the claim that its anticipation of litigation was objectively reasonable.  *See id.* at 36.  Countering the FTC's argument that Match could not have reasonably anticipated litigation because it did not immediately begin to preserve documents, the company contends that the agency's legal support is inapposite and that, in any case, equating reasonable anticipation of litigation with the triggering of a duty to preserve documents "would not jibe with the law of this Circuit, where 'reasonable contemplation of litigation,' as opposed to pending, direct, or specific litigation, provides a suffi-cient basis for invoking the work product doctrine." *Id.* at 36–37 (quoting *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 80 (D.D.C. 2003)).

Match then states that it is "irrelevant" that "a small number of documents were created before counsel was contacted" because "[w]hether a document is work-product protected is a func-tion of the circumstances that led to its creation, not the document's author," pointing to Hobley's testimony that she "would have notified [OkCupid's] attorneys to give us some legal guidance" and begun to gather facts because an inquiry "in the realm of data and privacy . . . could lead to litigation." *Id.* at 38.

Finally, Match contends that the FTC "has not articulated a cognizable 'substantial need'" for any fact work product and has failed to "show what information it hopes to gain from [Match's]

protected work product that it cannot get by other means." *Id.* at 39.  As to substantial need, Match argues that, rather than "pointing to factual information it needs but lacks," the FTC merely asserts that needs to "'cross-check' . . . OkCupid's interrogatory responses and the investigational hearing witnesses' testimony." *Id.*  But "the desire to obtain impeachment evidence," Match contends, "is not a substantial need." *Id.* at 39–40 (citing *McPeek v. Ashcroft*, 202 F.R.D. 332, 339 (D.D.C. 2001)).   Regarding the unavailability of similar evidence, Match denies that its witnesses were unprepared and asserts that, if the agency "believed it did not get the full benefit of testimony or that hearings were obstructed by improper objections, it has recourse within the FTC's Rules of Practice." *Id.* at 40 n.20 (citing 16 C.F.R. § 2.9(b)).[16]  And Match faults the FTC for failing to explain why further interrogatory responses, document production, or investigative hearings "cannot suffice for any additional, legitimate fact-finding." *Id.* at 41.

### 3.    The FTC's Reply

In reply, the FTC pushes back against Match's implication that the fact that attorneys are senders and/or recipients of a communication alone confers privileged status.  ECF No. 19-1 at 5. Rather, the fact that Match does not "identify whether the significant purpose of each communication was for the seeking or rendering of legal advice," together with the likelihood that "both business and legal issues may have been under consideration," indicates to the FTC that Match has claimed attorney-client privilege over material that is largely or exclusively business related. *Id.* at 6–7.  The agency also challenges Match's assertion that the investigation that followed Metz's inquiry continued between July 12, 2019, when OkCupid provided its response to Metz, and "the following spring, when Match appears to have renewed its investigation pursuant to the FTC's March 2020 CID." *Id.* at 7.  The FTC states that "there is no indication that any investigation

---

[16] Subsection (b)(3) of that section allows a hearing officer to recess an investigative hearing and reconvene at a later date "to continue a course of inquiry interrupted by an objection."  16 C.F.R. § 2.9(b)(3).

continued" during that period in Match's written responses to the March 2020 CID or in the testi-mony of its witnesses, yet the September 2021 Privilege Log "contains scores of documents from July 13, 2019 and onward that describe the communications as related to Match's purportedly ongoing investigation." *Id.* at 7–8.  The agency acknowledges that "there may be communications reflecting the seeking or provision of legal advice specific to the preparation of the cease-and-desist letter sent to Clarifai or responses to customer inquiries that in-house counsel became in-volved with," but contends that possibility does not justify the withholding of "unrelated commu-nications." *Id.* at 9.  More, the FTC points out that Match has admitted that some responses to customer inquiries did not involve in-house counsel—an admission allegedly supported by Slack messages produced to the FTC in May 2021 (after most of the investigational hearings had taken place) between Sacco and McGee indicating that they drafted the response sent to customers them-selves without advice from counsel—but nonetheless claims protection over "communications where customer support personnel were handling matters on their own." *Id.* at 9–10, 16; *see also* ECF No. 36-2, ¶¶ 21–23.

Turning to Match's claims of work product protection, the FTC fastens on Match's admis-sion that an attorney did not get involved in the investigation following the New York Times' inquiry until 3 hours after it was received, a period during which the first 15 documents on the September 2021 Privilege Log were created, insisting that is fatal to any claim of work product protection over those documents  *See* ECF No. 19-1 at 11.  According to the FTC, a general policy that any inquiry touching privacy and data security matters cannot save those communications because that would "insulate the records of an internal investigation from discovery[] no matter what their source or purpose[] and would expand the protections of Rule 26(b)(3)[] beyond their intended bounds." *Id.* at 12 (third alteration in original) (quoting *Onwuka v. Fed. Express Corp.*,

178 F.R.D. 508, 514 (D. Minn. 1997)).  And the agency points out that Sine has asserted that he and his legal team determined that litigation was likely after an "initial factual briefing"—that is, the agency argues that the initial communications cannot have been created in anticipation of litigation because that expectation did not arise until after in-house counsel got involved and received that briefing some three hours later.  *Id.* (quoting ECF No. 17-2, ¶ 5).  In addition, the FTC contends that, because the company "would have investigated the NYTimes story, determined whether and how to respond, and drafted and submitted a response to the NYTimes regardless of whether there were concerns about potential litigation risk"—particularly because it believed the story to be inaccurate—it has failed to show that the documents would not have been created "'in substantially similar form' regardless of litigation concerns" as required by D.C. Circuit precedent.  *Id.* at 13 (quoting *Boehringer Ingelheim*, 778 F.3d at 149).

The FTC also counters Match's argument that the agency has not shown that it is entitled to fact work product under the "substantial need" and "undue burden" standard.  The agency asserts that it has demonstrated substantial need for the materials "to fill in the many blanks" in the testimony of "OkCupid's Chief Marketing Officer [Hobley], . . . OkCupid founder and Match board member [Yagan], and OkCupid's customer support personnel [McGee]," who "could not remember basic information regarding their conversations during the internal investigation, what facts they learned, and how they handled customer inquiries."  *Id.* at 14.

As to undue burden, the FTC points out that Match has produced merely 600 pages of responsive documents,[17] which include "only a handful of internal communications related to the NYTimes and Clarifai," including a few Slack messages between McGee and Sacco (produced

---

[17] Match has since agreed to produce an additional 28 pages of documents to the FTC, with some disputed proposed redactions.  *See* ECF No. 43 at 3 (agreeing to produce 16 documents, 4 with redactions of allegedly non-responsive material).

after the investigative hearings), along with "multiple versions of Match's privacy policies, terms of use, data security documents, and third-party communications," many of which predate the inquiry from the New York Times. *Id.* at 15. On the other hand, the September 2021 Privilege Log contains entries for 271 documents reflecting "contemporaneous internal communications concerning the NYTimes and Clarifai." *Id.* The agency emphasizes, too, that the late production of those Slack messages and "Match's changing representations regarding attorney involvement" interfered with the efficacy of the investigative hearings.[18] *Id.* at 16. Re-opening those hearings, the agency asserts, would not remedy the problem because the passage of time will likely have further compromised witness' memories. *Id.* at 16 n.17.

## II.     LEGAL STANDARDS

### A.     Attorney-Client Privilege

"The attorney-client privilege protects confidential communications between clients and their attorneys made for the purpose of securing legal advice or services." *Boehringer Ingelheim*, 180 F. Supp. 3d at 16. The D.C. Circuit has "rejected a strict 'but for' requirement under which a communication could not be privileged if there was any purpose behind it other than seeking or providing legal advice"; instead, a communication is entitled to attorney-client privilege if "'one of the significant purposes' of the communication was to obtain or give legal advice." *Id.* (quoting *Kellogg Brown & Root, Inc.*, 756 F.3d at 757–60). Although the underlying facts on which an attorney-client communication rests are generally not privileged, purely factual exchanges can be protected when, among other things, they are provided at the request of an attorney for the purpose of enabling legal advice. *Id.* Indeed, even communications among corporate employees who are

---

[18] The "changing representations" the FTC mentions appear to refer to the FTC's discovery in May 2021 that a privilege log produced by Match in December 2020 "had misdated the first entry . . . giv[ing] the false impression that Match's in-house counsel had been involved in the NYTimes matter from the outset and before any non-attorney correspondence had taken place." ECF No. 36-2, ¶ 27.

not attorneys are entitled to protection if the purpose of those communications was to marshal facts for counsel to use in rendering legal advice. *Id.* at 34; *see also AT&T Corp. v. Microsoft Corp.*, No. 02-cv-164, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications between non-lawyer employees about matters [on] which the parties intend to seek legal advice are likewise cloaked by attorney-client privilege."); *Santrade, LTD v. General Electric Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds."). However, because "[t]he attorney-client privilege exists to protect *confidential* communications," a "voluntary disclosure by the holder of such a privilege is inconsistent with the confidential relationship and thus waives the privilege." *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir. 1981) (emphasis added) (quoting *United States v. AT&T*, 642 F.2d 185, 1299 (D.C. Cir. 1980)); *see also Neuder v. Battelle Pac. Nw. Nat'l Lab.*, 194 F.R.D. 289, 295 (D.D.C. 2000) ("A party asserting the [attorney-client] privilege has the burden of showing that the communications in question were intended to be kept confidential." (alteration in original) (quoting *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 511 (D.N.H. 1996))).

### B.   Work Product Protection

The work product doctrine "protect[s] the mental processes and opinions of the drafter of the document in question," as well as "factual material that is bound up with the drafter's opinions and recommendations." *United States v. All Assets Held at Bank Julius Baer & Co.*, 169 F. Supp. 3d 54, 57 (D.D.C. 2015). Under Rule 26(b)(3)(A), which "codified in substantial part" the federal work product doctrine, "a party generally may not discover 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative.'" *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (quoting Fed. R.

Civ. P. 26(b)(3)(A)).  That is, it is not necessary to a claim of work product protection that the documents were prepared by an attorney or under the direction of an attorney, "so long as they were clearly prepared in anticipation of litigation" by a party's representative.  *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 77 (D.D.C. 2003) (collecting cases); *see also Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 603 (8th Cir. 1977) ("While the 'work product' may be, and often is, that of an attorney, the concept of "work product" is not confined to information or materials gathered or assembled by a lawyer."); *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 221 (S.D.N.Y. 2001) ("[D]ocuments prepared in anticipation of litigation need not be created at the request of an attorney."); *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, No. 95-cv-4856, 1996 WL 490710, at *2 (S.D.N.Y. Aug. 27, 1996) (same); 8 Charles A. Wright, *et al.*, Federal Practice and Procedure § 2024 (3d ed.) (noting that the 1970 amendment to Rule 26 "extended" work product protection to include not only documents and things prepared "by or for the attorney of the party from whom discovery is sought" but also "documents and things prepared for litigation or trial by or for the adverse party itself or its agent").  Still, "although materials prepared by non-attorneys supervised by attorneys are *capable* of enjoying work-product protection, the degree to which counsel is involved in creating the document bears directly on whether the document was prepared in anticipation of litigation." *ISS Marine Servs.*, 905 F. Supp. 2d at 134); *see also, e.g.*, *Lapaix v. City of New York*, No. 13-cv-7306, 2014 WL 11343854, at *3 (S.D.N.Y. Aug. 15, 2014) ("[T]he overall case law . . . reflects a tiered approach to applying work product protection depending on who prepared the document in question.  In this tiered approach, documents prepared by an attorney are at the core of the doctrine and presumed to have the strongest basis for protection, while documents prepared by an agent for the attorney, by a party, and by an agent for a party are each

one further step removed from the core and presumed to have a correspondingly weaker basis for protection.").

Courts in this Circuit consider material to have been generated in anticipation of litigation if, "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 315 F.R.D. 103, 108–09 (D.D.C. 2016) (emphasis added) (quoting *Boehringer Ingelheim*, 778 F.3d at 149). "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998). The litigation "need not be actual or imminent; it need only be 'fairly foreseeable.'"[19] *Hertzberg*, 273 F. Supp. 2d at 78 (quoting *Coastal States*, 617 F.2d at 865). How-

---

[19] The undersigned declines to apply a standard, urged by the FTC and derived from *Coastal States*, that a document cannot be work product unless it was prepared with a specific legal claim in mind. As the D.C. Circuit explained in *National Association of Criminal Defense Lawyers v. Department of Justice Executive Office for Attorneys*, although *Coastal States* and a later case, *SafeCard Services. Inc. v. SEC*, "used language suggesting that, for the documents in question to be prepared with an enforcement action sufficiently on the horizon to implicate the work-product privilege, the agency's investigation must have advanced to the point that the documents' authors contemplated bringing 'a specific claim supported by concrete facts,'" it did not "establish any across-the-board specific-claim prerequisite for application of the privilege." *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for Att'ys*, 844 F.3d 246, 253 (D.C. Cir. 2016) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1202 (D.C. Cir. 1991)). Indeed, the D.C. Circuit later "specifically disavowed any such specific-claim requirement" in *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992). *Nat'l Ass'n of Crim. Def. Laws.*, 844 F.3d at 253–54. The FTC insists that cases post-dating *Schiller* have "noted [the] relevance" of the *Coastal States* standard. ECF No. 19-1 at 12 n.10. Again, as explained in *National Association of Criminal Defense Lawyers*:

> [T]he point of the specific-claim inquiry in *Coastal States* and *SafeCard* was to differentiate between audits as to which enforcement litigation might well never take place and active investigations with an enforcement action foreseeably at hand. In those cases, looking at whether agency attorneys were contemplating a specific claim proved useful in assessing the likelihood that litigation would ever come to pass.

844 F.3d at 254 (internal citations omitted). That is, although looking to whether a specific claim is contemplated may be relevant to determining if a document is prepared in anticipation of litigation in certain situations, it is decidedly *not* a requirement under this Circuit's precedent for application of work product protection. And, to the extent that "courts in this jurisdiction have noted that *Coastal States*' specific claim inquiry may still have applicability in certain situations," ECF No. 19-1 at 12 n.10, the FTC has not explained why this is one of them.

ever, "[t]he mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege." *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983).

Importantly, the D.C. Circuit's "because of" test does not require that "anticipation of litigation be the 'primary motivating purpose' behind the document's creation"; rather "a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 136–138 (D.C. Cir. 2010) (rejecting the "more demanding" primary motivating purpose test in favor of the "more lenient 'because of' test"); *see also Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 137). But "[w]here a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available." *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138); *see also, e.g.. McKinley v. Fed. Hous. Fin. Agency*, 789 F. Supp. 2d 85, 90 (D.D.C. 2011) ("Where a document has a non-litigation component, the key question is whether it 'would have been created in essentially similar form irrespective of the litigation.' If so, it is unprotected." (citation omitted) (quoting *United States ex rel. Fago v. M & T Mortg. Corp.,* 242 F.R.D. 16, 18 (D.D.C. 2007)).

Moreover, "the work product privilege is a qualified privilege which may be overridden by a showing of substantial need by the requesting party." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1302 (D.C. Cir. 1980). More specifically, so-called "fact work product," which is material prepared in anticipation of litigation that does not "reveal 'the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation,'" is discoverable where "the party seeking disclosure 'has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent

by other means.'" *All Assets*, 315 F.R.D. at 109 (first quoting Fed. R. Civ. P. 26(b)(3)(B), then quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)).  On the other hand, opinion work product—that is, material that does reveal the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative—is "virtually undiscoverable."  *Id.* (quoting *Dir., Off. of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997)).

## III.   DISCUSSION[20]

Again, the FTC now challenges the full or partial withholding of 68 of the 271 documents on the September 2021 Privilege Log—36 withheld on the basis of work product protection alone,[21] 27 withheld as both attorney-client privileged and work product,[22] 1 withheld as attorney-client privileged alone,[23] and 4 that Match has agreed to produce with challenged redactions.[24] The following discussion first addresses the FTC's arguments as to work product protection—that is, whether work product protection applies in the first instance to the 63 documents over which it is claimed and whether the requirements of Rule 26(b)(3)(A) for production of fact work product

---

[20] *Match Grp. I* explained that "[t]he March 2020 CID is a species of administrative subpoena," which may be used by the FTC "to 'investigate merely on the suspicion that the law is being violated, or even just because [it] want[s] assurance that it is not.'"  *Match Grp. I*, 2023 WL 3181351, at *17 (second and third alterations in original) (quoting *CFPB v. Accrediting Council for Indep. Colls. & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017)).  The FTC Act authorizes the agency "to file a petition to enforce a CID 'in the district court of the United States for any judicial district in which the [entity subject to the subpoena] resides, is found, or transacts business.'"  *Id.* (quoting 15 U.S.C. § 57b-1(e).  "Proceedings to enforce an administrative subpoena 'are generally summary in nature,' and require a court to 'consider only whether "[(1)] the inquiry is within the authority of the agency, [(2)] the demand is not too indefinite and [(3)] the information sought is reasonably relevant."'"  *Id.* (alterations in original) (first quoting *SEC v. Lavin*, 111 F.3d 921, 926 (D.C. Cir. 1997), and then quoting *Accrediting Council*, 854 F.3d at 688)).  As noted, Match does not argue that March 2020 CID was procedurally improper, outside the agency's authority, insufficiently definite, or unduly burdensome; the undersigned therefore does not address those issues.  Match's argument that the FTC filed the petition for enforcement for an improper purpose has been rejected.  *See Match Grp. I*, 2023 WL 3181351, at *16–25.

[21] Document nos. 1–15, 18, 21, 39, 50–52, 67, 73, 78, 87, 91, 97, 105–08, 117, 156, 165, 185, 198.

[22] Document nos. 17, 19–20, 23–27, 54, 57, 60, 72, 75, 103, 111, 115–16, 175, 181, 186, 207–08, 228–29, 240, 244, 267.

[23] Document no. 266.

[24] Document nos. 32, 48, 196, 209.

have been met.  It then analyzes the claims of attorney-client privilege over the 28 documents withheld on that basis.  Finally, it addresses the dispute over Match's proposed redactions on 4 documents, each of which was originally withheld as work product alone.  The discussion takes a belt-and-suspenders approach.  For each document at issue over which Match claims work product protection, the following discussion analyzes both whether it constitutes work product and whether the FTC has met the requirements for the disclosure of fact work product under Rule 26(b)(3)(A), even if the document is found *not to be* work product.  Similarly, for each document that Match contends is attorney-client privileged, the following discussion analyzes the applicability of that privilege, even if the document has been found to be protected by the work product doctrine.

### A.  Work Product Protection

To review, documents are *not* considered work product if *either* they were not prepared at a time when litigation was sufficiently anticipated *or* they were not prepared by or for a party or its representative because of the prospect of litigation, such as where they have both litigation and non-litigation purposes but would have been created in similar form even in the absence of litiga-tion.  Additionally, even material that constitutes work product because it was created both while litigation was anticipated and because of the prospect of litigation may be ordered produced if the requirements of Rule 26(b)(3)(A) and (B) are met, that is, they are fact work product for which the requesting party has shown both that it has a substantial need and that it cannot obtain their equiv-alent by other means.

### 1.  Anticipation of Litigation

As noted, a prerequisite for the application of work product protection is that the lawyer or party anticipated litigation when an allegedly protected document was created; to establish that, the party claiming protection must show that the belief that litigation was likely was subjectively

held by the party creating the document and that the belief was objectively reasonable. *See In re Sealed Case*, 146 F.3d at 884. The FTC appears to acknowledge that Match sufficiently antici-pated litigation at some point not long after in-house counsel was briefed about the New York Times' inquiry on July 12, 2019: it asserts that Match "confirm[ed] in its Opposition and in the Declaration of Jared Sine" that "attorneys were not involved at the outset, but rather were contacted three hours after OkCupid received the . . . inquiry" and "further confirm[ed] that Match did not anticipate litigation commensurate with what the law requires until Match's legal team had evalu-ated the situation." ECF No. 19-1 at 11–12. Indeed, in arguing that litigation was not anticipated, it focuses on the "communications that took place before the legal team arrived on the scene"— that is, the 15 communications that occurred immediately after the inquiry from New York Times reporter and before any attorneys had been consulted. *Id.*; *see also id.* at 10 ("Match Wrongly Claims Work Product Over Non-Attorney Communications That Took Place Prior to Attorney Involvement"); ECF No. 36-1 at 12 ("Match improperly claims work product protection over com-munications that took place immediately after the NYTimes' request for comment, even though those communications do not include a single attorney and took place before attorneys had even been consulted." (citing document nos. 1–15)), 13 (citing document nos. 1–3 as "emails between public relations and marketing personnel who were the first to contend with the NYTimes inquiry" and who "acknowledged having no understanding of what the reporter's email was referring to, let alone what legal claims might be at issue").[25]

The question here, then, is whether the first 15 communications on the September 2021 Privilege Log, all created prior to Hobley's email to Sine—i.e., those emails created between 11:21

---

[25] Even if the FTC does not concede that litigation was sufficiently anticipated once Hobley emailed Sine, Match's chief legal officer, at 2:41 a.m. on July 12, 2019, *see* ECF No. 36-20 at 3, a review of the documents indicates that at or around that time, Match was considering legal remedies against Clarifai.

p.m. on July 11, 2019, and 2:28 a.m. on July 12, 2019, and comprising communications sent by either Hobley, Kaye (OkCupid's Global Communications and Public Relations Manager),  or Charyton (the then-current CEO of OkCupid), or Cirello (OkCupid's Chief Technology Officer) with recipients Kaye, Hobley, Charyton, Cirello, Sacco (Match's Chief Communications Officer), Lofthouse (OkCupid's Chief Product Officer) and/or Archer (an OkCupid finance and analytics executive)—were created with both a subjective belief and objectively reasonable belief that litigation was likely.  There is conflicting evidence on this point.  On one hand, there is testimony from Match representatives supporting the existence of a company policy under which the response to certain kinds of media inquiries—about data privacy, for example—would involve counsel because of the likelihood they would spawn litigation.  Hobley, who received the inquiry from Metz, testified that because it dealt with data and privacy it "trigger[ed] a process" whereby she began to "gather the facts" to "be able to get some legal advice" and that she informed the company's leadership and attorneys "[b]ecause it could lead to litigation."  ECF No. 36-13 at 9, 11; *see also* ECF No. 17-18 (Sacco testifying that she communicated with Clarifai's CEO Zeiler on January 11, 2019, to get details because "[p]rivacy is a topic that often times winds up with litigation").  Sine asserted that there was a policy, "well-known among [Respondent's] subsidiaries in 2019" that "the investigation of and response to media and other external inquiries touching on privacy and data security matters should be conducted under the direction and supervision of Respondent's legal department" because of both "industry- and company-specific litigation risks . . . , as well as the frequency with which the FTC, other regulators, and the class-action plaintiffs' bar have been known to initiate legal proceedings based on media reports and articles."[26]  ECF No.

---

[26] The FTC argues that "crediting Match's position that it is entitled to withhold documents as attorney work product based only on a general corporate policy that certain inquiries categorically foretell litigation and absent attorney involvement would render meaningless the requirement of claim specificity or foreseeability of litigation."  ECF No. 36-1 at 12–13.  To the extent that the FTC contends that the existence of a "general corporate policy that certain

17-2, ¶ 4.  More, Match's corporate designee, Jacques, testified that "[t]he company understands that the process to . . . gather facts for the purposes of seeking legal advice began prior to the first outreach to an attorney."  ECF No. 17-6 at 9.

On the other hand, further testimony from Sine—who was, after all, Match's General Counsel and Chief Legal Officer—subverts the notion that litigation was sufficiently anticipated between the time that the New York Times inquiry was made and three or so hours later when in-house attorneys became involved—that is, during the time period that the first 15 communications on the September 2021 Privilege Log were made.  Sine asserted that it was not until after he was briefed—apparently by Hobley, as the first email to Sine on the September 2021 Privilege Log is from her, *see* ECF No. 36-20 at 3 (document no. 16)—and conferred with members of his legal team that they "had an immediate expectation that litigation was likely." ECF No. 17-2, ¶ 5.  That is, Match's Chief Legal Officer did not subjectively anticipate litigation until later in morning of July 12, 2019.  More, Jacques' testimony that personnel began gathering facts to seek attorney advice prior to contacting any in-house attorneys does not speak directly to the anticipation of litigation (and there is no claim of attorney-client privilege as to the first 15 documents in the

---

inquiries categorically foretell [likely] litigation" is irrelevant to the determination of whether work product protection attaches because it "would render meaningless the requirement of . . . foreseeability of litigation," ECF No. 36-1 at 12–13, the undersigned disagrees.  It seems logical that a company could reasonably determine that some sorts of media inquiries would ordinarily create a reasonable expectation that litigation was likely.  However, what the agency seems to be saying is that the mere existence of such a policy, alone, is not sufficient to deem all documents created in response to such an inquiry necessarily protected as work product.  That point is well taken.  If the individuals creating the allegedly protected material were unaware of such a policy, for example, it would be difficult to argue that litigation was subjectively anticipated.  If the inquiry was insubstantial or frivolous, whatever its subject matter may be, it would be difficult to argue that anticipation of litigation was objectively reasonable.  More, the mere reasonable belief that litigation is likely is not enough to protect a communication.  As discussed more fully below, there must be a showing that the document was "prepared or obtained *because of* the prospect of litigation," *All Assets*, 315 F.R.D. at 109 (emphasis added) (quoting *Boehringer Ingelheim*, 778 F.3d at 149), which includes a showing that it would not "have been created 'in substantially similar form'" in the absence of likely litigation, *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).  Thus, an argument that a company "is entitled to withhold documents as attorney work product based only on a general corporate policy that certain inquiries categorically foretell litigation," ECF No. 36-1 at 12–13, would be likely to fail.  But the undersigned does not read Match's briefing as making that simplistic argument.

September 2021 Privilege Log).  Indeed, the existence of a policy that media inquiries about data privacy are likely to lead to litigation and so should spur contact with in-house counsel is not inconsistent with a finding that it was not until counsel was informed and weighed in that litigation could be deemed reasonably anticipated.  *Cf., e.g.*, *In re Rutter's Data Sec. Breach Litig.*, No. 20-cv-382, 2021 WL 3733137, at *2 n.1 (E.D.Pa. July 22, 2021) ("A reasonable anticipation of litigation is not established by the mere fact that litigation occurred, the party consulted or retained an attorney, undertook an investigation, or engaged in negotiations." (quoting *Faloney v. Wachovia Bank, N.A.*, 254 F.R.D. 204, 214 (E.D. Pa. 2008))); *see also ISS Marine Servs.*, 905 F. Supp. 2d at 134 ("[A]lthough materials prepared by non-attorneys supervised by attorneys are *capable* of enjoying work-product protection, the degree to which counsel is involved in creating the document bears directly on whether the document was prepared in anticipation of litigation.").

*In camera* review of the 15 documents corroborates the view that litigation was not anticipated at the time they were created.  None of the first 13 documents mentions a potential legal issue or suggests that facts were being gathered "under the direction and supervision of [Match's] legal department," ECF No. 17-2, ¶ 4, or with an eye to providing those facts to in-house (or, for that matter, outside) counsel.  The 14th document, an email sent by Charytan on July 12, 2019, at 2:12 a.m. to Hobley and copied to Kaye and Cirello, merely floats that there might be reason to involve the legal department but does not indicate that litigation was a real possibility.  The 15th, a Slack thread between Charytan and Hobley, is entirely non-substantive, mentioning nothing about legal issues, litigation, or the legal department.  Nor do these documents make any mention of a company policy that "the investigation of and response to media and other external inquiries touching on privacy and data security matters should be conducted under the direction and supervision of [Match's] legal department."  ECF No. 17-2, ¶ 4.

In short, Match has not met its burden of demonstrating that when the first 15 documents on the September 2021 Privilege Log were drafted, "they were clearly prepared in anticipation of litigation." *Hertzberg*, 273 F. Supp. at 77.  And, because there is no claim of attorney-client privilege over these documents, that alone is sufficient for the undersigned to recommend production of those documents.[27]

### 2.    Prepared Because of the Prospect of Litigation

The FTC challenges Match's assertion of work product protection over both the 41 challenged documents withheld on that basis alone (a number that includes the 15 discussed above) and the 27 withheld as both work product and attorney-client privileged because they "consist of communications where Match and OkCupid were taking steps to address a public relations concern in order to mitigate damage to Match's brands, avoid public scrutiny, and limit the potential for fallout," which "were prepared, and would have been prepared in substantially similar form, for ordinary business pursuits."  ECF No. 36-1 at 14, 19.

To enjoy work product protection, anticipation of litigation need not be "the 'primary motivating purpose' behind the document's creation"; rather "a document can contain protected work-product material even though it serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation." *Deloitte*, 610 F.3d at 136–138.  "[N]ot all documents generated from an internal investigation are protected by the work[-]product doctrine simply because an organizations' internal investigation coexists with a present or anticipated lawsuit.  Documents that would have been created in the ordinary course of business irrespective of litigation are not protected by the work[-]product doctrine." *Banneker Ventures, LLC v. Graham*,

---

[27] Moreover, even had Match sufficiently demonstrated that litigation was anticipated during the period that these 15 documents were created, it has not shown that the documents would not have been created in substantially the same form in the absence of the prospect of litigation, as discussed immediately below in Section III.A.2.

253 F. Supp. 3d 64, 72 (D.D.C. 2017) (alterations in original) (quoting *Duran v. Andrew*, No. 09-cv-730, 2010 WL 1418344, at \*4–5 (D.D.C. April 5, 2010)).  So, if "a document would have been created 'in substantially similar form' regardless of the [prospect of] litigation, work product protection is not available." *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).  And so, the party claiming work product protection "must 'explain with reasonable particularity' how the documents withheld as work product were prepared in their particular form 'because of the prospect of litigation' or why they would have been prepared in a different form in the ordinary course of business." *EEOC v. George Washington Univ.*, 342 F.R.D. 161, 182 (D.D.C. 2022) ("*GW II*") (quoting *EEOC v. George Washington Univ.*, No. 17-cv-1978, 2021 WL 7907064, at \*5 (D.D.C. Sept. 23, 2021) ("*GW I*").

In the sections of its brief addressing work product protection, Match focuses on the separate legal requirement (addressed above) of whether the documents it claims are work product were prepared at a time when litigation was anticipated.  *See* ECF No. 17-1 at 33 ("To demonstrate applicability of the work-product doctrine, the asserting party must show (1) that at the time the materials were prepared, the party possessed a subjective belief that litigation was a real possibility, and (2) that that belief was objectively reasonable."); *id.* at 34 (arguing that the "OkCupid employees and other [Match] representatives acting under the legal investigations policy believed they were acting in anticipation of litigation"); *id.* at 35–37 ("It was reasonable for [Match] to anticipate not only offensive litigation to halt Clarifai's apparent misconduct, but also the prospect of regulatory litigation and consumer class actions."); *see also id.* at 37–38 (maintaining that the FTC's "speculat[ion]" that the challenged documents are "'communications where Match and OkCupid were taking steps to address a public relations concern' and 'would have been prepared

in substantially similar form, for ordinary business purposes'" is the product of "ignoring or dismissing" the evidence, but pointing to no specific evidence that addresses whether the documents would have been prepared in substantially similar form if litigation were not likely (quoting ECF No. 36-1 at 14)). Its argument appears to be that because the documents were prepared in anticipation of litigation the Court should deem that they were prepared because of the prospect of litigation and would not have been created in substantially similar form in the ordinary course of business. That argument—standing alone and without further factual support by the party seeking work product protection—is insufficient. "[T]he mere fact that a document is prepared when litigation is foreseen does not mean it was prepared [because] of litigation." *Glover v. Kansas City S. Ry. Co.*, No. 11-cv-2808, 2013 WL 3974533, at *4 (E.D. La. Aug. 2, 2013); *cf., e.g.*, *In re Juniper Networks, Inc. Sec. Litig.*, Nos. C 06-4327, C 08-246, 2009 WL 4644534, at *2 (N.D. Cal. Dec. 9, 2009) ("[T]he mere fact that a company has a committee conduct an investigation at the same time that litigation is pending is insufficient to show that the purpose of the investigation is in any way connected to the litigation."). However, in its discussion of attorney-client privilege, Match makes a further assertion that can be interpreted to address this issue: it contends that "[t]he central role of [Sacco,] Respondent's Chief Communications Officer and of *multiple* in-house counsel, including [Sine,] the Chief Legal Officer, in steering the investigation demonstrates that this was *not* typical of an ordinary business response to a press inquiry." ECF No. 17-1 at 28–29. That is, Match appears to contend that the fact that many communications include its in-house counsel and/or Sacco is evidence that they were created because of the prospect of litigation and would not have been created in substantially similar form in the ordinary course of business.

Two recent cases from this district are instructive on this point. In *Guo Wengui v. Clark Hill, PLC*, the plaintiff argued that Clark Hill, the law firm that formerly represented him, "failed

to take sufficient precautions to protect [his] data," which had been compromised in a cyberattack. 338 F.R.D. 7, 9 (D.D.C. 2021).   During discovery, the law firm claimed that a report created by "external security-consulting firm Duff & Phelps," which was hired by Clark Hill's outside litigation counsel, was protected by the work product privilege.   *Id.*   Judge Boasberg found that the defendant had "not met its burden to show that the Report, or a substantially similar document, 'would [not] have been created in the ordinary course of business irrespective of litigation.'"   *Id.* at 10 (alteration in original) (quoting *Banneker Ventures*, 253 F. Supp. 3d at 72).   The court reasoned:

> For many organizations, surely among them law firms that handle sensitive materials, "discovering how [a cyber] breach occurred [is] a necessary business function regardless of litigation or regulatory inquiries. [There is a] need[] to conduct an investigation . . . in order to figure out the problem that allowed the breach to occur so that [the organization] [can] solve that problem and ensure such a breach [cannot] happen again."   It is therefore more likely than not, if not "highly likely[,] that [Clark Hill] would have conducted [an] investigation" into the attack's cause, nature, and effect "irrespective of the prospect of litigation."   From the Court's *in camera* review, it is clear that the Duff & Phelps Report summarizes the findings of such an investigation, and that "substantially the same [document] would have been prepared in any event . . . as part of the ordinary course of [Defendant's] business."

*Id.* at 10–11 (internal citations omitted) (alterations in original) (first quoting *In re Dominion Dental Servs. USA, Inc. Data Breach Litig.*, 429 F. Supp. 3d 190, 193 (E.D. Va. 2019), then quoting *ISS Marine Servs.*, 905 F. Supp. 2d at 137, and then quoting *United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir. 1998)).   The Court rejected as unsupported by the evidence the law firm's contention that the Duff & Phelps investigation focused exclusively on "assisting [the firm] in gathering information necessary to render timely legal advice" while a parallel investigation by a different vendor "worked 'to investigate and remediate the attack' so as to preserve 'business continuity.'"   *Id.* at 11 (alteration in original) (quoting the record).

Similarly, in *GW II*, the EEOC sued The George Washington University on behalf of an employee who had "filed an internal grievance complaining of gender discrimination with the University's Equal Employment Opportunity Office."  342 F.R.D. at 166.  The agency sought production of documents related to the university's investigation of that grievance, which was originally conducted by the university's EEO office before the university hired an outside law firm "to 'take over' the internal investigation and draft a Confidential Informal Grievance Report."  *Id.* at 166–67 (quoting the record).  The university withheld 80 documents regarding the investigation as attorney-client privileged, work product, or both.  *Id.* at 167.  The Court first found that the defendant had "adequately shown that it anticipated litigation at the outset of the internal investigation" where the head of the university's EEO office—Vickie Fair—"contacted the Office of General Counsel days after receiving [the] complaint not in the ordinary course of business, but because she thought it likely to prompt litigation; thereafter, the Office of General Counsel provided guidance in the conduct of the investigation, including in discussions about the interviews . . . conducted and [the] preliminary findings."  *Id.* at 182.  However, even though litigation was reasonably anticipated and in-house counsel were significantly involved in the preliminary investigation, not all the documents withheld as work product were protected by that doctrine.  The Court found that the university did not show that interview notes Fair took would not have been created in substantially similar form but for the prospect of litigation:

> While it has demonstrated that attorneys [from the Office of General Counsel] advised her about potential witnesses, the University has not explained how that resulted in Fair's preparation of the witness interview notes in a form that was not substantially similar to the form they would have taken during a more routine investigation not commenced in anticipation of litigation.  Nor does it provide any detail to support its assertion that "the content of the notes . . . was different . . . because [their] purpose . . . was to memorialize what witnesses told Fair so that she could obtain further legal advice in anticipation of litigation."  The primary purpose of any notetaking is to "memorialize" what is observed. How the fact that Fair would use those memorializations to obtain legal advice influenced them such that

44

their form was not substantially similar to interview notes taken in the ordinary course of business (absent anticipation of litigation) is left unanswered in the University's submissions.

*Id.* at 183 (internal citation omitted) (second through fourth alterations in original) (quoting the record).[28]  On the other hand, the university had shown that documents related to the report produced by outside counsel (who took over the investigation about four months after receipt of the grievance), communications with or among attorneys from that firm, and notes taken by that firm's lawyers "would not have been created in the same form in the ordinary course of business" because the firm would not have been retained to create such a report in the absence of likely litigation. *Id.* at 177, 182.

The discussion below applies the reasoning of those two cases to documents from the three periods identified above: (1) July 11, 2019, to July 12, 2019, when OkCupid provided its response to the inquiry from Metz of the New York Times; (2) July 13, 2019, when the New York Times article was published, to July 27, 2019, after Match sent a cease-and-desist letter to Clarifai; and (3) August 2019 to March 2020, the period that includes the commencement of the FTC's investigation.

### a.    *Documents Created July 11–12, 2019*

There are 39 challenged documents claiming work product protection created during this period, including the 15 addressed in the previous section.[29]  As relevant here, Sacco testified that, in the immediate aftermath of the inquiry from the New York Times, she and her team "set about trying to determine if Clarifai and OkCupid had worked together and if what Matt Zeiler was

---

[28] Because the Court found that those notes were protected by attorney-client privilege, however, they were not discoverable.  *See id.* at 183.

[29] Not including the 2 documents created during this time period over which the only dispute is Match's proposed redactions of non-responsive material, the documents at issue are document nos. 1–15, 17–21, 23–27, 39, 50–52, 54, 57, 60, 67, 72–73, 75, 78, 87, and 91.  As noted in note 6, *supra*, 12 of those—document nos. 17, 19–20, 23–27, 54, 57, 60, 72, and 75—have also been withheld as attorney-client privileged.

saying . . . was accurate" before they decided whether or how to respond.  ECF No. 36-14 at 10.
Sacco spoke to Jacques and Yagan as part of that investigation, which also included members of
the legal department searching "for any contracts or anything that would indicate a working rela-
tionship with [Clarifai]."  ECF No. 36-14 at 12–14, 18.  She further communicated with Zeiler in
an email that was apparently produced to the FTC.  *See* ECF No. 17-18 at 8 (quoting an email
Sacco sent to Zeiler sent on July 11, 2019).  That is, the evidence shows that the inquiry from the
New York Times prompted Match personnel to engage in an investigation geared toward discov-
ering the facts behind the claim that OkCupid's founders provided Clarifai access to users' data.
That investigation was largely aimed at crafting a response to the reporter's request for comment
and, as Hobley testified, motivated at least in part by a concern that any inaccurate information be
corrected to minimize the "impact of [the] story on [the] brand."  ECF No. 36-13 at 17.  As in *Guo
Wengui*, because of that potential adverse impact the New York Times article could have on
Match's business, it is "more likely than not," even "highly likely," that Match "would have con-
ducted [an] investigation" into the claims to be included in the article, "irrespective of the prospect
of litigation."  338 F.R.D. at 11 (alteration in original) (quoting *ISS Marine Servs.*, 905 F. Supp.
2d at 137).  The mere fact that in-house counsel and Sacco were involved in the investigation does
not suggest that the communications at issue, or "substantially similar document[s], 'would [not]
have been created in the ordinary course of business irrespective of litigation,'" *Guo Wengui*, 338
F.R.D. at 10 (second alteration in original) (quoting *Banneker Ventures*, 253 F. Supp. 3d at 72);
*see also Travelers Prop. Cas. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh*, 250 F.R.D. 421,
425 (W.D. Mo. 2008) ("The mere fact that [documents] were prepared after counsel was [involved]
is insufficient [to determine that they were prepared because of litigation] . . . .").

*In camera* review of the documents shows that, even if some of the communications reflect attorney advice on legal issues (as noted below and in Section III.B, *infra*, discussing attorney-client privilege), the majority are focused on gathering facts and crafting a response to the inquiry from the New York Times, and would likely have been "created in essentially similar form irrespective of the [prospect of] litigation." *McKinley*, 789 F. Supp. 2d at 90 (quoting *Fago*, 242 F.R.D. at 18). Indeed, although legal expertise is sometimes proffered in these communications, attorneys largely appear to take a back seat in a fact-gathering exercise driven by non-attorney businesspeople: of the 95 documents created during this period listed on the September 2021 Privilege Log, only 14 are authored by an attorney (document nos. 29, 33–36, 40–41, 47, 55–56, 64, 69, 71, and 94) and only 17 are directly addressed to an attorney rather than merely copied to an attorney (document nos. 16, 29–30, 34–35, 37–38, 40, 42, 47, 56, 58, 70, 72, 75,79, and 95). *See* ECF No. 36-20 at 3–12; *see also ISS Marine Servs.*, 905 F. Supp. 2d at 134 ("[A]lthough materials prepared by non-attorneys supervised by attorneys are *capable* of enjoying work-product protection, the degree to which counsel is involved in creating the document bears directly on whether the document was prepared in anticipation of litigation."); *Lapaix*, 2014 WL 11343854, at *3 ("[T]he overall case law . . . reflects a tiered approach to applying work product protection depending on who prepared the document in question. In this tiered approach, documents prepared by an attorney are at the core of the doctrine and presumed to have the strongest basis for protection, while documents prepared by an agent for the attorney, by a party, and by an agent for a party are each one further step removed from the core and presumed to have a correspondingly weaker basis for protection.").

There are, however, a few communications that constitute work product included among these documents. Specifically, Sine discloses legal strategy in three emails. The first two were

sent at 8:52 p.m. on July 11, 2019, and at 4:40 a.m. on July 12, 2019.  Portions of a third email

sent on July 12, 2019, at 10:15 a.m.—specifically, the second paragraph in that communication—

also relate to legal strategy.  Some or all of those emails are included in an email thread that is

reproduced in document nos. 54 (at Bates nos. C13288–89), 57 (at Bates nos. C12660–61), 60 (at

Bates nos. C13313, C13316–17), 72 (at Bates no. C13382–84), and 75 (at Bates nos. C13390,

C13392–93).  Those specific emails or portions of emails would not have existed in substantially

the same form but for the prospect of litigation and therefore should be redacted from any produc-

tion of those communications.

In sum, Match has failed to show that these investigative efforts were undertaken because

of potential litigation or that the vast majority of these communications—with the few exceptions

noted in the previous paragraph—"would [not] have been created in essentially similar form irre-

spective of the [prospect of] litigation." *McKinley*, 789 F. Supp. 2d at 90 (quoting *Fago*, 242 F.R.D.

at 18).  The undersigned therefore finds that Match has not met its burden to demonstrate that the

other communications reflected in the following documents are protected by the work product

doctrine:  document nos. 1–15, 17–21, 23–27, 39, 50–52, 54 (except for the Sine emails identified

above), 57 (except for the Sine emails identified above), 60 (except for the Sine emails identified

above), 67, 72 (except for the Sine emails identified above), 73, 75 (except for the Sine emails

identified above), 78, 87, and 91.  Of those, there is no claim of attorney-client privilege over

documents nos. 1–15, 18, 21, 39, 50–52, 67, 73, 78, 87, and 91, so the undersigned recommends

that those 26 documents should be ordered produced.[30]

---

[30] As discussed above in Section III.A.1, document nos. 1-15 should also be produced because they were not created in anticipation of litigation.  As discussed below in Section III.A.3, the FTC has also met the requirements of Rule 26(b)(3)(A) for many of those (document nos. 1–15, 18, 21, 39, 50, 67, 87, and 91).

b.    *Documents Created July 13–27, 2019*

The next group of documents are 21 created between July 13, 2019 (the date the New York Times story was published) and July 27, 2019 (approximately one day after the cease-and-desist letter was sent).[31], [32]   Of those, 4 documents described in the September 2021 Privilege Log as "[a]ttorney-client privileged attachment to previous attorney-client privileged email," ECF No. 36-20 at 14, 20 (document nos. 111, 115, 116, 175), are easily dispensed with.   First, that description does not even purport to represent that the documents are work product but asserts only that they are attorney-client privileged.   Second, "attachments to privileged communications are not thereby automatically privileged.   Instead, the attachments must independently satisfy the requirements for the application of the [claimed] privilege."   *Boehringer Ingelheim*, 180 F. Supp. 3d at 31–32 (internal citations omitted).   Match has made no attempt to establish that those attachments meet the requirements of work product protection.   Third, *in camera* review of the documents definitively establishes that they are not work product.   Each of those attachments (which are all the same single document) was created by a third party unrelated to Match, rather than by or for Match or by or for a representative of Match.   But to be considered work product under Rule 26(b)(3), a document must be "prepared by or for any party or by or for its representative." *Hertzberg*, 273 F. Supp. 2d at 76 (emphasis omitted); *see also Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997) ("The work product doctrine shields materials 'prepared in anticipation of litigation or for

---

[31] Not including the 2 documents created during this time period over which the only dispute is Match's proposed redactions for non-responsive material, the documents at issue are document nos. 97, 103, 105–08, 111, 115–17, 156, 165, 175, 181, 185–86, 198, 207–08, 228–29.   As noted in note 9, *supra*, 11 of those have been also withheld as attorney-client privileged—document nos. 103, 111, 115–16, 175, 181, 186, 207–08, 228–29.

[32] As noted above, this period saw OkCupid's receipt of and response to a small number of customer complaints relating to the New York Times article.   *See* ECF No. 17-2, ¶ 8; ECF No. 36-9; ECF No. 36-10; ECF No. 36-11 at 2. However, according to the September 2021 Privilege Log and the undersigned's review, none of the documents created in July 2019 that are at issue concern consumer inquiries or responses thereto, so the parties' arguments regarding such complaints are irrelevant.

trial by or for [a] party or by or for that . . . party's representative (including the . . . party's attor-
ney, consultant, . . . or agent.'" (alterations in original) (quoting Fed. R. Civ. P. 26(b)(3))).  That
is (subject to an exception not at issue here),[33] "the work product doctrine does not extend to
documents . . . that were prepared by a third party in the ordinary course of business and that would
have been created in essentially similar form irrespective of any litigation anticipated by coun-
sel."[34]  *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 384–85
(2d Cir. 2002); *see also, e.g.*, *Kurlander v. Kroenke Arena Co., LLC*, No. 16-cv-02754, 2017 WL
3084473, at *5 (D. Colo. July 20, 2017) ("Defendant cites no cases, and this court could find none,
that suggest a party can claim work product protection over communication authored by third par-
ties with whom it has no relationship."); *Callaway v. Papa John's USA, Inc.*, No. 09-civ- 61989,
2010 WL 4024883, at *7 (S.D. Fla. Oct. 12, 2010) ("[O]rdinarily, the work product doctrine does
not shield from discovery documents created by third parties." (quoting *Hunter's Ridge Golf Co.,
Inc. v. Georgia–Pacific Corp.*, 233 F.R.D. 678, 681 (M.D. Fla. 2006))); *Nationwide Mut. Fire Ins.
Co. v. Smith*, 174 F.R.D. 250, 253 (D. Conn. 1997) ("This court also fails to see how Nationwide
can claim the protection of the work product doctrine with respect to information that it did not
prepare or direct to have prepared.").  These documents are not work product.[35]

---

[33] That exception applies "when an attorney has so specifically selected and compiled [third-party] documents in anticipation of litigation that production would necessarily reveal the attorney's developing strategy."  *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 385 (2d Cir. 2003).  Match has not argued and the evidence does not indicate that was the case here.

[34] To be sure, the D.C. Circuit in *Deloitte* asserted that, for so-called intangible work product, "the question is not who created the document or how they are related to the party asserting work-product protection, but whether the document contains work-product—the thoughts and opinions of counsel developed in anticipation of litigation."  610 F.3d at 136.  The court made that statement in relation to a document created by a company's independent auditor described as a "draft memorandum prepared by [the auditor] that summarizes a meeting between [the company's] employees, [its] outside counsel, and [the auditor's] employees about the possibility of litigation."  *Id.* at 133.  That is, the document at issue could have included work product because it summarized a meeting that included representatives of the company.  Here, there is no possibility that the attachments include Match's work product because they were created by a third party unrelated to Match.

[35] Match's claims of attorney-client privilege over the documents are addressed below in Section III.B.

The remaining 18 are somewhat more complicated.  Sine asserts that during this period executives and in-house attorneys from Match "continued the legal-investigative efforts" that began on July 11, 2019, offering that "the legal department drafted and revised a cease-and-desist letter to Clarifai"—dated July 15, 2019, and sent on July 25 or 26, 2019—and that an "internal meeting regarding the investigation" was held on July 16, 2019.  ECF No. 17-2, ¶ 7; *see also* ECF No. 17-7 (cease-and-desist letter).  For its part, the FTC disbelieves Match's assertion that its investigation continued past July 12, 2019, noting that, when asked in an interrogatory to "detail the investigation . . . and any other activities" it took in response to the New York Times article, the only activity the company identified was the issuance of the cease-and-desist letter.  ECF No. 19-1 at 7–8; ECF No. 17-5 at 26–27.  Significantly, however, although it would be an overstatement to say that the FTC concedes that communications related to the drafting of the cease-and-desist letter were prepared because of the prospect of litigation, it does not mount an argument against the proposition that preparation of a cease-and-desist letter may indicate that litigation was anticipated, which has been recognized in a number of cases.  *See Louis Vuitton Malletier v. Tex. Int'l P'ship*, No. H-10-2821, 2012 WL 5954673, at *4 (S.D. Tex. May 14, 2012) (finding that the plaintiff was anticipating litigation at the time it sent a cease-and-desist letter); *see also Kandypens Inc v. Puff Corp.*, No. 20-cv-358, 2020 WL 7978226, at *8 (C.D. Cal. Dec. 7, 2020) (indicating that communications created after receipt of a cease-and-desist letter were protected as work product); *Plate, LLC v. Elite Tactical Sys., LLC*, No. 18-cv-265, 2020 WL 5209303, at *15 (E.D. Tenn. Sept. 1, 2020) (noting that documents prepared prior to the sending of a cease-and-desist letter were not prepared in anticipation of litigation); *cf. Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 75 (S.D.N.Y. 2010) (finding a cease-and-desist letter was not sent because of the prospect of litigation

where in-house counsel testified that "such cease-and-desist letters [were] 'standard,' and therefore issued in the ordinary course of [the company's] business as a luxury goods company").

Beyond that, although Match has had ample opportunity to meet its burden—there were years of negotiation over privilege pre-dating the filing of this action and the full briefing on this motion runs to hundreds of pages—the company provides precious little to help the Court determine whether these documents are work product.[36]  Although the September 2021 Privilege Log reflects that in-house attorneys became more involved during this period—about 60 percent of the documents (79 out of 133) have an attorney listed as the author or a direct addressee—*in camera* review indicates that efforts to explore legal options (such as the cease-and-desist letter) co-existed with efforts more focused on the business effects of the New York Times article.  That review, together with Match's submissions, offer scant evidence that the following communications would not have been made in a substantially similar form in the absence of potential litigation: document nos. 103, 105, 106, 107, 108, 117, 156, 165, 185, 198, 207 (all communications after Sine's email dated July 18, 2019 9:20 AM), and 208 (all communications after Sine's email dated July 18, 2019 9:20 AM).  Only two of those documents—document nos. 207 and 208—contain any text written by an attorney, but the communications identified here do not obviously relate to the prospect of litigation; instead, they are about a press report.  *See Lapaix*, 2014 WL 11343854, at *3 (noting the tiered approach to work product protection in which documents prepared by attorneys are "presumed to have the strongest basis for protection, while documents prepared by an agent for the attorney, by a party, and by an agent for a party are . . . presumed to have a correspondingly weaker

---

[36] As recently as January 2024—after providing the documents to the undersigned for *in camera* review and after the parties met to narrow their disputes—Match sought an opportunity to address "any questions [the undersigned has] about the merits of Match's privilege and work product designations," including through *ex parte* submissions.  *See* ECF No. 45-1.  Match has not satisfactorily explained, however, why "the interests of the adversary process are outweighed [here] by other crucial interests" such that *ex parte* submissions would be appropriate, *Boehringer Ingelheim*, 180 F. Supp. 3d at 20, or why the undersigned should take further evidence at this late date to allow Match to attempt to rectify any prior failure to prove up its claims of attorney-client privilege or work product protection.

basis for protection"); *see also, e.g.*, *Shah v. Metro. Life Ins. Co.*, No. 16-cv-1124, 2017 WL 5712562, at *3 (S.D. Ohio Nov. 27, 2017) ("[T]he mere fact that a document was prepared by an attorney does not necessarily lead to the characterization of that document as work product." (quoting *Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 181 (S.D. Ohio 1993))); *Travelers Prop. Cas. Co. of Am.*, 250 F.R.D. at 425 ("The mere fact that [documents] were prepared after counsel was retained is insufficient [to determine that they were prepared because of litigation]; the mere fact that some may contain the name of a lawyer or law firm is [also] insufficient."). Nor is there any indication that those communications would not have been created in the same form in the absence of the prospect of litigation. Match does not claim attorney-client privilege over document nos. 105–08, 117, 156, 165, 185, or 198, so those should be produced.[37]

The following documents are or include non-substantive invitations to a Zoom meeting: document nos. 181, 186, 207 (communication dated July 15, 2019, at 10:22 p.m.), 208 (communication dated July 15, 2019, at 10:22 p.m.), 228 (communication dated July 15, 2019, at 10:22 p.m.), 229 (communication dated July 15, 2019, at 10:22 p.m.). "[C]ommunications dealing with merely administrative, logistical, or scheduling matters" are "outside the scope of the work product doctrine." *Valley Forge Ins. Co. v. Hartford Iron & Metal, Inc.*, No. 14-cv-6, 2018 WL 739870, at *4 (N.D. Ind. Feb. 6, 2018) (collecting cases); *see also, e.g.*, *Am. Municipal Power, Inc. v. Voith Hydro, Inc.*, No. 17-cv-708, 2021 WL 5917096, at *3 (S.D. Ohio Dec. 14, 2021) (same).

The following communications, however, relate to preparation and transmittal of the cease-and-desist letter and are protected by the work product doctrine—document nos. 97, 207 (communications from July 16, 2019, at 10:50 a.m.; July 18, 2019, at 9:18 a.m.; and July 18, 2019, at 9:20

---

[37] Match's claims of attorney-client privilege over document nos. 103, 111, 115–16, 175, 207, and 208 are addressed in Section III.B.

a.m.), 208 (communications from July 16, 2019, at 10:50 a.m.; July 18, 2019, at 9:18 a.m.; and

July 18, 2019, at 9:20 a.m.), 228 (communications from July 15, 2019, at 9:51 a.m.; July 25, 2019,

at 9:05 a.m.; July 26, 2019, at 6:09 p.m.; and July 27, 2019, at 12:20 a.m.), and 229 (communica-

tions from July 15, 2019, at 9:51 a.m.; July 25, 2019, at 9:05 a.m.; July 26, 2019, at 6:09 p.m.; July

27, 2019, at 12:20 a.m.; and July 27, 2019, at 12:25 a.m.).

    *c.*  *Documents Created August 2019–April 2020*

   The relevant occurrence during this period is the litigation hold notice that the FTC emailed

to Match's outside counsel on February 21, 2020.  *See* ECF No. 17-4.  This group comprises 3

documents created between February 14, 2020, and February 28, 2020; all are withheld as both

work product and attorney-client privileged.[38]  The first—document no. 240—is an attachment to

an email sent by attorney Teckman to Hobley, Sacco, and attorneys Setnick and Sine, copied to

attorney Kitchens.  The attachment was not prepared by Match or an attorney for or representative

of Match; it is a complaint filed in unrelated litigation.  As such, it is not protected as work product.

*See, e.g., In re Grand Jury Subpoenas*, 318 F.3d at 384–85 (stating that documents created by third

parties are generally not protected as work product).  The second, document no. 244, was created

by a third party—the FTC, incidentally—and is not the work product of Match or its attorneys or

representatives.[39]  *See id.*

---

[38] They are document nos. 240, 244, and 267.  *See* note 11, *supra*.

[39] As noted *supra* note 33, there is an exception to the principle that documents created by third parties are not work product where "an attorney has so specifically selected and compiled [third-party] documents in anticipation of liti-gation that production would necessarily reveal the attorney's developing strategy."  *In re Grand Jury Subpoenas*, 318 F.3d at 385.  Again, Match has not attempted to establish that such an exception applies here.

The final document—document no. 267—is a three-message Slack thread from Huns-berger to Charytan and Lofthouse that discusses legal strategy related to Clarifai's use of OkCupid data.  It should be withheld as work product.[40]

### 3.    Substantial Need and Undue Burden

The FTC contends that, even if Match has properly claimed work product protection over some or all of the documents at issue here, the fact work product in them should nevertheless be produced because the agency has met the requirements of Rule 26(b)(3)(A).  That rule provides that fact work product—which is the only type of work product FTC seeks here—"is discoverable if the party seeking such discovery 'shows that it has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.'" *GW II*, 342 F.R.D. at 183 (quoting Fed. R. Civ. P. 26(b)(3)(A)(ii)).  Under D.C. Circuit precedent,

> the "substantial need" and "undue hardship" requirements of the Rule are "gener-ally met if [the movant] demonstrates that the materials are relevant to the case, the materials have a unique value apart from those already in the movant's possession, and 'special circumstances' excuse the movant's failure to obtain the requested ma-terials itself."

*Id.* (quoting *Boehringer Ingelheim*, 778 F.3d at 155).  As to the relevance prong, "no heightened showing of relevance is required," particularly in an administrative subpoena enforcement pro-ceeding like this one, where "the FTC is 'merely exercising its legitimate right to determine the facts' . . . to decide whether a complaint should issue" and "[t]he district court is not free to spec-ulate about the possible charges that might be included in a future complaint, and then to determine the relevance of the subpoena requests by reference to those hypothetical charges."  *Boehringer Ingelheim*, 78 F.3d at 156–57 (second alteration in original) (quoting *FTC v. Texaco, Inc.*, 555

---

[40] As discussed in Section III.B.3, *infra*, all three of these documents are protected as attorney-client privileged.

F.2d 862, 874 (D.C. Cir. 1977) (en banc)).  Rather, the inquiry "requires a careful examination of whether non-disclosure will impair the truth-seeking function of discovery."  *Id.* at 156.

The thrust of the FTC's argument is that it needs the factual material included in the documents withheld as work product (and that are not otherwise protected by attorney-client privilege, which is not overcome by a showing of substantial need, *see GW II*, 342 F.R.D. at 183 n.19) "to fill in the many blanks of witness testimony" caused by the inability of  OkCupid's co-founder Yagan, its Chief  Marketing Officer Hobley, and its customer support personnel manager McGee, to "remember basic information regarding their conversations during the course of the internal investigation, what facts they learned, and how they handled customer inquiries."[41]  ECF No. 19-1 at 14; *see also* ECF No. 36-1 at 16–17 & n.10.  For the reasons stated below, the undersigned agrees that the FTC has shown a substantial need for evidence related to the conduct of Hobley and Yagan in the initial stages of the investigation.

Match has not argued that the material sought is not relevant—indeed, its inclusion on the September 2021 Privilege Log is a concession that it is responsive to the March 2020 CID—so that requirement is met.  The other two requirements collapse into each other somewhat.  The D.C. Circuit has recognized that among the "special circumstances" that excuse the failure of a litigant to obtain the substantial equivalent of the documents he seeks is "where a witness had a lapse of memory."  *Boehringer Ingelheim*, 778 F.3d at 156; *see also, e.g.*, *Perez v. DirecTV Grp. Holdings,*

---

[41] In its opening brief, the FTC also asserted that it needed the documents to check the accuracy of evidence already in its possession, specifically, Match's written response to the March 2020 CID and Yagan's testimony.  ECF No. 36-1 at 15–16.  The FTC appears to have abandoned that argument after Match pointed out that courts in this District have held that "the desire to obtain impeachment evidence is not a substantial need."  ECF No. 17-1 at 40 (citing *McPeek v. Ashcroft*, 202 F.R.D. 332, 339 (D.D.C. 2001) ("[I]f the desire to impeach a witness with prior inconsistent statements is a sufficient showing of substantial need, the work product privilege would cease to exist; there is not a lawyer born who would not like to see opposing counsel's files in order to search for inconsistencies in opposing witnesses' potential testimony."); *see also Clemmons v. Acad. for Educ. Dev.*, 300 F.R.D. 6, 8 (D.D.C. 2013) (same). The undersigned need not address this issue because, as discussed below, the FTC has otherwise demonstrated a substantial need for certain fact work product.

56

*LLC*, No. 16-cv-1440, 2020 WL 10818049, at *6 (C.D. Cal. July 23, 2020) ("Undue hardship is demonstrable if witnesses are unavailable or cannot recall the events in question." (quoting *AT&T Corp.*, 2003 WL 21212614, at *6); *Rumble v. Fairview Health Serv.*, No. 14-cv-2037, 2016 WL 4515922, at *3 (D. Minn. Aug. 29, 2016) ("[T]he party seeking work product 'can claim undue hardship if he cannot obtain the information he seeks by deposition. For instance, if the plaintiff makes a particularized showing that a witness cannot recall the event in question or is unavailable, this may constitute undue hardship.'" (quoting *King v. Odeco Inc.*, 106 F.3d 396, 1997 WL 33367, at *3 (5th Cir. 1997))); *Chaney ex rel. Guilliam v. Slack*, 99 F.R.D. 531, 534 (S.D. Ga. 1983) ("It is well-recognized that deposing witnesses unable to remember the details of an event, which were fresh in their minds when the investigation was conducted and their statements taken, is not a substantial equivalent of the work product material."); 8 Charles A. Wright, *et al.*, Federal Practice and Procedure § 2025 (3d ed.) ("No one doubts that production should be ordered if the witness has a faulty memory and no longer remembers details of the event."). Here, the transcript of the investigative hearing of Yagan demonstrates that he was unable to answer questions about his initial contact with Hobley after the inquiry from Metz of the New York Times or the concerns of Match executives in the immediate aftermath of that inquiry. *See* ECF No. 39-1 at 9–13. Hobley's transcript, too, shows that she was unable to recall what she did after receiving the inquiry, what she spoke about with Metz, or what she or other personnel did prior to the issuance of OkCupid's response. *See* ECF No. 36-13 at 8–13, 15–16. As for McGee, he did not remember whether he had discussions with any other OkCupid personnel about the New York Times article or about the response OkCupid sent out to consumer inquiries received on July 13, 2019, and in October of that same year. *See* ECF No. 36-15 at 6, 8–9, 11, 13, 15. On that basis, the undersigned finds that the FTC has "ma[de] a particularized showing that [these] witness[es] cannot recall" the events during

the period between the receipt of the inquiry from the New York Times and the time that OkCupid's response was issued. *Rumble*, 2016 WL 4515922, at *3 (quoting *King*, 106 F.3d 396, 1997 WL 33367, at *3); *cf. In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1240 (5th Cir. 1982) ("[B]road unsubstantiated assertions of unavailability or faulty memory are not sufficient."). However, other than McGee's inability to recall his response to a consumer complaint received in October 2019, the FTC has not pointed to evidence of any witnesses' difficulty recalling events after this time period.

The holes in the witnesses' testimony identified by the FTC also support a finding that communications reflecting the conduct of these witnesses during the period between the New York Times inquiry on July 11, 2019, and OkCupid's response on July 12, 2019, "have a unique value apart from those already in the movant's possession." *Boehringer Ingelheim*, 778 F.3d at 155. Courts have found that statements made contemporaneously with the relevant events can have "a unique value in the discovery of truth." *Halpin v. Barnegat Bay Dredging Co.*, No. 10-cv-3245, 2011 WL 2559678, at *17 (D.N.J. June 27, 2011) (quoting *Tinder v. McGowan*, 1970 WL 105708, at *2 (W.D. Pa. Dec. 29, 1970)); *see also Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419, 425–26 (D.D.C. 2014) (similar). And, here, the FTC has represented that, of the approximately 200 documents produced by Match, "[o]nly a handful" are "internal communications related to the New York Times and Clarifai" and the bulk of the production comprises "multiple versions of Match's privacy policies, terms of use, data security documents, and third-party communications" that "predominantly pre-date the inquiry OkCupid received" from the paper, which is a significant focus of the investigation. ECF No. 19-2, ¶ 7. More, Match's response to the interrogatory in the March 2020 CID asking for a detailed description of "the investigation [Match] conducted and any other activities [it] undertook in response to the New York Times article" reveals little about that

investigation: it states that, because Metz's inquiry "did not identify a specific time frame in which Clarifai's alleged collection of data occurred," personnel initially focused on the 2016–17 time period, when "Clarifai approached OkCupid with suggestions that it could act as a service provider and vendor," which did not result in any contractual agreement; that OkCupid was unable to corroborate Metz's allegations; and that the company provided its response to the paper on July 12, 2019 and later issued a cease-and-desist letter to Clarifai.  ECF No. 17-5 at 26–27.  Indeed, in light of the dearth of evidence about what precisely went on during Match's investigation, Match's argument that the FTC's "extensive" use of tools such as investigative hearings, interrogatories, and document production "should end any reasonable inquiry about the purported 'substantial need' to compel related work product," ECF No. 17-1 at 40–41, appears to get it backwards.  Thus, the undersigned finds that the FTC has met the "substantial need" and "undue hardship" requirements of Rule 26(b)(3)(A) with respect to certain documents over which Match has claimed work product protection.

But which documents?  The FTC wants "all responsive documents consisting of non-privileged fact work product," ECF No. 36-1 at 18, but it has not supported such an expansive request.  As shown in the discussion above, the FTC has demonstrated "special circumstances" for its failure to obtain factual information likely contained in documents withheld as work product on the basis of the faulty memories of witnesses Yagan and Hobley as to events that occurred in the immediate aftermath of the New York Times inquiry—that is, when the initial investigation began on July 11, 2019, when OkCupid issued its response on July 12, 2019; and the faulty memory of McGee related to consumer complaints on July 13, 2019 and then again in October.  No documents that include McGee are at issue any longer.  That leaves communications involving Yagan and/or Hobley on July 11 or 12, 2019.  During that period, the September 2021 Privilege Log reflects that

35 of the communications still at issue over which Match has claimed work product protection include either Hobley, Yagan, or both. *See* ECF No. 36-20 at 1–15 (document nos. 1–15, 17–21, 23, 25–27 39, 50–52, 54 57, 60, 67, 72, 75, 87, and 91). The FTC has met the requirements of Rule 26(b)(3)(A) for those documents. Of those, 24 (document nos. 1–15, 18, 21, 39, 50–52, 67, 87, and 91), do not include claims of attorney-client privilege, so the undersigned recommends that they be produced even if they are protected by the work product privilege (which the undersigned believes they are not). The remaining 13 documents (document nos. 17, 19–20, 23, 25–27, 54, 57, 60, 72, 75, and 103) do include claims of attorney-client privilege and so should be ordered to be produced only if those privilege claims (discussed in Section III.B., *infra*) fail.[42] Moreover, 5 of those documents (document nos. 54, 57, 60, 72, and 75) contain opinion work product—the Sine emails of July 11, 2019, at 8:52 p.m., July 12, 2019, at 4:40 a.m., and the second paragraph of the Sine email of July 12, 2019, at 10:15 a.m. identified above in Section III.A.2.a—which should be redacted from any production of those communications pursuant to Rule 26(b)(3)(B).

### B.   Attorney-Client Privilege

The FTC challenges Match's assertion of attorney-client privilege over 28 documents. Of those, 13 were created on July 11 or 12, 2019—that is, between the time that the inquiry from the New York Times was received and the time that OkCupid provided its response to the paper;[43] 11 were created between July 13, 2019, the day the New York Times story was published, and July 27, 2019, a day or so after the cease-and-desist letter was sent to Clarifai;[44] the remaining 4 were

---

[42] The undersigned has found that none of those constitutes work product.

[43] Those are document nos. 17, 19–20, 23–27, 54, 57, 60, 72, 75.

[44] Those are document nos. 103, 111, 115–16, 175, 181, 186, 207–08, 228–29.

created between February 14 and February 28, 2019, around the time that the FTC issued its liti-

gation hold notice on February 21, 2019.[45]  *See* ECF No. 36-20.  Of these 28 documents, the

following 10 documents were sent by and/or sent to an attorney: document nos. 72, 75, 111, 115–

16, 175, 181, 186, 240, and 244.  The following 7 communications were not authored by or sent

to an attorney but were copied to an attorney: document nos. 20, 23, 25–27, 54, and 60.  The

following 11 communications were between or among only non-attorney businesspeople: docu-

ment nos. 17, 19, 24, 57, 103, 207–08, 228–29, and 266–67.

　　As an initial matter, there is some slippage in the FTC's characterization of the legal stand-

ard applicable to claims of attorney-client privilege in this Circuit.  That is, the agency asserts

variously that, to be protected by attorney-client privilege, "*the* significant purpose" of a commu-

nication must be obtaining or providing legal advice, ECF No. 36-1 at 20 (emphasis added and

emphasis omitted), and that merely "*a* significant purpose" of the communication must be obtain-

ing or providing legal advice, *see* ECF No. 19-1 at 5 (emphasis added) (internal quotation marks

omitted).  It is a subtle, but meaningful, difference.  As the undersigned pointed out in *GW II*, "the

proper test is whether 'obtaining or providing legal advice [was] *a* primary purpose of the com-

munication, meaning one of the significant purposes of the communication.'"  342 F.R.D. at 179

(emphasis in original) (quoting *Kellogg, Brown & Root*, 756 F.3d at 760).  That is,

> [i]f one of the significant purposes of an internal investigation was to obtain or
> provide legal advice, the privilege will apply.  That is true regardless of whether an
> internal investigation was conducted pursuant to a company compliance program
> required by statute or regulation, or was otherwise conducted pursuant to company
> policy.

---

[45] Those are document nos. 240, 244, 266, 267.

*Kellogg, Brown & Root*, 756 F.3d at 760.  The FTC's formulation that "the significant purpose" of a communication must be legal advice comes perilously close to the "but for" test that the D.C. Circuit has rejected with respect to the attorney-client privilege.  *See GW II*, 342 F.R.D. at 179.

For its part, Match emphasizes that attempting to identify a communication's primary purpose "'can be an inherently impossible task' when the communications have 'overlapping purposes (one legal and one business, for example).'"  ECF No. 17-1 at 30 (quoting *Boehringer*, 892 F.3d at 1267).  That observation does not, however, supplant the rule that "communications made by and to [an] in-house lawyer with respect to business matters, management decisions or business advice are not protected by the [attorney-client] privilege."  *A.N.S.W.E.R. Coal. v. Jewell*, 292 F.R.D. 44, 48 (D.D.C. 2013) (alterations in original) (quoting *Minebea Co., Ltd. v. Papst*, 228 F.R.D. 13, 21, (D.D.C. 2005)).  Thus, although it may be difficult, where there is a challenge to a claim of attorney-client privilege over communications involving in-house counsel, the litigant claiming the privilege must still establish to the court's satisfaction that in-house counsel was not "'acting solely in his capacity as a business advisor' and the 'legal advice,' if any, 'is [not] merely incidental to business advice.'"[46]  *Boehringer Ingelheim*, 180 F. Supp. 3d at 17 (quoting *Neuder*, 194 F.R.D. at 292).

---

[46] It is worthwhile at this point to reiterate the differences between the requirements of attorney-client privilege and those of work product protection.  As noted, attorney-client privilege will protect a communication as long as one of its significant purposes was to obtain or provide legal advice.  *See, e.g.*, *Kellogg, Brown & Root*, 756 F.3d at 760. Material will be considered work product, on the other hand, only if it was "prepared or obtained *because of* the prospect of litigation."  *All Assets Held at Bank Julius Baer & Co.*, 315 F.R.D. at 108–09 (emphasis added) (quoting *Boehringer Ingelheim*, 778 F.3d at 149).  Although courts have recognized that the prospect of litigation need not be the sole purpose of such material, there is a restrictive caveat to that precept: the work product doctrine will not protect a document from disclosure if it "would have been created 'in substantially similar form' regardless of the [prospect of] litigation."  *Boehringer Ingelheim*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).  In this way, work product protection is "narrower" than attorney-client privilege.  *See, e.g.*, *id.*  Thus, it is not unusual for a court to find, as the undersigned does below, that material not protected as work product is attorney-client privileged.  *See, e.g.*, *GW II*, 342 F.R.D. at 181–83.  Here, there is no inconsistency in finding, for example, that Match personnel were simultaneously collecting information to obtain legal advice while also engaging in an investigation dealing with the public relations ramifications of the New York Times article that would have taken the same form even in the absence of potential litigation.  And the fact that Match has failed to "explain with reasonable particularity" why the documents

1.      Documents Created July 11–12, 2019

All the putative attorney client communications still at issue during the period of July 11–12, 2019, are part of an extended email thread including attorneys Sine, Teckman, and Kitchens, and non-attorneys Hobley (OkCupid Chief Marketing Officer), Seidman (Tinder CEO), Charytan (OkCupid CEO), Sacco (Match Group Vice President of Communications and Chief Communications Officer), Jacques (Tinder Vice President of Engineering and Chief Technology Officer), Ciesla (Tinder Senior Vice President of Finance & Analytics), Jenny Campbell (Tinder Chief Marketing Officer), Jenny McCabe (Tinder Chief Communications Officer), and Christina Marenson (Tinder Director of Corporate Communications).  Parts of that thread, which begins with the inquiry from the New York Times reporter, comprise document nos. 17, 19–20, 23–27, 54, 57, 60, 72, and 75.  As noted above, during that period, Match was concerned with crafting a response to the New York Times article to mitigate damage to its business.  *See* Section III.A.2.a.  *In camera* review of the documents shows, however, that these communications were also, at least in significant part, intended to provide information to in-house attorneys to enable them to render legal advice and to seek legal advice from in-house attorneys.  Indeed, some of the emails in the thread consist of legal advice.  Accordingly, document nos. 17, 19–20, 23–27, 54, 57, 60, 72, and 75 should be withheld in full as attorney-client privileged.  *See, e.g.*, *Boehringer Ingelheim*, 180 F. Supp. 3d at 33 ("[A]lthough the documents speak to both business and legal matters, the Court cannot say that legal advice . . . was not 'one of the significant purposes' of these communications." (quoting *Kellogg Brown & Root*, 756 F.3d at 758.

---

over which it claims work product protection "would have been prepared in a different form in the ordinary course of business," *id.* at 182 (quoting *GW I*, 2021 WL 7907064, at *5), has stymied its efforts to meet its burden.

2.      Documents Created July 13–27, 2019

As noted, this is the period between the publication of the New York Times article and the issuance of the cease-and-desist letter.  Match's claims of attorney-client privilege over 11 documents are still at issue.  *See* note 44, *supra*.  Some of those documents are attachments to emails—specifically, document nos. 111, 115–16, and 175.  Again, "attachments to privileged communications are not thereby automatically privileged.  Instead, the attachments must independently satisfy the requirements for the application of the [claimed] privilege."  *Boehringer-Ingelheim*, 180 F. Supp. 3d at 31–32 (internal citations omitted).  According to the September 2021 Privilege Log, document no. 111 was attached to a purportedly privileged email from Sacco to attorneys Kechida, Kerstens, and Sine; document nos. 115 and 116 were attached to a purportedly privileged Slack thread involving attorney Kerstens and non-attorney Aurelio, OkCupid's Director of Information Security; and document no. 175 was attached to a purportedly privileged Slack thread among attorneys Michel, Perez, and Kerstens.[47]  *See* ECF No. 36-20 at 13–14, 20.  Based on those representations and *in camera* review, each of those attachments appears to be communicating factual information related to the New York Times inquiry to enable in-house attorneys to provide legal advice.  They are therefore privileged.  Document no. 103 is a short email chain involving Hobley, Sacco, Yagan, and Match's Associate General Counsel Teckman; it, too, appears to provide information to enable the provision of legal advice.

Match describes document nos. 181 and 186 as emails regarding an "attorney-led" investigation in response to the allegations included in the New York Times article.  In actuality, the documents are merely meeting invitations without substantive content.  Such communications are

---

[47] The undersigned has not reviewed the emails to which these documents were attached.  The FTC did not challenge Match's claims of attorney-client privilege or work product protection over them.  The documents were therefore not submitted for *in camera* review.

not privileged.  *See, e.g.*, *Savignac v. Day*, No. 19-cv-2443, 2022 WL 1236114, at *1 (D.D.C. Apr. 14, 2022) (noting that communications about scheduling are not privileged); *see also, e.g.*, *City of Fort Collins v. Open Int'l, LLC*, No. 21-cv-02063, 2023 WL 2837914, at *5 (D. Colo. Feb. 21, 2023) (finding a Webex meeting invitation not protected by attorney-client privilege), *objections overruled*, 2023 WL 2583107 (D. Colo. Mar. 21, 2023); *AHF Cmty. Dev., LLC v. City of Dallas*, 258 F.R.D. 143, 147 (N.D. Tex. 2009) (finding communications "concern[ing] merely logistical matters" not protected by attorney-client privilege).

Document nos. 207 and 208 are email threads, portions of which discuss the cease-and-desist letter.  Those portions—communications from July 16, 2019, at 10:50 a.m.; July 18, 2019, at 9:18 a.m.; and July 18, 2019, at 9:20 a.m.—are attorney-client privileged.  The remainder are not.  The first communication in the thread, from July 15, 2019, at 10:22 p.m., is merely a non-substantive meeting invitation.  A later communication from attorney Setnick on July 18, 2019, at 11:19 a.m. concerns a press report and offers no legal advice; indeed, it appears to ask the non-attorney businesspeople on the thread for advice.  The follow-up emails are all among non-attorney businesspeople discussing a response to that press report.  Significantly, one of those follow-up emails asks a non-attorney to draft a response and indicates that the response will be reviewed not by any attorney, but by another non-attorney businessperson.  Those emails are not covered by attorney-client privilege.  Document nos. 228 and 229 begin with the same meeting invitation as document nos. 207 and 208.  That communication is not privileged.  The rest of the thread, which discusses the cease-and-desist letter, is privileged.

3. Documents Created August 2019 to February 2020

There are 4 challenged documents in this period, *see* note 45, *supra*, two of which are attachments.  Unlike the attachments discussed above, the emails to which the documents at issue

were attached have been lodged with chambers, thus providing some context.  Both the attachments—document nos. 240 and 244—are attorney-client privileged, provided to enable in-house counsel to render legal advice.

Document no. 266 is described on the September 2021 Privilege Log as Hunsberger's "[i]nternal notes and communication reflecting internal privileged content."  ECF No. 36-20 at 29.  It comprises a complaint from a customer, a note from Hunsberger, and a response to the complaint that indicates the customer viewed it on February 28, 2020.  The context indicates that the complaint was provided to in-house attorneys to enable them to render legal advice.  That and the intermediate note are attorney-client privileged.  The response, which was accessed by the customer, was not kept confidential; thus, any privilege over it was waived.  *See, e.g.*, *Permian Corp.*, 665 F.2d at 1219 (noting that voluntary disclosure waives the privilege).  Document no. 267 is a Slack thread from Hunsberger to Charyton and Lofthouse reporting on certain legal developments.  *See* ECF No. 36-20 at 29.  The communication discusses matters about which Hunsberger had sought and planned to seek legal advice.  It is attorney-client privileged.  *See AT&T Corp.*, 2003 WL 21212614, at *3 ("Communications between non-lawyer employees about matters which the parties intend to seek legal advice are likewise cloaked by attorney-client privilege.").

## C.    Redaction Dispute

Finally, the FTC objects to Match's proposal to redact material the company has identified as non-responsive in four documents (originally withheld as work product) that it has now agreed to produce, document nos. 32, 48, 196, and 209.  In compliance with the undersigned's order, *see* Minute Order (Jan. 19, 2024), Match has lodged with chambers electronic copies of those documents with the proposed redactions marked for *in camera* review.

Several courts have held that it is improper for a party to redact non-responsive material from otherwise relevant documents. *See, e.g.*, *Karnoski v. Trump*, No. C17-1297, 2020 WL 2736961, at *1 (W.D. Wash. Mar. 4, 2020) ("The Federal Rules of Evidence favor the *complete* production of non-privileged evidence if some portion of the evidence is deemed responsive."); *Doe 1 v. Nielsen*, No. 18-cv-2349, 2019 WL 2266622, at *3 (N.D. Cal. May 28, 2019) ("As a general matter, a document that is otherwise responsive to a discovery request must be produced as it is kept in the usual course of business and may not be altered to eliminate non-responsive information simply because the producing party believes the non-responsive information is not relevant to a claim or defense."); *Orion Power Midwest, L.P. v. Am. Coal Sales Co.*, No. 05-cv-555, 2008 WL 4462301, at *2 (W.D. Pa. Sept. 30, 2008) ("There is no express or implied support for the insertion of another step in the process (with its attendant expense and delay) in which a party would scrub responsive documents of non-responsive information.").  The general concern is that to allow such redaction would "permit the producing party to essentially unilaterally redact otherwise responsive discovery," *Karnoski*, 2020 WL 2736961, at *2, or material that would put relevant information in context, *see Al Thani v. Hanke*, No. 20 Civ. 4765, 2022 WL 1684271, at *2 (S.D.N.Y. May 26, 2022) ("'[I]t is a rare document that contains only relevant information' and 'irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information.'" (quoting *Toussie v. Allstate Ins. Co.*, Nos. 14 Civ. 2705, 15 Civ. 5235, 2017 WL 4773374, at *4 (E.D.N.Y. Oct. 20, 2017))); *see also Chabot v. Walgreens Boots All., Inc.*, No. 1:18-cv-2118, 2019 WL 13162432, at *2 (M.D. Pa. Aug. 16, 2019) ("Courts are hesitant to permit such redaction based on one party's position that such information is not relevant or responsive where that information appears in a document that otherwise contains relevant or responsive information."); *Engage Healthcare Commc'ns, LLC v. Intellisphere, LLC*,

No. 12-cv-787, 2017 WL 3624262, at *3–4 (D.N.J. Apr. 26, 2017) (stating, "The majority of the cases cited by the parties, as well as those independently located by the Special Master, clearly state that unilateral redactions based on one party's subjective view of relevancy are improper," and collecting cases), *report and recommendation adopted*, 2017 WL 3668391 (D.N.J. Aug. 23, 2017).

However, courts have allowed such redactions after *in camera* review.  *See, e.g.*, *Gates v. Rohm and Hass Co.*, No. 06-cv-1743, 2007 WL 295416, at *1 (E.D. Pa. Jan. 29, 2007) (approving redaction of irrelevant information after *in camera* review); *Beauchem v. Rockford Prods. Corp.*, No. 01 C 50134, 2002 WL 1870050, at *2 (N.D. Ill. Aug. 13, 2002) (same).  Here, given that the undersigned was already engaging in extensive *in camera* review of documents withheld by Match to determine disputes over attorney-client privilege and work product protection, it also permitted Match to present its proposed redactions for review.  Upon that review, the undersigned finds that the redacted material is neither relevant to the issues the FTC is investigating nor provides context for any information relevant to those issues and therefore recommends allowing Match to produce document nos. 32, 48, 196, and 209 with its proposed redactions.

## IV.   CONCLUSION

In its briefing, Match answers the FTC's complaints about the imprecision in the descriptions of the withheld documents on the September 2021 Privilege Log by arguing that its "bases for asserting privilege are clear on the face of the privilege log and the *entire* record."  ECF No. 17-1 at 25 (emphasis in original).  The "*entire* record" in this case runs to many hundreds, perhaps upward of a thousand, pages.  Additionally, Match produced hundreds of additional pages to the undersigned for *in camera* review.  And yet, the company has recently sought to shore up its claims

of attorney-client privilege and work product protection with even more.  The time for substantive submissions has passed.

A review of the documents *in camera* indicates that Match has an over-expansive view of attorney-client privilege and work product protection that was previewed in its meritless motion to seal the record in this case.  *See Match Grp. I*, 2023 WL 3181351, at *10–11 (rejecting Match's contention that the record in this case must be sealed to "protect attorney client communications and work product").  Its claims of protection extend even to communications that precedent clearly establishes are neither attorney-client privileged nor work product.  More, Match seems to have ignored that work product protection does not attach to documents that "would have been created in essentially similar form irrespective of the litigation," *McKinley*, 789 F. Supp. 2d at 90 (quoting *Fago,* 242 F.R.D. at 18), failing to adequately address that requirement in its submissions here.

In summary, having reviewed the briefing and completed *in camera* review, the undersigned makes the following **RECOMMENDATIONS** as to the challenged documents:

| Doc. # | Protected as Work Product? | Is Rule 26(b)(3)(A), (B) met? | Attorney-client privileged? | Recommendation |
|---|---|---|---|---|
| 1–15 | No | Yes | N/A | Produce |
| 17 | No | Yes | Yes | Withhold |
| 18 | No | Yes | N/A | Produce |
| 19 | No | Yes | Yes | Withhold |
| 20 | No | Yes | Yes | Withhold |
| 21 | No | Yes | N/A | Produce |
| 23 | No | Yes | Yes | Withhold |
| 24 | No | No | Yes | Withhold |
| 25 | No | Yes | Yes | Withhold |
| 26 | No | Yes | Yes | Withhold |
| 27 | No | Yes | Yes | Withhold |
| 39 | No | Yes | N/A | Produce |
| 50 | No | Yes | N/A | Produce |
| 51 | No | Yes | N/A | Produce |
| 52 | No | Yes | N/A | Produce |
| 54 | In part | In part | Yes | Withhold |
| 57 | In part | In part | Yes | Withhold |
| 60 | In part | In part | Yes | Withhold |

| 67 | No | Yes | N/A | Produce |
|---|---|---|---|---|
| 72 | In part | In part | Yes | Withhold |
| 73 | No | No | N/A | Produce |
| 75 | In part | In part | Yes | Withhold |
| 78 | No | No | N/A | Produce |
| 87 | No | Yes | N/A | Produce |
| 91 | No | Yes | N/A | Produce |
| 97 | Yes | No | N/A | Withhold |
| 103 | No | No | Yes | Withhold |
| 105 | No | No | N/A | Produce |
| 106 | No | No | N/A | Produce |
| 107 | No | No | N/A | Produce |
| 108 | No | No | N/A | Produce |
| 111 | No | No | Yes | Withhold |
| 115 | No | No | Yes | Withhold |
| 116 | No | No | Yes | Withhold |
| 117 | No | No | N/A | Produce |
| 156 | No | No | N/A | Produce |
| 165 | No | No | N/A | Produce |
| 175 | No | No | Yes | Withhold |
| 181 | No | No | No | Produce |
| 185 | No | No | N/A | Produce |
| 186 | No | No | No | Produce |
| 198 | No | No | N/A | Produce |
| 207 | In part | No | In part | Produce with identified redactions |
| 208 | In part | No | In part | Produce with identified redactions |
| 228 | In part | No | In part | Produce with identified redactions |
| 229 | In part | No | In part | Produce with identified redactions |
| 240 | No | No | Yes | Withhold |
| 244 | No | No | Yes | Withhold |
| 266 | N/A | N/A | In part | Produce with identified redactions |
| 267 | Yes | No | Yes | Withhold |

In addition, the undersigned further **RECOMMENDS** that Match be ordered to produce document nos. 32, 48, 196, and 209 with the redactions Match has proposed.

\*        \*        \*        \*        \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  March 12, 2024

                                                     _____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE